# Exhibit A



TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY that the photographic copy hereunto annexed is a true copy of an original heads of agreement dated 4th April 2007, I having carefully collated and compared the said copy with the said original and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this sixteenth day of March in the year two thousand and sixteen.





Bankside House  107 Leadenhall Street  London EC3A 4AF
Tel 020 7623 9477  Fax 020 7623 5428
E-mail notary@cheeswrights.co.uk
DX 627 / London City EC3  www.cheeswrights.co.uk



## APOSTILLE
(Convention de La Haye du 5 octobre 1961)

| | |
|---|---|
| **1. Country:** Pays/Pais | United Kingdom of Great Britain and Northern Ireland |

**This public document**
Le présent acte public / El presente documento público

| | |
|---|---|
| **2. Has been signed by** a été signé par ha sido firmado por | Edward Gardiner |
| **3. Acting in the capacity of** agissant en qualité de quien actúa en calidad de | Notary Public |
| **4. Bears the seal/stamp of** est revêtu du sceau / timbre de y está revestido del sello / timbre de | The Said Notary Public |

**Certified**
Attesté / Certificado

| | | |
|---|---|---|
| **5. at** à / en | London | **6. the** le / el día    17 March 2016 |
| **7. by** par / por | | Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs |
| **8. Number** sous no / bajo el número | | K907876 |
| **9. Seal / stamp:** Sceau / timbre: Sello / timbre: | | **10. Signature:**   Jeremy Crook Signature: Firma: |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK public official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country which is not party to the Hague Convention of 5th October 1961, it should be presented to the consular section of the mission representing that country.

*To verify this apostille go to www.verifyapostille.service.gov.uk*

HEADS OF AGREEMENT

("HoA")

THESE HEADS OF AGREEMENT are made on the 4th day of April 2007 ("the **Effective Date**")

between

THE KURDISTAN REGIONAL GOVERNMENT OF IRAQ ("KRG"), duly represented by the Minister of Natural Resources and the Prime Minister of Kurdistan.

and

DANA GAS PJSC of P.O. Box 2011, Sharjah, United Arab Emirates **("Dana")** duly represented by Mr. Rashid Saif Al-Jarwan, General Manager and Mr. Hamid Dhia Jafar, Executive Chairman.

The KRG and Dana are collectively referred to as **(the "Parties")**.

WHEREAS

A.   The KRG has entered into a Strategic Alliance Protocol ("SAP") dated 4th April 2007 with Dana and Crescent Petroleum Company International Limited ("**Crescent**") (Dana and Crescent are collectively herein referred to as the "**Companies**") whereby the Companies will carry out optimization of the development and utilization of natural gas resources in the Kurdistan Region of Iraq.

B.   The KRG wishes to appoint Dana to carry out certain works in the field of Khor Mor situated some 45 Km from Kirkuk and in the field of Chemchemal situated some 50 Km from Sulaimaniyah in the Kurdistan Region of Iraq. The work is urgently required to fulfill energy requirements in the Kurdistan Region of Iraq and in particular to provide urgent gas supplies for use at the power stations under construction at Erbil and Bazian, and thereby help to relieve the electrical power shortage affecting all the people of Iraq.

C.   The KRG has endorsed a federal draft Oil and Gas Law for Iraq that requires petroleum contracts issued by federal and regional entities, including by the KRG, to meet agreed commercial criteria, in addition to other relevant provisions pursuant to the KRG and the Constitution of Iraq.

D.   The KRG has endorsed the principles of a draft Revenue Sharing Law for Iraq that provides for all petroleum revenues, however derived, to be shared and distributed throughout Iraq in proportion to the whole of the population of Iraq.

E.   Dana, being a natural gas resource company does not normally enter into service-type agreements, but being suitably qualified and desirous of developing a strategic partnership with the KRG for development of gas resources , is willing to co-operate with the KRG by entering into these HoA. The KRG recognizes that work and services performed in the context of the perceived current legal and political circumstances in Iraq may render engagement of subcontractors for the performance of the Services problematic and which may add elements

of additional expense and difficulty, to the performance of the Services. The KRG accordingly undertakes to assist and accommodate Dana so far as possible, in so far as the terms and provisions of these HoA are concerned, in order to manage and ameliorate such risk.

F.    The KRG, desirous of rapid and optimal economic development of the petroleum gas resources of the Kurdistan Region of Iraq, gas-related industries, and job creation for the benefit of the people of Iraq and the Kurdistan Region of Iraq, has declared its intention to associate and contract with Dana Gas to take the lead in the development of the gas resources of the Kurdistan Region of Iraq, both for domestic gas utilization as a priority, as well as for export.

G.    These HoA set out the terms by which the Parties agree to perform certain services (the "**Services**") in respect of the Khor Mor and Chemchemal areas as further described below ("**the HoA Areas**") and simultaneously to negotiate terms of a Service Agreement (as legally permitted, the respective successor two risk-reward contracts envisaged herein in respect of the HoA Areas) for: (a) the initial Development and Production of Petroleum within the Khor Mor HoA Area, and transportation of gas, by pipeline from the Khor Mor HoA Area to the power stations at Erbil and Bazian; (b) appraise the additional deep oil reserves potential of the Khor Mor HoA Area; and (c) appraise the reserves and the development potential of the Chemchemal HOA Area, prior to full-scale development in accordance with good petroleum industry practice.

**NOW IT IS AGREED as follows:**

1.    Dana together with the KRG have identified the Khor Mor HoA Area as delineated in Annexure 1 ("**Khor Mor HoA Area**") in relation to which Dana has agreed to commence the initial Work Program and related activities for the Khor Mor Gas Utilization Plan as set out in Annexure 3 ("**Khor Mor Gas Utilization Plan**").

2.    Dana together with the KRG have identified the Chemchemal HoA Area within the Kurdistan Region of Iraq as delineated in Annexure 4 ("**Chemchemal HoA Area**") in relation to which Dana has agreed to commence the initial appraisal program and related activities as set out in Annexure 5 ("**Chemchemal Appraisal Program & Subsequent Development Program**").

3.    Dana has an LPG plant under construction which is scheduled for completion in July 2007 (ex-works US) and is willing to divert said LPG plant (which is destined for another project) for use in the Khor Mor Gas Utilisation Plan

4.    The Parties wish to enter into a detailed Service Agreement with a view to producing gas as soon as reasonably possible pursuant to the Khor Mor Gas Utilization Plan (it being understood that production is urgently required on a fast track basis  to supply power stations currently under construction in Erbil and Bazian, and to perform the Chemchemal Appraisal Program & Subsequent Development Program in accordance with the timetable forming part of the Chemchemal Appraisal Program & Subsequent Development Program set out in Annexure 5 . The KRG shall facilitate the co-ordination of Dana directly with the relevant governmental authorities and the power station owners/contractors to ensure seamless management and interface of the power stations with the Khor Mor Gas Utilization Plan.



5. The Service Agreement shall incorporate the Commercial Terms set out in Annexure 2 ("**Commercial Terms**") as well as applicable terms of these HoA. At any future date and as and when permitted by law, Dana in consultation with the KRG may, as circumstances permit pursuant to the provisions stipulated herein as and when permitted under law, whether before or after execution of the Service Agreement, in preference to continuing with the Service Agreement elect to substitute the arrangements as agreed herein, into the terms of two separate Risk-Reward Contracts ("**the RRC's**"): one in respect of Petroleum from the Khor Mor HoA Area, and the other in respect of Appraisal and Development within the Chemchemal HoA Area. In such event the terms of the said RRCs shall, in respect of the Khor Mor RRC, be along the lines of the model Production Sharing Contract the KRG may adopt in the future (albeit suitably adjusted to take account of the higher risks prevailing at the date hereof), and in respect of the Chemchemal RRC be based on the draft document attached in Annexure 7 ("**Chemchemal Draft RRC**") and otherwise as consistent with the model Production Sharing Contract KRG may generally adopt in the future. In any event and irrespective of the grant of any such contract, the Parties shall honour the terms of these HoA and any subsequent Service Agreement until such time as Dana has performed its obligations, and has been paid in full for the Services in accordance with the terms of these HoA.

6. Dana shall use its best efforts to utilize commercially and technically competent local companies for the construction work related to services under this HOA to be approved by KRG.

7. Until such time as the Parties have executed the Service Agreement and/or (as applicable) the RRC's, Dana shall implement the initial Work Programs of the Khor Mor Gas Utilization Plan and the Chemchemal Appraisal Program & Subsequent Development Program set out in Annexures 3 and 5, respectively to be subsequently followed by full development program on both HOA Areas as reasonably agreed by the Parties. These documents will be updated and revised from time to time by agreement between the Parties as new information is obtained by the Parties, and such revisions shall be incorporated into the respective documents to be annexed to the Service Agreement or the RRC's as applicable.

8. Until such time as the Service Agreement (and/or the RRC's as applicable) has been signed, the Parties agree that, in respect of the HoA Areas, the Commercial Terms shall apply to the Services to be performed pursuant to these HoA.

9. The KRG hereby grants Dana the exclusive right during the term of these HoA and that of the Service Agreement (and/or the RRC's as applicable) to develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area.

9. The Parties undertake to keep all data and information relating to these HoA ("**Confidential Information**") confidential during the entire term of these HoA and for a period of five years thereafter. The Parties further undertake each to the other not to divulge or disclose such data or information to third parties without the specific written consent of the other Party, such consent not to be unreasonably withheld or delayed. The foregoing confidentiality obligation shall not apply to information or data in the public domain, or which is known to the Receiving Party at the date of disclosure; nor shall it apply with regard to any public announcements or press releases required to be made under any applicable law, rules or regulations, by a Government agency having jurisdiction over Dana; or by a court order; or pursuant to the regulations of a recognised stock exchange on which the shares of Dana or its Affiliate are listed.




Notwithstanding the foregoing a Party may disclose Confidential Information to:

(a)    Affiliated and Associated Companies;

(b)    employees, officers and directors of each entity constituting Dana and their respective Affiliated Companies;

(c)    consultants or agents retained by any entity constituting Dana for the purpose of analysing or evaluating information or data;

(d)    banks or financial institutions retained by any entity constituting Dana with a view to financing Petroleum Operations, including any professional consultants retained by such bank or financial institution;

(e)    bona fide prospective assignees of a participating interest under these HoA; and

(f)    any other person or entity, upon the prior written approval of the non-disclosing Party.

For these purposes **"Affiliate"** means any company or legal entity which (i) controls a Party, or (ii) is controlled by a Party, or (iii) is controlled by a company or legal entity which controls a Party. "Control" means the right to exercise, either directly or indirectly, more than fifty percent (50%) of the voting rights in such company or legal entity; **"Associated Company"** means a company with which Dana has a cooperation or similar agreement.

10.    The KRG hereby warrants to Dana that all necessary KRG, other Governmental and regulatory approvals required for the implementation of these HoA and the Service Agreement shall be obtained when and if required.

11.    To be valid, any correspondence, written communication or notice between the Parties shall be in writing and may be delivered by hand or transmitted by electronic mail or fax, at sender's option and expense, and (unless delivered by hand or acknowledged or otherwise agreed by the Receiving Party) shall be confirmed by registered mail with acknowledgement of receipt and shall become effective once received by the first of these means of transmission. These communications shall be addressed as follows:

**Dana Gas PJSC**
PO Box 2011, Sharjah, United Arab Emirates
Attention: Mr. Rashid Al-Jarwan, General Manager
E-mail address: mail@danagas.ae

**The Kurdistan Regional Government of Iraq**
Minister of Natural Resources,
Council of Ministers,
Erbil
Kurdistan,
Iraq
email: asnti.hawrami@krg.org

The above address and/or designated representative of any of the Parties may be changed on giving (10) days prior notice to the other Party.

12.    The Parties intend that these HoA shall continue to govern the relationship between the Parties until execution of the Service Agreement, and/or the RRC's (as applicable). In the event the Service Agreement or the RRC's is/are not executed before 30th June 2007, Dana may at its discretion suspend the Services under these HoA until such time as the Service Agreement or

RRC has been executed in respect of the HoA Areas. Under such circumstances, the KRG shall reimburse Dana for all Expenses (comprising direct and indirect costs, including any costs for canceling/suspending various suppliers' and subcontractors' agreements) within 3 months of the date of such suspension.

13. The Parties shall make their best efforts to negotiate the terms of the Service Agreement and/or the RRC's consistent with the terms of these HoA as soon as possible. Until and unless such Service Agreement and/or the RRC's is/are agreed and entered into by the Parties, the terms of these HoA shall continue to be legally binding upon the Parties.

14. The KRG and Dana undertake to sign such documents as may reasonably be required to put into full force and effect the intention and provisions of these HoA.

15. The HoA/Service Agreement/ RRC's (as applicable), including any Dispute arising in relation thereto, shall be governed by English Law (except any rule of English Law which would refer the matter to another jurisdiction), together with any relevant rules, customs and practices of international law, as well as by principles and practice generally accepted in the international petroleum industry.

16. For the purpose of this Article, **"Dispute"** shall mean any dispute, controversy or claim (of any and every kind or type, whether based on contract, tort, statute, regulation or otherwise) arising out of, relating to, or connected with these HoA, the Service Agreement or the RRC's and the operations carried out under them, including without limitation any dispute as the construction, existence, validity, interpretation, enforceability, breach or termination of these HoA, which arises between the Parties (or between any one or more entities constituting Dana and the KRG).

A Party who desires to submit a Dispute for resolution shall commence the dispute resolution process by providing the other parties to the Dispute written notice of the Dispute (**"Notice of Dispute"**). The Notice of Dispute shall identify the parties to the Dispute, shall contain a brief statement of the nature of the Dispute and the relief requested and shall request negotiations among Senior Representatives.

If the Dispute cannot be resolved by negotiation within sixty (60) days after the date of the receipt by each party to the Dispute of the Notice of Dispute any party to the Dispute may seek settlement of the dispute by mediation in accordance with the London Court of International Arbitration (LCIA) Mediation Procedure, which Procedure shall be deemed to be incorporated by reference into this Article, and the parties to such Dispute shall submit to such mediation procedure:

(a) If the Dispute is not settled by mediation within sixty (60) days of the appointment of the mediator, or such further period as the parties to the Dispute may otherwise agree in writing, any party to the Dispute may refer the Dispute to, and seek final resolution by, arbitration under the LCIA Rules, which Rules shall be deemed to be incorporated by reference into this Article.

(b) Any arbitration shall be conducted by three (3) arbitrators.

(c) The KRG and Dana shall each nominate one (1) arbitrator.




(d)     In any event, the two arbitrators so nominated shall, in good faith, use all reasonable endeavours to agree on the nomination of the third arbitrator, who will chair the arbitral tribunal. In case of failure to appoint an arbitrator or to agree on the appointment of the third arbitrator, Rules of the LCIA shall apply.

(e)     Arbitration shall take place in London, England. The language to be used in any prior negotiation, mediation and in the arbitration shall be English. During the arbitration procedure and until the arbitral decision, neither entity shall act in a manner that may affect the rights of the other Party under these HoA/Service Agreement. The arbitral award may include an award of specific performance and may be enforced by any court of competent jurisdiction, including the Kurdistan Region. Any award shall be expressed in US Dollars.

(f)     The Parties agree that the arbitral award shall be final and not subject to any appeal.

17      The KRG hereby undertakes to Dana that it will, pursuant to the provisions of the Federal Oil and Gas Law of Iraq when adopted, and as and when permitted by said Law, enter into appropriate arrangements for the joint administration between the KRG and the Central Government of Iraq of these HoA and any subsequent Service Agreement and/or RRC and undertakes to ensure that these HoA and any subsequent Service Agreement and/or RRC are adopted by any incoming governmental authority on substantially the same terms. The KRG shall hold Dana harmless from the result of any material change suffered by Dana as a result of KRG failure or inability to honour this obligation.

18      Dana shall make efforts to ensure that appropriate measures are taken to train Iraqi personnel and to transfer know how and technology, through the judicious appointment of Iraqi personnel who shall be provided adequate access to relevant parts of the Services. The KRG shall appoint a representative to monitor performance of the HoA, to witness transparent procurement of the Services and to carry out instructions of the KRG Monitoring Committee for the Services. The Parties shall co-operate together in good faith.

19      No delay, default, breach or omission of Dana in the execution of any of its obligations under these HoA shall be considered a failure to perform these HoA or be the subject of a dispute or give rise to a claim for damages if such delay, default, breach or omission is due to Force Majeure. In the event of Force Majeure Dana shall promptly notify the KRG in writing and take all reasonably appropriate measures to perform its contractual obligations to the extent reasonably and economically possible. The time resulting from any such delay or curtailment in the execution of obligations, increased by the time necessary to suspend the Services or repair any damage resulting from or occurred during such delay or curtailment, shall be added to any time period provided under these HoA and the Service Agreement/RRC (as applicable). The Parties shall meet as soon as possible after the notification of Force Majeure with a view to using reasonable endeavours to mitigate the effects of such delay or curtailment thereof. If an obligation is suspended by Force Majeure for more than two years, Dana may elect to terminate these HoA/Service Agreement/RRC's (as applicable) without having any further obligations or interest in the HoA Area in respect of which Force Majeure was declared.

20      For the purpose of these HoA/Service Agreement/RRCs (as applicable), Force Majeure means any occurrence beyond the reasonable control of either Party which hinders, delays or prevents one of them from performance of all or part of its obligations under the HoA/Service Agreement/RRC's (as applicable) or renders them substantially more onerous than those

obligations Dana originally and reasonably anticipated.  Such events shall include but not be limited to the following:

(a)     war, whether declared or not, civil war, insurrection, riots, civil commotion, any other hostile acts, whether internal or external or any event leading Dana to believe that the safety of personnel or the security of the petroleum operations are in jeopardy;

(b)     action or inaction on the part of the KRG affecting a HoA Area;

(c)     strikes or other labour conflicts;

(d)     accidents or blowouts, pipeline rupture, explosions;

(e)     quarantine restrictions or epidemics;

(f)     any act, event, happening or occurrence due to natural causes, in particular floods, storms, cyclones, fires, lightning, or earthquakes;

(g)     environmental restrictions, which the KRG has not notified to Dana prior to the date of these HoA; and

(h)     acts or orders of any Governmental authority, KRG or of any applicable legislative authority in Iraq, of general application.

Further, if any failure to comply with the provisions of this HoA or the Service Agreement is occasioned by any action or inaction or order of any governmental authority, and Dana is performing the Services in accordance with generally accepted international petroleum industry practice in the HoA Area and is making reasonable efforts to comply with such Law, act or order, the occurrence shall be deemed beyond the reasonable control of Dana.

The intention of the Parties is that Force Majeure shall receive the interpretation that complies most with generally accepted principles and practice prevailing in the international petroleum industry. Force Majeure affecting an Affiliated Company or subcontractor shall be deemed Force Majeure affecting such entity constituting Dana, if the consequence of such Force Majeure prevents the performance of any of the Dana's obligations under these HoA/Service Agreement/RRCs (as applicable);

No Party may rely upon a defense of Force Majeure to the extent that it or a company or entity controlled by it has willfully created the occurrence or has otherwise by its action or inaction substantially contributed to the occurrence which occurrence would have been avoided by the exercise of due diligence.

The KRG shall not itself declare or rely upon Force Majeure as a defense to claim from Dana to the extent that the claim of Dana results from any action or any inaction on the part of the KRG (or by any instrumentality of any relevant governmental authority) which results in Dana suffering damage or loss.

The KRG also waives any right to a defense of lack of capacity, illegality arising as a result of any Law or the introduction of any new Law having a direct or indirect impact on the Services.

During the period of suspension arising out of Force Majeure (which period shall continue unless these HoA or the service Agreement is terminated by Dana); all costs and expenses incurred by Dana as a result of suspension including demobilization expenses, any suspension activities and remobilization costs including costs of financing and refinancing shall (together with interest on

such costs and expenses at Libor plus 2%) be recoverable as Expenses on resumption of the Services

21 The KRG will make its best efforts to ensure that these HoA and any subsequent Service Agreement/RRCs are adopted by any authority on substantially the same terms. The KRG shall hold Dana harmless from the result of any material change to these HOA arising from such Referendum.

22 These HOA are subject to and conditional upon Dana notifying the KRG that these HOA have been approved by the Board of Directors of Dana. The approval of such Board of Directors shall not be assumed to have been obtained by virtue of the execution of these HOA by any officer of Dana who might (but for this provision) be assumed to have been acting with the authority of the Board.

For and on behalf of

THE KURDISTAN REGIONAL GOVERNMENT OF IRAQ

By: _____        By: _____

Name:  Dr.Ashti Hawrami          Name: Nechirvan Barzani

Title:    Minister of Natural Resources     Title: Prime Minister of the Kurdistan Regional Government

For and on behalf of
DANA GAS PJSC

By: _____        By: _____

Name:  Duncan Nightingale for and behalf    Name: Hamid Dhia Jafar
of General Manager Rashid Al Jarwan

Title: Executive Chairman

Annexure 1
HoA Area – Khor Mor

The area of the Khor Mhor field is enclosed within a 6 sided rectangular block represented by the following points: A,B,C,D,E and F with the following UTM co-ordinates:

| Point | Easting | Northing |
|-------|---------|----------|
| A | 474,500 | 3,890,000 |
| B | 476,000 | 3,894,500 |
| C | 485,000 | 3,891,000 |
| D | 493,000 | 3,881,000 |
| E | 490,000 | 3,878,000 |
| F | 481,500 | 3,887,000 |

## Annexure 2
### Key Commercial Terms of the Service Agreement

- The KRG shall pay Dana in United States Dollars for the Services on the basis set out in the Accounting Procedure and in these HoA or in the Service Agreement (as applicable);

- The KRG shall provide a guarantee in a form acceptable to Dana for its payment obligations for the Services. KRG shall: (i) allow Dana to market and lift and export all condensates from the Khor Mor HoA Area, free from all taxes, imposts, and the like; (ii) allow Dana to market and lift and export all of the production of LPG's from the Khor Mor HoA Area; and (iii) allow Dana to account for and retain the proceeds of sales of such LPG, condensates ; referred to as **"Revenues"** to firstly, pay for the Expenses, Operating Costs and Remuneration Fee (defined below) and secondly for the electricity tariff to be paid to the Independent Power Producer (IPP) at the agreed electricity tariff between the KRG and the IPP.

- Dana  shall be entitled to take title and market any " Excess Gas" on an optimised arms-length commercial basis, with first priority being given to local industries, and then (if available in sufficient quantities) for export.  " Excess Gas" shall mean any gas in excess of the specification gas required to be supplied by Dana to the IPP, on behalf of the KRG, free of charge. Any  revenue from such sale of Excess Gas , after reimbursing Dana pursuant to its entitlements under the HOA and/or Service Agreement (as applicable) , shall be for the account of KRG.

- The KRG shall procure that all Gas produced from the Khor Mor HoA Area (excluding Gas required for Petroleum Operations) is processed by the Plant to be built by Dana as part of the Services. The title to the petroleum liquid products shall pass to Dana at the point of processing.

- Dana undertakes that it shall make reasonable efforts to obtain the best arms-length price reasonably possible for the LPG's and Condensates and Excess Gas in accordance with generally accepted petroleum industry practices but taking into account the location and availability of infrastructure.

- KRG may elect that Dana not market and sell the LPG's and instead sell its LPG's to the KRG at the international FOB Med market price and shall pay for such sales within 30 days from the month ends as quoted by Platts Oilgram Report or similar journals.

- In the event Dana is unable to export and market the LPG's, Condensates by any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control Dana  then the KRG shall purchase and lift ( or arrange for the lifting by the domestic companies/users) and  pay for the liquid petroleum products at international FOB Med market prices as quoted by Platts Oilgram Report or similar journals within 30 days from the month ends;

- In the event Dana is unable to market locally or export Excess Gas by any act or omission of government (including foreign neighbouring governments) and/or for

political reasons beyond the control Dana then the KRG shall: (a) allow any Excess Gas to be re-injected into the field (by adding suitable compression); and (b) permit any Excess Gas to be flared on a short-term temporary basis.

- Khor Mor Services shall include all operations conducted by Dana during the construction phase of the Khor Mor project, in accordance with the Khor Mor Gas Utilization Plan. Such construction phase to end when Services are complete as per the Khor Mor Gas Utilization Plan and gas production commenced ("**First Gas**").

- "**Expenses**" means all expenditure incurred by Dana pursuant to these HoA including those related to the Chemchemal Appraisal Program & Subsequent Development Program and the Khor Mor Gas Utilization Plan and all Services and work performed during the construction phase, including financing costs and any other expenditures (such as head office overhead, costs of security, costs or the equivalent fair market costs of insurance against terrorism and sabotage and other such risks) as determined in accordance with the Accounting Procedure. For the avoidance of doubt, Expenses include: (a) all Services and work performed during the construction phase related to the Chemchemal Appraisal Program and the Khor Mor Gas Utilization Plan; and (b) all Services and work performed relating to production and operation of the Khor Mor field prior to First Gas.

- Title to property purchased or installed by Dana shall reside with Dana until recovery of Expenses, Operating Costs and Remuneration Fee.

- Operating Activities commencing at First Gas in respect of the Khor Mor Gas Utilization Plan shall be described in an Operating Agreement governing the servicing, maintenance and operation of all facilities, including production, processing, transportation, storage and handling facilities.

- In addition to reimbursement of the Expenses and Operating Costs, Dana shall be entitled to a remuneration fee that provides Dana with an IRR of (18%) ("**Remuneration Fee**") on funds incurred for the Expenses, Operating Costs as per the Accounting Procedure. The Remuneration Fee, however, in no event shall be less than ten percent (10%) of the Aggregate Revenues throughout the duration of the Service Agreement.

- Dana shall perform services as per the Khor Mor Gas Utilization Plan through the construction phase and thereafter during production/operating activities until Dana has recovered its Expenses and Remuneration Fee in respect of the Services.

- Expenses and Operating Costs in respect of Operating Activities incurred by Dana and Remuneration Fee shall be recovered from the Revenues derived from the sales of condensates or LPG's extracted from Natural Gas from the Khor Mor HOA Area, commencing on the date of First Gas, as per the Accounting Procedure

- Land and water reasonably required by Dana for the purpose of Works to be acquired by the KRG for benefit of Dana. The KRG shall provide other facilities/rights required in a timely manner to implement the Chemchemal Appraisal Program & Subsequent Development Program and the Khor Mor Gas Utilization Plan;

- The KRG shall give Dana access, where possible, to copies of all relevant technical data relating to the HoA Areas;

- Dana to carry out its activities in compliance with Iraqi laws and laws of the Kurdistan Region of Iraq;

- The KRG shall secure all necessary governmental approvals, licenses and permits for project implementation, including from the Iraqi central government. In addition, the KRG shall secure all necessary export and import permits and licenses for Dana's use, including from neighbouring countries, if required, on a government-to-government basis.

- The KRG shall not take any discriminatory action (or allow any discriminatory action to be taken) which adversely affects Dana's obligations and rights;

- Dana shall provide all managerial services, supervision, labour, materials and equipment for the performance of the Services, and to procure all funds necessary to carry out and complete the Construction Services;

- Dana to submit to the KRG for its review and approval, *inter alia*, the details of the following items: Work Program and Budget; Monthly Reports , Contracting and Procurement Plans; Chart of Accounts and Accounting Procedure; and Project Execution Plan including QA and HSE Plans;

- The KRG waives on its own behalf and that of the KRG any claim to immunity for itself and assets;

- Dana shall maintain insurance coverage required including coverage for third party liability, terrorism, sabotage, etc. in an amount appropriate to the risk, the cost of which shall be recoverable as Expenses. Dana may elect to self insure certain risks in which event Dana shall be entitled to recover as Expenses an amount equivalent to 95% of the insurance premium that would have been paid to a third party bona fide insurance company;

- The Parties shall indemnify and hold each other harmless from all loss or damage, including injury or death, suffered by third parties or their respective representative(s), officers, personnel or agents as determined by law;

- Dana shall indemnify the KRG from any and all claims for loss or damage suffered by third parties as a result of the Services carried out by Dana and/or its subcontractor(s);

- Either Party may terminate the HoA on the grounds of a breach by notice in writing to the other Party provided a 60 day rectification period has first been given;

- Consequential or indirect losses shall be excluded from liabilities of Dana;

- No assignment by either Party without approval of the other, such approval not to be unreasonably withheld or delayed. Assignment by Dana to an Affiliated or Associated Company is permitted without prior approval of the KRG

- No liability of Dana if default, breach or omission is due to Force Majeure;

- Detailed Accounting Procedures applicable to work program and budget shall be developed in accordance with the key principles set out in Annexure 6;

- Any excess or deficit in the aggregate amount of revenues in US Dollars derived from sales of condensates and LPG's and Excess Gas, if any ("Aggregate Revenues") that is more or less (as the case may be) than the aggregate amount of: (i) Expenses; (ii) Operating Costs; and (iii) Remuneration Fee; (iv) electricity tariff to IPP, shall be for the account of the KRG, payable by the concerned Party to the other within 60 days from the end of the month in which the obligation to make such payment occurred.

- The term of these HOA or any successor agreement(s) thereto shall be for a duration to be agreed by the Parties but in any event shall not be less than the maximum duration of gas supply to any IPP or the duration of RRC's normally applicable to this type of agreement, whichever is greater.

Annexure 3
The Khor Mor Gas Utilization Plan

## 1- Introduction

The Khor Mor field is a large anticline situated along the Kirkuk structure to the South East, some 45 kms from Kirkuk town. The structure is approximately 35 kms long by 4 kms wide rather smaller than Chemchemal, but having some 30% more reserves and clearly more prolific.

Khor Mor field was discovered in 1929, and two appraisal wells were drilled in 1954, and 1980. It was one of the five fields that were earmarked by the Iraqi KRG in the mid nineties of the last century as a source of gas for export to Turkey. The plan called for the development of the field in two stages: An initial stage of 50 MMscf/d, and a final stage of 200 MMscf/d. The gas was to be partly processed on site and transported as a single phase fluid (or, alternatively, as a two-phase fluid) to a new processing plant to be built in Beiji.

Khor Mor has been partly developed and put on early production. Five development wells were drilled during the period July 1989 to August 1990, and the field was connected to Jambur degassing station for gas processing, so as to partially substitute for the production of Dome gas from Jambur field. An international tender was issued by SCOP in 2005 for further development of this Field, but no information is available on the outcome.

## 2- Wells

Discovery well KM-1, which was drilled in 1929, proved the existence of hydrocarbons in the Jeribe Tertiary reservoir. The first appraisal well KM-2 which was drilled in 1953 down to Jaddala formation, flowed sweet gas and condensates to surface from the Jeribe reservoir. The field however was not properly appraised until 1980, when well KM-3 was drilled down to the Kometan formation (Upper Cretaceous). The well produced sweet gas from Euphrares, Askend, and Ibrahim (Tertiary resevoirs), and sour gas from the Kometan.

The five development wells drilled in 1989-1990 were completed in the Teretiary resevoirs, and flowed gas at rates of 23 MMscf/d to 61 MMscf/d as shown in the following table.

| Well No. | Total Depth (Meters) | Formation | Current Status | Production Rate MMscf/day |
|---|---|---|---|---|
| KM-1 | 1990.5 | Jeribe | Abandoned | – |
| KM-2 | 1623.5 | Jaddala | Plugged | – |
| KM-3 | 2965 | Kometan | Suspended | 25 |
| KM-4 | 1350 | Euphrates | Producer | 34.7 |
| KM-5 | 1412 | Euphrates | Producer | 57 |
| KM-6 | 1340 | Euphrates | Producer | 31.2 |
| KM-7 | 1491 | Bajwan | Producer | 23 |



| KM -8 | 1406 | Jeribe | Producer | 61 | |

Based on the above tests, wells KM 4 – KM 8 appear capable of initially delivering the required 200 MMscf/day: 100 MMscf/dy to each power station. However, detailed test data are not available and therefore the sustainability of these rates cannot be confirmed. It is therefore proposed that the plans include at least two additional wells to improve well distribution and create a more balanced and sustainable offtake from the reservoir.

## 3- Gas Reserves

The gas in place and gas reserve estimates of the Khor Mor reservoirs have been reported with differing values, ranging from 1.4 to 2.8 Tcf. The following table represents one such estimate for the Tertiary gas reservoirs:

| Resevoir | Average Depth (Meters BSL) | Gas in Place (Bcf) | Reserves (Bcf) |
|---|---|---|---|
| Jeribe | 1200 | 64.8 | 40.8 |
| Euphrates | 1225 | 773.7 | 487.4 |
| Askend | 1275 | 1353.9 | 853 |
| Ibrahim | 1635 | 10.5 | 6.6 |
| Total | | 2202.9 | 1387.8 |

The presence of an oil rim, bearing some 206 million barrels has also been postulated and it is proposed to drill an exploration well (with full coring, wire line logging, and testing) and target the cretaceous reservoir to assess whether oil is present in commercial quantities.

Higher field gas reserves, of 2.33 – 2.78 Tcf were reported by Ghadhban & Fathi, in an international conference in year 2000, based on a technical feasibility study conducted by the Iraqi-Turkish team related to the gas export plan to Turkey.

## 4- Reservoir Pressure

All tertiary reservoirs seem to be in pressure communication, as shown by the pressure depth plot made from the following Amerada pressure measurements in the different wells:

| Well No. | Date | BHCIP | Depth (mBSL) | Comment |
|---|---|---|---|---|
| KM-1 | 3/1/1954 | 3175 | 1450.1 | Not accurate |
| KM-2 | 19/8/1953 | 2873.4 | 859.4 | Pr. Survey |
| | | 2918 | 1000.9 | |
| | | 2937.5 | 1061.8 | |
| | | 2985 | 1153.3 | |
| KM-3 | 12/4/1980 | 3064 | 1310.5 | Not accurate (MFE) |
| | 18/4/1980 | 3120 | 1424.5 | Not accurate (MFE) |
| | 26/8/1989 | 3001 | 1286.4 | Pr. Buid up |
| KM-4 | 27/9/1989 | 2855 | 810.73 | Pr. Buid up |
| KM-6 | 11/4/1990 | 2866 | 814 | Pr. Buid up |

| KM-7 | 16/6/1990 | 2857 | 825.1 | Pr. Buid up |
| KM-8 | 30/8/1990 | 2892 | 881 | Pr. Buid up |

The original reservoir pressure is estimated to be about 3000 psig at 1260 meters subsea depth.

## 5- Surface Facilities

### a- Overview

It is not known what existing facilities are already installed at Khor Mor and this will need to be ascertained before the design of the facilities can be finalized. Nevertheless, it is intended that the existing wellheads on the flanks will be connected to a central manifold by means of infield surface flow lines. High pressure gas separation facilities will be installed at the collection point to condition the Gas (both water and hydrocarbon dewpoint) so that the Gas is suitable for transporting by pipeline and for use in the power stations.

The Gas will be dehydrated by the use of molecular sieve facilities to lower the water content so that no free water can form in the chilling section of the LPG plant. The Gas will be further processed in a packaged LPG plant which will not only achieve a low hydrocarbon dewpoint (to meet the Gas specification requirements of the turbine manufacturer at the power stations), but also maximise the production of high value liquid products (LPG's and condensate). A 150 MMscfd liquids recovery expander plant (after appropriate modifications) that is currently being built by a US manufacturer has recently become available and will be ready for shipment from the US in July 2007. The plant includes: inlet separation/filtration, mol sieve dehydration, licensed SCORE liquids recovery plant, depropaniser, debutanizer, product pumps, hot oil system, flare system, fuel gas system, instrument air system, drains system, chemical storage and 9500 HP of residue gas compression. This plant will require some modifications (larger depropaniser and debutanizer columns) to handle the higher liquid loads but such columns can be constructed readily at the US suppliers newly opened facilities in the UAE. Consequently, the LPG plant could be installed and ready for operation by the end of 2007.

Any increase in gas processing capacity beyond the 150 MMscfd shall be provided by the installation of additional gas processing facilities, as mutually agreed by KRG and Dana.

The condensate outlet from the high pressure separator together with the condensate from the LPG plant will be stablised by means of a low pressure separator and a degassing tank and stored in a suitably sized tank. The condensate will be either: (a) trucked or piped to existing facilities at Kirkuk (or elsewhere if feasible), for commingling and export sales utilizing the existing export pipelines; or (b) processed by means of a small topping plant (availability of second-hand plants are being investigated) for converting to finished products that can be sold into the domestic market.

The LPG's will be stored in pressurized spheres and transferred either by truck to existing LPG bottling plants or to new LPG bottling plants that are likely to be established adjacent to the LPG plant by the existing domestic marketing companies.

## b- Pipelines

The Gas from Khor Mor is destined for use in the power stations at Erbil and Bazian. It is proposed to route the pipeline from Khor Mor to Chemchemal so that Gas from the Chemchemal field can be subsequently combined with the Khor Mor Gas. The distances to Erbil and Bazian have been estimated to be 145 Kms and 65 Kms, respectively. A preliminary pipeline route has been selected, however, such a route can only be confirmed once surveys have been carried out.

Preliminary hydraulic calculations, based upon an inlet pressure of around 1,000 psig and a required pressure of circa 500 psig at the power station (such pressure depends upon the turbine manufacturer selected) provides the following results:

- a 20" inch diameter pipeline is required to deliver the 200 MMscf/day of gas to Chemchemal, some 50 Kms North of Khor Mor,
- a 12" inch diameter pipeline is required to deliver 100 MMscf/day of gas to Bazian power station, some 15 kms from Chemchemal and
- a 20" inch diameter pipelines is required to deliver the 100 MMscf/day of gas to Erbil power station, some 95 kms from Chemchemal.

It is suggested that slightly larger pipelines are installed, together with thicker wall thickness to provide for future expansion capacity. The nominal increase in costs for the larger and thicker wall pipes provides considerable growth potential to supply the expanding needs of Erbil, Sulaimaniyah and other neighbouring cities, villages, and industrial localities. However, such decisions require input from KRG and so the selection of the pipe size will be taken with the approval of the KRG during the initial engineering stages.

## 6- Timing

The timetable for such a project is typically 18 to 20 months; the key long lead item is the LPG plant. However, because the LPG plant is available from the US in July 2007 the timetable may be reduced to circa 9 months, depending upon the deliveries obtained for pipe materials, which has now become a critical path activity for the Project. However, further definition of deliveries for both the pipe materials and the larger columns are required from the suppliers before a detailed project schedule can be prepared to confirm that such timings are achievable. Nevertheless the timings given below are based upon the above assumptions and are given in months after unconditional award of the HoA.

| | |
|---|---|
| Month 0 | Place order for available LPG plant outlined above and source shortest deliveries for pipe and valves. |
| Month 1 | Perform process and engineering related studies to design new columns and surface facilities equipment and select pipe size. Carry out preliminary survey to ascertain pipe quantum. |
| Month 2 | Place orders for materials for pipelines, separators, columns, storage tanks, valves and long lead facilities. Perform detailed route survey. |
| Month 3 | Finalise detailed engineering and place remaining equipment and bulk orders. |
| Month 4-5 | Invite tenders for pipeline construction and award construction contract. Ship LPG plant from US to nearest port in Turkey. |



| Month 5-6 | Prepare and level site and transport LPG plant to site by road from Turkey port. |
| Month 6-7 | Deliver pipes, manifold, separator, columns, and valves to site and install LPG plant and related surface facilities. |
| Month 7-9 | Install export pipeline, separation, and condensate storage tanks. |
| Month 9-10 | Test and pre-commission LPG plant and deliver gas to power stations. |

The activities required to achieve the above timings are shown in the attached schedule.

## 7· Costs

The following preliminary (very rough) cost estimates have been prepared and include US$ 50 million contingency.  Further definition (pipe size and feedback/cost from the suppliers and the KRG and the findings of a site/route survey) is required before these costs can be firmed up

|  | US$ million |
|---|---|
| Infield pipelines | 15 |
| Major Pipelines | 110 |
| Gas Processing Facilities | 100 |
| Hookup testing and commissioning | 10 |
| Additional gas wells | 15 |
| Reservoir studies and seismic | 10 |
| Oil exploration well & studies | 15 |
| Security and Work Safety | 15 |
| Other (Logistics) | 20 |
| Total cost | 310 |
| | |
| Contingency | 50 |
| KRG Capacity Building Support* | 10 |
| | |
| Grand total | 370 |

This table and the estimated costs are indicative only and provide a best estimate given the current state of knowledge at the date hereof. Dana shall work with the KRG to reduce and eliminate some of these costs where possible (such as infield pipelines if such pipelines are already installed), and to further define others, with the result that some items may be decreased or eliminated and others perhaps increased.

* KRG Capacity Building Support is payable as $ 1 million per calender month starting 30 days from the Effective Date.

Annexure 4
Chemchemal HoA Area

| Code | Easting | Northing | Longitude | Latitude |
|------|---------|----------|-----------|----------|
| A | 444 064 | 3975 253 | 44 22 48 | 35 55 12 |
| B | 455 319 | 3975 189 | 44 30 17 | 35 55 12 |
| C | 475 138 | 3956 779 | 44 43 30 | 35 45 17 |
| D | 483 608 | 3949 365 | 44 49 08 | 35 41 17 |
| E | 491 608 | 3942 533 | 44 54 26 | 35 37 36 |
| F | 504 326 | 3924 784 | 45 02 52 | 35 28 00 |
| G | 488 339 | 3916 338 | 44 52 18 | 35 23 25 |
| H | 468 939 | 3944 949 | 44 39 25 | 35 38 52 |
| I | 466 507 | 3944 941 | 44 37 48 | 35 38 52 |
| J | 434 208 | 3962 715 | 44 16 18 | 35 48 23 |
| K | 434 391 | 3965 220 | 44 16 25 | 35 49 44 |

Annexure 5
Chemchemal Appraisal Program
& Subsequent Development Program

## 1. Introduction

Chemchemal gas field is a large elongated anticline situated in the folded Zagros foreland basin, some 50-100 kms South East of Erbil city, and some 50 kms to the East and North East of Kirkuk. The structure is approximately 70 kms long by 5 kms wide, and is made up of three domes, the biggest in the north western side. The middle and south eastern domes seem to be within Sulaimaniyah province while the north-western dome seems to be within Ta'ameem province.

Two wells were drilled in the field; both are located on the middle dome which is close to the town of Chemchemal. The first well was drilled for few hundred meters (about 500 m) which penetrated Lower Fars and was abandoned in early thirties, the second well was drilled in early fifties penetrating 2250 meters and then deepened to TD 2785 meters in 1960 penetrating Sarmord formation, and it was later plugged. The field tested gas in two reservoirs: The Pila Spi Tertiary reservoir, (at a depth of around 2000 feet from surface), and the Shiranish Upper Cretaceous reservoir (some 6000 feet deep).

The available data related to the Chemchemal field is very limited. Indeed, even though two wells have been drilled on the structure, the field has not been properly appraised and tested, and very little petrophysical data is available; neither the wireline logs, nor cores have been found. Clearly, further data is required to assist in the understanding of the geological and reservoir features of the Chemchemal field.

## 2. Well Test & Stratigraphy

The Shiranish flowed on test gas with some condensate at a rate of 7 million cubic feet per day (after acidisation); the Pila Spi gas rate was not measured. The pertinent test data is given below:

- Mid perforation at 6000 ft
- Reservoir pressure of 2600 psi
- Flowing well head pressure of 700 psi
- Bottom hole temperature of $135^0$ F

Clearly, a very large pressure drawdown occurred during the well test. The most likely explanation for this large draw-down is due to a high skin factor caused by the acidisation by-product and insufficient time allowed to clean up the well before conducting the test. However, some caution is required; an alternate explanation is that the large draw-down indicates poor permeability of the Shiranish formation, which will make it very difficult and costly to extract the gas reserves.

Figure 1 overleaf provides a graphical illustration of the stratigraphy together with Chemchemal 2 well test results.

Figure 1

## Chemchemal No : 2
## Sequence Stratigraphy

Location : Latitude : 35 deg 33 min 27.65 sec  Longitude : 44 deg 51 min 14.86 sec.
RTKB : 2280 feet until suspension , then 2284 feet after re-opening

| AGE | FORMATION | DEPTH (RTKB) | LITHOLOGY | | TESTING |
|---|---|---|---|---|---|
| | | SURFACE FORMATION | | | |
| UPPER MIOCENE | UPPER FARS | 197' | | | |
| MIDDLE MIOCENE | LOWER FARS | 1568' | Conglomerates | | |
| MIDDLE/UPPER EOCENE | PILA SPI | 2430' 2480' | Fractured Chalky Limestone (Lagoon) | | G/W Contact 1,890' JFT Test 1 JFT Test 2 |
| | KHURMALA | 2735' | Anhydritic Limestone | | |
| | SINJAR | 3042' | Limestone | | |
| PALEOCENE/LOWER EOCENE | AALIJI/KOLOSH | 5400' | Shales and Marls | | |
| UPPER CRETACEOUS | SHIRANISH | 6602' | Marly Limestone and Limestone (Fractured in places) | | 3579' Flow Test 1  6883' 6115'  Flow Test 2 |
| | KOMETAN | 7089' | Marly Limestone (Highly Fractured) | | 6750' |
| MIDDLE CRETACEOUS | DOKAN | 7565' | Chalky Limestones | | |
| | UPPER QAMCHUQA (Mauddud) | 8380' | Dolomitic Limestones | | |
| | UPPER SARMORD (Nahr Umr) | 8502' | Limestones and Marls | | |
| LOWER CRETACEOUS | LOWER QAMCHUQA (Shuaiba) | 8850' | Marly Limestone | | |
| | SARMORD | 70' | Marly Limestone | | |

**1703' – 2091':** JFT : Strong initial blow, rapidly decreasing pressure, results Gas and 310' black sulfurous water.

**1703' – 2103':** JFT: Light steady blow, decreasing gradually, results 1410' fluid rise (mud and black sulfurous water, no Oil), swabbing action of pulling out resulted in well coming in with gas.

**5879' – 6116':** Flow Test. Produced gas, very small quantity of light oil, and salt water. Oil had specific gravity of 0.75, 56 deg API, 0.14% sulphur, 0.001% asphaltenes. Second test produced gas, oil and water, with WHCIP (Ann) 2440 psi, WHCIP (Tubing) 2240 psi, oil specific gravity 0.78, 54.8 deg API , 0.053% sulphur, nil asphaltenes.

**5883' – 6750':** Flow test. After acidization, well flowed gas, no H2S, 0.4% CO2. Killed. Reacidized. Flowed gas again. 7 MMscfd, some condensate with specific gravity 0.73, 63.1 deg API, and water. WHCIP 2002 psi, BHCIP 2600 psi at 6696', BHFP 700 psi, BHDP 1900 psi.

0220/298



## 3.  Reserves & Uncertainties

There are large uncertainties in both the Shiranish and Pila Spi reserves due to lack of data, which does not allow a proper formation evaluation.  The uncertainties fall into two groups as shown below:-

- *Reservoir uncertainties*
  - a)      No structural contour maps pin pointing extension, reservoir continuity, and possible separation of the three recognized domes.

  - b)      No petrophysical properties: logs derived porosity, (net thickness/net to gross and saturation values)

  - c)      No core and core analysis

  - d)      No fluid characterizations

  - e)      No fluid Contacts

- *Well Deliverability uncertainties*

     Poor quality test with no build-up or draw down data.  Short period for flow test and well performance.

The above uncertainties will be addressed in the Appraisal  Program by carrying out adequate 2D seismic  Program, re-entering the existing Chemchemal well and drilling two more appraisal wells.

## 4.  Work Program

The Work Program involves:

- (i)      appointing risk advisors to establish proper security arrangements and attain 'manageable risk' status at the worksite;
- (ii)     acquiring 400kms of 2D seismic data;
- (iii)    drilling out the cement plug in the existing Chemchemal well 2, running wire-line logs and, if feasible, retesting the horizons; and
- (iv)    drilling two appraisal wells to 3,000 metres and testing the horizons.

These elements are described in more detail below:

### Risk Assessment

The risk advisors will be mobilized at the head office and at the worksite to put in place the arrangements that will maintain a safe and secure (to the extent practicable) during the work Program.  Resources for conducting the seismic and drilling activities will only be mobilized once the security advisors have assessed the situation and are satisfied that the work site represents a manageable risk for equipment and personnel; this assessment will also identify any de-mining activities that will have to be carried out on the work site area.

### Seismic Activities

A 2D seismic survey will be undertaken, initially on the crest, for the purpose of defining the appraisal well location (s) and thereafter covering an area of around 400 kms to provide better resolution of the faulting and the dipping flanks of the Field.

It is proposed to acquire the 2D seismic data at 2 km grid geometry over the field and immediate adjacent areas.  This survey will fully resolve the field and allow an accurate structural and stratigraphic interpretation.  This will also provide a more detailed picture of the reservoir structure and faulting, and possibly further valuable information on the facies and fluid distribution.

Well velocity survey and VSP data will have been collected during the drilling of the first appraisal well, which will allow an accurate well to seismic tie-in at this well location.

### Drilling Activities

The primary objectives of the field are the Shiranish/ Kometan formations, which are at a depth of 1,650 to 2,100 metres, below surface. The initial drilling is planned for evaluating deeper horizons down to perhaps 3,000 metres feet to fully evaluate the potential of the area.  In addition the Pila Spi Formation which is at 510 metres to 740 metres below surface will be tested and fully appraised.

It is intended to re-enter the existing well and acquire log data, which will be used for locating the subsequent well after recording 3 to 4 seismic lines. The location of the second appraisal well will be selected after completing the testing of the first appraisal well and acquiring and interpreting the 2D data. A list of suitable rigs that are available and suitable have been identified and will be invited to tender for re-entering the existing well, drilling two appraisal wells (with an option to drill further appraisal and development wells back to back).  The bids will be evaluated and the most suitable rig contractor selected.

The Shiranish and Kometan are both predominantly limestone formation and somewhat fractured, especially the Kometan.  Mud losses can therefore be expected while drilling these formations and accordingly, an intermediate casing string is planned to be run and cemented just above the Shiranish.  Sufficient quantities of loss circulation material will be made available to limit the losses to controllable levels.  It is proposed to drill the first appraisal well through reservoir intervals with a $12^1/4$" hole to enable the deeper horizons to be drilled with at least an $8^1/2$" hole and thereby allow a full evaluation to be conducted.  The provisional casing  Program for the first appraisal well is outlined below:

- 20" surface casing at 50 feet
- $13^3/8$" casing at +-1,700 feet in the Pila Spi
- $9^5/8$" casing at 5,200 feet in the Kolosh and as close to the top of the Shiranish as possible
- 7" casing at 7,600 feet in the Upper Sarmord to isolate the gas bearing intervals

The well will be drilled to total depth with a 6" hole and a $4^1/2$" liner run and cemented at the test horizons.

An extensive coring, data collection and testing  Program will be planned for the Pila Spi, Shiranish and Komestan formations.  The Pila Spi and Shiranish/Kometan reservoirs will be fully evaluated, and it is anticipated that with the use of state of the art logging tool technology the character of these carbonates can be fully resolved. The data obtained from appraising the two wells together with the 2D data will address the uncertainties, particularly the porosity of the Shiranish

An appropriate training plan will be formulated during the Field operations, to ensure that KRG personnel are given "hands-on' training to acquire the necessary skills and experience of oil and gas operational activities. Technical training will also be provided for drilling and well engineering staff and for geoscientists and reservoir engineers. This will be tailored specifically to meet individual requirements.

## 5. Costs

The capital expenditure for the Appraisal Program is estimated as follows:

|  | US$MM |
|---|---|
| Project definition & security arrangements | 5 |
| Drilling cement plugs and re-entering/logging existing well | 3 |
| Drilling and testing two appraisal wells | 16 |
| 2D seismic acquisition, processing & interpretation | 8 |
| Reservoir studies, management, insurance and overheads | 5 |
| Subtotal | 37 |
| 20% contingency | 7.4 |
| Total | 44.4 |

The above cost estimates are very approximate and have been derived from an in-house cost database of implementing similar projects in the region and where available budgetary costs obtained from vendors and subcontractors.

All of these costs will be expended over a 12 to 14 month period.

The uncertainties associated with the cost estimates are, to a large extent, dependent upon the prevailing market conditions and the extent of security arrangements and de-mining activities, therefore the actual costs may be lower or higher than the above value

## 6. Timing

The estimated schedule for the Appraisal Program is around 12 months as shown on the attached schedule. The actual dates depend upon the date of execution of the HOA and the prevailing conditions at that time, particularly with respect to seismic and drilling contractors.

Subsequent to appraisal program and pursuant to the results thereof, Dana shall propose a development program for full field development.

Annexure 6
## Accounting Procedure: Key Terms

1. Dana (or its Affiliate or an Associated Company) shall be appointed as the Operator/contractor for the execution of work and performance of the Services under these HoA or the Service Agreement /RRC's as applicable.

2. All accounting records shall be maintained and prepared in English and shall be recorded in US Dollars. All books and accounts relating to the HOA (hereinafter referred to as "Accounts") shall be maintained on an accruals basis. The accounts shall be kept in accordance with generally accepted practice and procedures in the international petroleum industry.

3. All work to be undertaken, services to be performed and costs to be incurred under these HoA or the Service Agreement/RRC's as applicable shall be carried out pursuant to work program and budgets presented by Dana in relation to Khor Mor Gas Utilization Plan and Chemchemal Appraisal Program, and which shall be approved by KRG such approval not to be unreasonably withheld.

4. Expenses, Operating Costs , Revenues and income from Excess Gas shall be segregated in accordance with the purposes for which costs are made and revenues are earned. Dana shall maintain appropriate separate accounting records to segregate and properly record the Expenses and Operating Costs incurred in relation to Khor Mor Gas Utilization Plan and Chemchemal Appraisal Program & Subsequent Development Program to enable their cost recovery and to further enable the calculation of the Remuneration Fee..

5. All Expenses and Operating Costs incurred in respect of these HoA and the Service Agreement/RRC's shall be classified into appropriate categories, including the following main headers: (i) Appraisal Costs; (ii) Development Costs; (iii) Gas Marketing Costs; (iii) Production Costs; (iv) Decommissioning Costs; (v) Service Expenditures; (vi) General and Administrative Expenditures; (vii) any other categories as appropriate. For this purpose, costs shall include financing costs calculated at one month LIBOR plus 2% per annum compounded monthly, until such time as these costs are recovered..

6. Dana shall have the right to recover costs incurred in respect of the Chemchemal Appraisal Program & Subsequent Development Program from the Revenues earned from the Khor Mor Gas Utilization Plan and such costs so recovered shall be regarded as Expenses under the Khor Mor Gas Utilization Plan.

7. In accordance with standard practice in the international petroleum industry, Dana shall maintain any insurance required by applicable Law, as well as any insurance considered appropriate by Dana  to mitigate the various risks to the extent practicable and subject to availability. All insurance premiums and other costs shall be treated as cost recoverable. In the event the Dana chooses to self-insure some of these risks, Dana shall be allowed to recover 95% of the quoted insurance premiums as a deemed insurance cost to compensate for the commercial risks assumed by Dana. For the avoidance of doubt, if the insurers fail to pay any sums claimed under the insurance policies in respect of insurances secured by Dana (or if liability exceeds the coverage supplied under the insurance policy) for any reason whatsoever (except where such losses arises as a result of a willful misconduct by Dana), then all such sums to the extent that such sums are not covered or not paid under the

insurance policies shall be treated as recoverable costs under these HoA, and the Service Agreement/RRC's as applicable.

8. A fixed charge of 4% shall be applied on the Expenses and Operating Costs, to cover the overhead costs of Dana, and accordingly such fixed charge shall not be subject to audit by KRG.

9. All personnel and other support costs incurred by Dana/Operator and/or its Affiliates shall be charged at cost including appropriate overhead in respect of various services provided by it under these HOA and the Service Agreement/RRC's, in accordance with the cost allocation systems in place for Dana/Operator. At the end of each Calendar Year , Dana/Operator and/or its Affiliates  will provide a certificate from its auditors to substantiate the costs billed, which shall be binding and conclusive on all parties

10. The KRG shall have the right: (a) to audit the Accounts with respect to each Calendar Year within a period of two (2) Calendar Years following the end of such Calendar Year (the "Audit Period"), failing which no adjustments shall be made later; and (b) to retain an auditor of international standing familiar with international petroleum industry accounting practice to undertake or assist the KRG to undertake the audit. Dana and the KRG shall agree on the audit exceptions, and failing which these shall be settled in accordance with the dispute resolution mechanism in the HoA/Service Agreement/'s (as applicable).

11. Dana shall provide periodic statements of Expenses/Operating Costs incurred and Revenue earned, as appropriate,  to KRG in accordance with the formats to be agreed, to enable cost recovery and if applicable, sharing of revenues in accordance with the terms of the Service Agreements/RRCs. The Expenses/Operating Costs incurred and the Remuneration Fee earned for the   Month shall be payable within 30 days from the end of such Month. Any unrecovered Expenses/Operating Costs and Remuneration Fee shall be carried forward until such time these are fully recovered under these HOA and the Service Agreements/RRCs.

12. All payments between the Parties shall, unless otherwise agreed, be in US Dollars and be made through a bank designated in writing by each receiving party; and all sums due under the HoA/Service Agreement/'RRCs (as applicable) shall be paid within thirty (30) days following the end of the month in which the obligation to make such payment occurred. All sums due by one party to the other under the HoA/Service Agreement/'RRCs (as applicable) shall, for each day such sums are overdue, bear interest compounded monthly at LIBOR plus two percent (2%).

13. Corporate income taxes or any such liability of  Dana shall be paid directly by KRG on  behalf of  Dana to the appropriate tax authorities. Furthermore, KRG shall fully indemnify Dana upon demand against any taxes, duties, levies, charges or impositions or withholdings assessed or imposed upon Dana, as a result of its activities under these HoA.

14. Dana and its subcontractors shall have : (i) the right to freely open and maintain bank accounts Abroad for any operations within or outside the Kurdistan Region and other parts of Iraq; (ii) right to be paid, receive, keep, transfer and use Abroad, without any restrictions, all proceeds of its share of cost recoveries and revenues; (iii)  the right to pay in any freely convertible currency all its financial requirements for the Petroleum Operations and to convert these currencies to Iraqi dinars in any bank in the Kurdistan Region or other parts of Iraq; (iv) the right, without any restrictions, to freely repatriate Abroad and to freely dispose of any proceeds received in the

Kurdistan Region or other parts of Iraq from the sale of Petroleum and any proceeds received from other operations and activities carried out under this Agreement in the Kurdistan Region or other parts of Iraq; (v) the right to pay in any foreign currency its Subcontractors and its expatriate personnel, either in the Kurdistan Region, other parts of Iraq, or Abroad. Abroad means outside the Kurdistan Region and other parts of Iraq.

Annexure 7

Chemchemal Draft RRC

