# Exhibit B

**CHEESWRIGHTS**
NOTARIES PUBLIC

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY that the photographic copies hereunto annexed are true copies of the original document and of my original notarial certificate attached thereto, I having carefully collated and compared the said copies with the said originals and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this sixteenth day of March in the year two thousand and sixteen.





International Union of Notaries

SCRIVENER NOTARIES

Regulated by the Faculty Office of the Archbishop of Canterbury

Bankside House  107 Leadenhall Street  London EC3A 4AF
Tel 020 7623 9477  Fax 020 7623 5428
E-mail notary@cheeswrights.co.uk
DX 627 / London City EC3   www.cheeswrights.co.uk

**APOSTILLE**

(Convention de La Haye du 5 octobre 1961)

| | |
|---|---|
| **1. Country:**<br>Pays/Pais | United Kingdom of Great Britain and Northern Ireland |
| **This public document**<br>Le présent acte public / El presente documento público | |
| **2. Has been signed by**<br>a été signé par<br>ha sido firmado por | Edward Gardiner |
| **3. Acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public |
| **4. Bears the seal/stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | The Said Notary Public |

**Certified**

Attesté / Certificado

| | | | |
|---|---|---|---|
| **5. at**<br>á / en | London | **6. the**<br>le / el día | 17 March 2016 |
| **7. by**<br>par / por | Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs | | |
| **8. Number**<br>sous no / bajo el número | K908153 | | |
| **9. Seal / stamp:**<br>Sceau / timbre:<br>Sello / timbre: | | **10. Signature:**<br>Signature:<br>Firma: | Jeremy Crook |

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK public official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country which is not party to the Hague Convention of 5th October 1961, it should be presented to the consular section of the mission representing that country.

*To verify this apostille go to www.verifyapostille.service.gov.uk*

# CHEESWRIGHTS
### NOTARIES PUBLIC

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY the genuineness of the signature subscribed to the certificate appearing on the copy document hereunto annexed, such signature being in the own, true and proper handwriting of **SARAH JOANNA LANCASTER**, registrar of **THE LONDON COURT OF INTERNATIONAL ARBITRATION**, a United Kingdom company duly organised and existing, registered with the Registrar of Companies for England and Wales under number 2047647, who, acting in such capacity, is a proper and competent officer to issue such certificate.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this sixteenth day of March in the year two thousand and sixteen.





Regulated by the Faculty Office of the Archbishop of Canterbury

Bankside House  107 Leadenhall Street  London EC3A 4AF
Tel 020 7623 9477   Fax 020 7623 5428
E-mail notary@cheeswrights.co.uk
DX 627 / London City EC3   www.cheeswrights.co.uk

International Union of Notaries

SCRIVENER



# AWARD

裁决

قرار التحكيم

LAUDO ARBITRAL

SENTENCE ARBITRALE

АРБИТРАЖНОЕ РЕШЕНИЕ

## LCIA

Arbitration and ADR worldwide

**Arbitration No: 132527**

www.lcia.org



The London Court of International Arbitration

## LONDON COURT OF INTERNATIONAL ARBITRATION
### CASE No. 132527

In the arbitration proceeding between

### (1)  PEARL PETROLEUM COMPANY LIMITED
### (2)  DANA GAS PJSC
### (3)  CRESCENT PETROLEUM COMPANY INTERNATIONAL LIMITED

Claimants

and

### THE KURDISTAN REGIONAL GOVERNMENT OF IRAQ

Respondent

---

# SECOND PARTIAL FINAL AWARD

---

*Members of the Tribunal*
Rt. Hon. Lord Hoffmann
(Presiding Arbitrator)
Rt. Hon. Lord Collins of Mapesbury
Mr John Beechey

*Date of Award:* 27  *November 2015*

LONDON COURT OF INTERNATIONAL ARBITRATION
Certified true copy of original

LCIA Registrar
SARAH LANCASTER
Date_____ DECEMBER 2015

I      INTRODUCTION

1. On 10 February 2015 the Tribunal made a Procedural Order on Preliminary Issues. It directed that 16 selected issues which appeared to arise in the arbitration should be tried as preliminary issues at a hearing which had been fixed for 20 April 2015. The Order gave the parties liberty to apply to vary its terms and upon the application of the Respondent ("the KRG") the Tribunal on 17 February 2015 issued an amended list of 13 issues. The hearing relating to these issues took place on 20-24 April 2015 and on 30 June 2015 the Tribunal issued a Partial Final Award giving its rulings. The background to the arbitration and the selected issues is set out in the Partial Final Award and this Award will use the same abbreviations.

2. As the Tribunal has declared[1] that on 5 February 2009 the benefit of the HoA was validly assigned to Pearl, this Award will for convenience use the term Pearl to include, when the context requires, its predecessors in title Dana and Crescent.

3. On the last day of the hearing counsel for Pearl (Mr Partasides QC) raised the question of whether, if certain issues were decided in his favour, the Tribunal would make a monetary award. The following exchange took place:[2]

> "[Mr Partasides] We believe that having made a decision as you will on the price applicable, as a result of determining issue (c), you have at your fingertips all that you need. Our submission is that this tribunal should proceed, if we are successful, to do so. In the event that you don't, Mr Chairman, feel that you have enough precisely for that, then we are hoping that that first date that we would use would be precisely to provide you with whatever further information you –
>
> THE CHAIRMAN: That's what I'm going to say. The procedural order is simply that we will decide those issues. And in this case [ i.e. issue (c)] what it means. If, on the basis of our decision, you feel that it is possible for us to make a monetary award in your favour, you are at liberty to apply for that order, but I don't see that such an order can be included in what we are about to do now. I understand that if you do feel you are able to apply for such an order, you want to be able to do so as soon as possible."

---

Partial Final Award, paragraph 213(1)(h).
Transcript Day 5, pp.182-183.

4. A hearing for such application as Pearl might make pursuant to this discussion was fixed for 21 September 2015.

## II       PROCEDURAL HISTORY

5. On 15 July 2015 Pearl's solicitors wrote to the Tribunal proposing that on 21 September 2015 the following issues be determined:

> "1. The amounts due for condensate and LPG produced at Khor Mor up to 30 June 2015 (i.e. the date of the Partial Final Award), following the Tribunal's findings at paras 212(1)(c), (d) and (e) of the Partial Final Award; and
>
> 2. The KRG's claim for equitable set-off (see para 183 of the Partial Final Award)."

6. Both sides understood that the issue on 21 September 2015 would be whether Pearl was entitled to an immediate monetary award and, if so, in what amount, and that Pearl was saying that it would for this purpose be necessary to decide the effect of the KRG's claim to an equitable set-off.

7. On 16 July 2015 the KRG's solicitors replied noting that Pearl's position was that the question of equitable set-off should be on the agenda for 21 September 2015 and reserving the KRG's position on the agenda until it had "received any application for a payment order and any evidence relied on in support of that application."

8. On 20 July 2015 Pearl's solicitors replied:

> "The Respondent knows full well the basis upon which [Pearl seeks] a monetary award and is therefore already in a position to prepare its defence to such claim. As the Tribunal will recall, [Pearl has] already submitted evidence of amounts due and payable pursuant to condensate and LPG invoices issued to the Respondent to the end of 2014 (using pricing bases now validated by the Tribunal). The updated amount outstanding of condensate and LPG invoices issued to the Respondent as at 30 June 2015 stands at US\$1.96 billion, and [Pearl] hereby make[s] a formal application for a partial final award ordering the Respondent to pay that amount to [Pearl] without delay. [Pearl] will adduce evidence in support of its application in due course."

9. On 6 August 2015 Pearl served a written submission on the amounts due under the Partial Final Award, together with an expert report from Richard Boulton, which

included an Appendix[3] containing a statement audited by Ernst & Young of the quantities of condensate and LPG ("petroleum products") lifted from Khor Mor during the period from first production of gas until 30 June 2015, together with their prices calculated in accordance with the determination of the Tribunal in its Partial Award[4] and the sums actually received by Pearl or invoiced to third parties.

10. On 4 September 2015 the KRG served a Response to Pearl's submission, together with the expert reports of John Emory, Linacre Associates, Gustavson Associates and Gervase MacGregor and a Third Witness Statement of Ahmed Mufti.

11. On 11 September 2015 Pearl served a Reply to the KRG's Response.

12. On 14 September 2015 the KRG sent the Tribunal copies of witness statements by Rebaz Mohamed Hamlan and Duncan James Speller which had been filed in the Commercial Court.

13. On 14 September 2015 the KRG gave notice of its intention to cross-examine Mr Richard Boulton at the hearing on 21 September 2015.

14. On 16 September 2015 the parties exchanged skeleton arguments. Pearl also served a fifth witness statement of Mohammed Eid Makkawi.

15. On 18 September 2015 the KRG's solicitors wrote to the Tribunal objecting to the admission of the fifth witness statement of Mohammed Eid Makkawi.

16. On 18 September 2015 Pearl served a witness statement of Dr Patrick Allman-Ward, exhibiting a Ministerial Order made by Dr Hawrami on 15 September 2015.

17. On 20 September 2015 the KRG's solicitors wrote to the Tribunal objecting to the admission of the witness statement of Dr Allman-Ward and repeating its objection to the admission of the witness statement of Mr Makkawi.

18. The hearing took place at the International Disputes Resolution Centre on 21 September 2015. Mr Boulton was cross-examined and the Tribunal was addressed by Mr Pollock QC and Mr Partasides QC on behalf of Pearl and by Mr Dunning QC on behalf of the KRG.

19. In the course of the hearing, Lord Collins inquired as to the division between the claims in respect of condensate and LPG which Pearl claimed had been bought by the KRG (which would give rise to a claim in debt for the price of goods sold and delivered) and the claims for products sold in or after September 2014 to local buyers (which would give rise to a claim against the KRG for damages for non-acceptance):[5]

---

[3] RL-2

[4] Paragraph 213(1)(d).

[5] Transcript p. 33.

"LORD COLLINS: In case there were a difference between the two types of claim can we take it that the damages claim would begin from the beginning of September 2014 or do we have to take an intermediate date?

MR PARTASIDES: Some time during September. That date is not so clear to us. The round numbers are that the period post September 2014, so from September 2014 to end June 2015 would take you to about 200 million of the 1.9 billion we are claiming. The remainder relates to the period pre-September 2014.

LORD COLLINS: There is no figure in the papers that would enable us to make that calculation, is there?

MR PARTASIDES: We could provide that if it would be of use to the Tribunal.

MR POLLOCK: You just have to go to Ernst & Young and take your calculator basically."

20. After the hearing, on 8 October 2015, Pearl's solicitors wrote to the Tribunal attaching two further calculations by Ernst & Young: the first dealing with the effect of the monthly average prices used in their calculations being simple or weighted averages and the second apportioning their calculations of liftings, prices and receipts between the periods before and after the commencement of direct sales by Pearl in September 2014.

21. On 12 October 2015 the KRG's solicitors wrote to the Tribunal objecting to the introduction of the additional calculations and asking for an opportunity to respond.

22. On 19 October 2015 the Chairman wrote to KRG's solicitors inviting comment on the additional calculations.

23. On 23 October 2015 the KRG's solicitors replied saying that they were unable to comment without being given the underlying documents which Ernst & Young had examined for the purposes of their audit. They wrote letters to the Tribunal to the same effect on 28 October 2015 and 3 November 2015.

### III          THE PARTIAL FINAL AWARD

24. Pearl's application is based upon the following rulings in the Partial Final Award:

(c)      [Pearl has] at all material times been unable to export and market the LPGs and Condensate by reason of acts of government and/or political reasons beyond [its] control within the meaning of BP [7] of Annexure 2.

(d)    For the period until the date of this award "international FOB Med market prices as quoted by Platts Oilgram Report" in the said BP [7] has meant (i) in respect of condensate, the prices quoted by Platts for Kirkuk Crude at Ceyhan and (ii) in respect of LPG, the Mediterranean prices quoted by Platts for butane and propane on the assumption that the LPG consists of equal quantities by weight of the two liquids.

<h3 style="text-align:center">IV        SUBMISSIONS OF THE PARTIES</h3>

*A. CLAIMANTS*

25.    Pearl says that ruling (c) means that the obligation of the KRG to lift and pay for condensates and LPG produced at Khor Mor was triggered at the outset of production and has continued up to the present time. Ruling (d) has determined the prices which the KRG should have paid. The KRG's liability to Pearl may therefore be calculated by adding up the quantities which have been lifted, ascertaining from Platts Oilgram Report the prices which should have been paid for each lifting, multiplying the two and then deducting the sums which Pearl has actually received, either from the KRG or from third parties. All these figures are, it says, now capable of being established beyond dispute and have been calculated and audited by Ernst & Young.

26.    There was at the April 2015 hearing a dispute as to whether the KRG had actually agreed to buy the condensates and LPG in accordance with what the Tribunal has found to have been its obligations. The Tribunal made no specific finding on this question because it was not one of the issues selected for determination.[6] The answer would determine whether Pearl's cause of action was for the price of goods sold and delivered (giving credit for part payment) or for damages for non-acceptance under the contracts of sale created by BP [7]. Pearl says that it does not matter whether the cause of action was one or the other because the damages for non-acceptance would be the price which should have been paid less the sums received by Pearl for disposing of the goods elsewhere, which produces exactly the same result as if there had been a sale. In any case, Pearl says that the way the KRG's case was conducted meant that the question of whether or not it had bought the goods and directed Pearl to sell them on for its account was exhaustively explored at the April 2015 hearing and the Tribunal is in a position to make a finding on the point. On Pearl's submission, the evidence showed that the KRG bought the condensates and LPG until it repudiated its liability to do so in July 2014.

27.    As to set-off, Pearl says that it is excluded by the terms of paragraph 1.8.3 of Annexure 6A to the HoA. Even if this were not the case, the KRG would not be

---

[6] It had been included in the original list of issues but was deleted in the amended version: see paragraph 1 above.

entitled to an equitable set-off in English law because that requires that the claim and cross-claim should be linked in a way which makes it unjust that the claimant should obtain a judgment without taking into account the cross-claim of the defendant: see Rix LJ in *Geldof Metaalconstructie NV v. Simon Carves Limited.*[7] Pearl submits that the structure of the HoA, which required Pearl to incur large capital expenditure and then fund running costs in return for an agreed income stream made it unjust that its income should be cut off while the KRG's claims are determined. It is particularly unjust that the KRG should be able on a current basis to take Pearl's condensate and LPG but not pay for it.

## B.  THE KRG

28. First, the KRG submits that Pearl has not shown any entitlement either to the price of the condensates and LPG which the KRG is alleged to have bought or to an ascertainable sum of damages for it not having done so.

29. The claim for the price of goods sold and delivered must fail because the Tribunal has not made a finding that the KRG bought the products[8] and Pearl has not proved that it did so. For this purpose it would have to prove, first, that, in respect of each cargo, it exercised the "put option" in BP [7] to require the KRG to buy and secondly that the KRG actually bought. It has done neither. The evidence at the April hearing was insufficient to enable such findings now to be made.

30. As for the alternative claim in damages, this would have to take into account the effect an earlier payment would have had upon Pearl's entitlement under the accounting provisions of the HoA to reimbursement of its Petroleum Costs and 18% IRR, as well as the KRG's entitlement to 90% of the revenue after payment of Pearl' costs and remuneration. These were complicated matters.

31. Secondly, the KRG claims to be entitled to rely upon an equitable set-off for its cross-claims for breaches of the HoA (principally, delay in supplying the LPG plant and inadequacies in its design and performance). It says that these cross-claims are closely linked with the Claimant's claims and that it would be unjust to order payment to Pearl before deciding whether its claims are exceeded by the KRG's cross-claims.

32. Thirdly, the KRG submits that even if it is not entitled to an equitable set-off, the Tribunal should as a matter of discretion refuse to make an immediately enforceable award. It could (on the hypothesis that the KRG failed on its first two points) make a declaration that the KRG was liable but defer making a monetary award, or it could make the award but stay its operation. The Tribunal is said to have a wide

---

[7] [2010] 4 All ER 847 at paragraph 43.
[8] See paragraph 26 above.  The relevant paragraphs in the Partial Final Award are 160 and 178.

enough discretion to take one or other of these courses, which would correspond to the powers exercised by an English court on an application for summary judgment.[9]


V        GOODS SOLD AND DELIVERED

33. It is true that, as the Partial Final Award noted, the question of whether the KRG had lifted and bought the condensates and LPG was not one of the issues directed to be tried at the April 2015 hearing. However, the point was one on which the Tribunal heard a great deal of evidence from both sides. This was because, on issue (c), whether Pearl had been able to export, the KRG's case was that Pearl had not only been able to export but had actually done so. Pearl's response was that any exports had been by the KRG or by local dealers in Kurdistan. In both cases, the KRG had bought the products and then either exported it or directed that it be sold to third parties in Kurdistan.

34. In support of its claim that the KRG had bought the products and then sold them on, Pearl relied upon the documentary record in respect of each of the companies which, at various stages, lifted the condensates and LPG.

A      The Documents in the Case

*a.    Pewand*

35. On 14 September 2008, before production began, Mr Watts on behalf of Pearl wrote to Mr Tahir of the Kurdistan Ministry of Natural Resources:[10]

> "…We have made all reasonable efforts to obtain the best arms-length price reasonably possible for sales of EPF condensates into these [export] markets but have been unable to do so, for reasons beyond our control, owing to inability to secure requisite permits (a KRG obligation under the HOA) for import and transiting the products through Turkey or Iran.
>
> Given the above situation, and pursuant to the terms of the HOA, we are obliged to notify the KRG of its obligation under the HOA to

---

[9] See *Sheppards & Co v Wilkinson* (1889) 6 TLR 13 (RLM-244); *United Overseas Ltd v Peter Robinson Ltd* (CA, 26 March 1991) (RLM-246).
[10] C-87

purchase and lift the condensate, or arrange for said lifting by domestic companies/users…"

36. On 27 September 2008 Mr Watts wrote again:[11]

"Further to our letter dated 14th September, and pursuant to your instructions, we met your nominated lifters in the presence of Dr. Kiwan Siwaily to discuss the Khor Mor condensate lifting arrangements…They intend to mix the Khor Mor condensate with their Jambur condensate in this tank for onward batch transfer of the Khor Mor condensate product mixture to Kirkuk, where it is commingled with the main pipeline crude exports to Turkey.

…These lifting arrangements that have been put in place by MNR/KRG for the Khor Mor condensate are moving ahead as per your instructions, and the only matter left to address is your trucking arrangements, and subsequently of course payment for the condensate, as outlined in this letter…

The responsibility for HSE and condensate loading operations will remain with our Company (Dana/Crescent) until your nominated transport company's trucks have been loaded and weighed at Khor Mor. Once the trucks exit the loading bay gate at the Khor Mor facility the title of the condensate, and risks and responsibilities related thereto, will pass to MNR/KRG. Our Company will, at the end of each month, submit a detailed invoice with full supporting documentation of all the lifts (including product tests and weighbridge readings) that have taken place during that month, together with the relevant pricing data for the said month in accordance with the terms of the HOA."

37. On 29 September 2008 Mr Tahir wrote back to Mr Watts:[12]

"…MNR…prefers to nominate a local company that is familiar with area of the routes between KorMor and Jambur. That company is the Paewand Company, we hereby instructing you to inter into a contract on our behalf to transport the said amount of condensate. In this respect please put in appropriate contractual terms and conditions with this company. The costs of this transportation are to be paid by you. With regards to the product pricing and the transport cost, this will be raised to H.E the Minister of Natural Resources Dr. Ashti."

38. On 30 September 2008 Mr Watts, Mr Tahir and Mr Bilind Abdulrahmen, the President of Pewand, signed a letter of intent which began as follows:[13]

---

C-88
C-89 *(sic)*
C-128

"Further to our discussions over the last few days, and as agreed
at the meeting of today, this letter confirms our intent, as
approved by and for and on behalf of the Ministry of Natural
Resources (MNR), to award to your company the contract for
transporting (trucking) Condensate from the loading facilities at
our Production Plant in Khor Mor to the storage facilities located
at Jambur station."

39. There is no evidence that this arrangement was varied during the period in which
Pewand lifted condensate from Khor Mor.  As foreshadowed by Mr Watts in his
second letter, on 20 November 2008 Pearl wrote Dr Hawrami a letter enclosing an
invoice. The letter began:[14]

"As you are aware, the condensate that has been produced from the
Kor Mor Field is being lifted by Pewand Company for Petroleum
Services and transported by truck (on behalf of KRG) to the storage
facilities at Jambour, which are operated by NOC. These
arrangements have been put in place in accordance with your
instructions, for and on behalf of the Ministry of Natural Resources.
Pursuant to Annexure 2 of the HOA, we hereby enclose our Invoice
for the sum of US$ 4,980,400.19..."

40. Payment of this invoice was authorised by the KRG government.[15]

    (b)    *Kani*

41. On 23 February 2010 the Kurdistan Council of Ministers made a Ministerial Order,
following on a decision of the Naptha Bidding Committee, to award a contract to
lift condensate from Khor Mor to Kani Company, a local trader.[16] It appears to have
followed an auction organised by the MNR.  After a few months, the contract was
terminated. In May 2010 Dr Walid Hebeika of Pearl visited Kurdistan and asked
both Mr Serwan of the MNR and the Executive Manager of Kani what had gone
wrong.  He recorded their views in an e-mail of 12 May 2010 to Mr Makkawi:[17]

"...Serwan listed two reasons for breaking with KANI: first, they
have not honored their commitment to bring their own fleet to handle
the operation and MNR (and us) had to intervene to keep Pewand and
safe guard the operation. And second, they failed to raise the
committed guarantee that would have allowed MNR to revert to
another uplifter in the cases where KANI failed to deliver and
Jambour was used as a safety-net."

On the other hand –

[14] C-37
[15] C-131
[16] C-138
[17] C-217

"[The Executive Manager of Kani] explained that MNR requested KANI first to deposit $2 million as cash guarantee (which they did), then they asked them to raise it to $5 million (and they also agreed), but finally MNR asked KANI to deposit a sum equivalent to all the potential condensate to be lifted according to the tender validity period. At that point KANI refused and MNR seized the chance and cancelled the deal."

42. We are not of course concerned with the rights and wrongs of the dispute between the MNR and Kani. But what both sides appear to have agreed was that the contract was with the MNR and that the MNR cancelled it.

   b.  *Energy Supply Services ("ESS")*

43. In May 2010, after discussion with the MNR, Pearl organised a tender for the purchase of condensate from Khor Mor. It drafted the tender documents, which included a draft contract.[18] These were sent for approval and approved by the MNR. Recital (c) of the draft contract read:

"The Ministry of Natural Resources of the Regional Government of Kurdistan has instructed and authorized the Seller to enter into this Contract"

44.      Pearl analysed the tenders. On 8 July 2010[19] Mr Riwandazi, then of Pearl, wrote to Mr Serwan Aziz at the MNR:[20]

"Pursuant to your instructions, we have engaged in direct negotiations with the companies of Energy Supply Services (ESS) and Mass Global (MG) to finalise their offers to enter into a long-term contract to buy and lift condensate from Khor Mor.

Based on the outcome of our detailed negotiations with the above-mentioned companies, we recommend that the MNR endorses the awarding of the condensate sale contract to ESS.

Yours sincerely

Hawre Riwandazi

Marketing Executive."

45.      Mr Serwan Aziz replied on 12 July 2010:[21]

---

[18] R-371

[19] R-373 contains a draft of this letter dated 7 July 2010, but the terms of Mr Serwan Aziz's reply suggest that it was sent on the following day.

[20] R-372

"Reference to your letter of July 8th, 2010, based on H.E The Minister's order, it was decided to supply 700 Metric Tons of the production of Condensate which is being produced from the Kor Mor field to Energy Supply Services for the duration of one year... After this, a contract will be ratified with them which is based on the terms and conditions which were agreed upon earlier."

46.  The contract with ESS was entered into on 15 July 2010[22] and appears to have been sent with a covering letter from Mr Watts to Mr Serwan Aziz. It records:

"The Ministry of Natural Resources of the Kurdistan Regional Government ("MNR") has instructed and authorized the Seller to enter into this Contract, and accordingly Seller is hereby entering into this contract as directed by and for and on behalf of the MNR in accordance with and subject to Seller contractual rights and obligations"

47.  Neither Pearl nor the MNR was satisfied with ESS's performance and in February 2011 it was terminated.  Before doing so, Mr Watts wrote on 3 February 2011 to Mr Serwan Aziz:[23]

"Subject: Subject: ESS Contract for lifting condensate pursuant to the Authorisation

As you are aware, we entered into the subject Contract pursuant to your instructions and on MNR's behalf as described in our letter dated 15th July 2010. That Contract was subsequently amended, once again pursuant to your instructions, as set out in our letter dated 13th January 2011. Following your meeting yesterday morning with Hawre, our marketing executive, we understand that MNR no longer wish to use ESS to lift the condensate produced from Kor Mor. Accordingly, please confirm those instructions, whereupon we shall take immediate action to: (i) terminate the ESS Contract, and (ii) seek your urgent directions as to whom MNR wish to appoint to lift the condensate (thereby avoiding tank-topping and the undesirable consequences of curtailing production and gas deliveries, which are outside our control and responsibility). In this regard, I have requested Hawre to urgently contact you so that the replacement lifting arrangements, in accordance with the Authorisation, are swiftly put in place."

48.  We have no record of an answer to this letter but the contract with ESS was terminated.

*(d)*     *Powertrans*

---

[21] C-142
[22] C-91
[23] C-222

49. There is no dispute over the deliveries of Khor Mor condensate to PowerTrans. They were made by the KRG, sometimes for money and sometimes by way of barter for fuel. Dr Hawrami said "Pearl was not party to the agreement between PowerTrans and the KRG"[24] and "Pearl could not access the KRG's arrangement with Powertrans, which was the product of a special arrangement between the KRG and Powertrans."[25]

(e) *LPG Sales*

50. Production of LPG began on 13 January 2011. On 19 January 2011 Mr Watts wrote to Mr Serwan of the MNR:[26]

> "As advised at our meeting in Erbil last week, our facilities at Kor Mor have commenced production of LPG, and we have requested those companies that expressed interest in lifting our LPG (under similar contract terms as those for the condensate) to provide their final and best priced offers by the end of next week. We will evaluate those priced offers and present you with the findings, whereupon we shall finalise the LPG lifting arrangements in accordance with your instructions.
>
> In the meantime, given the limited storage available at Kor Mor ... it is imperative that short term lifting arrangements are put in place to prevent over-filling of the LPG storage thereby maintaining gas deliveries to the power stations. In this regard, we have received an offer from Sagrma company to lift LPG on short term FOT Kor Mor basis for 368 $ per tonne. Pursuant to your verbal instructions provided to Hawre (our Marketing Executive) today, we intend to enter in a short term contract with Sagrma, on behalf of MNR, to lift the LPG product."

51. These verbal instructions were countermanded by an e-mail from Mr Ibrahim Zrary of the MNR on the following day:[27]

> "According to MNR's instructions, kindly you have to start loading lpg product to Pawand company's trucks."

52. On 26 January 2011, after receiving some criticism of Pearl's efforts at marketing LPG, Dr Walid Hebeika of Pearl wrote to Mr Zrary:[28]

> "[O]ur contract stipulates that KRG is the party responsible for lifting LPG in circumstances where normal exports are not possible, which is the prevailing situation. Accordingly, our marketing efforts are merely a supportive role pursuant to MNR's instructions."

---

[24] First Witness Statement, paragraph 139.
[25] Fifth Witness Statement, paragraph 47.
[26] C-147
[27] C-148 *(sic)*
[28] C-93

13

53. An e-mail exchange over the procedure for obtaining security clearances for drivers lifting LPG at Khor Mor in August 2011 showed how the MNR viewed the relationship between the parties.[29] The application for the appropriate badges was originally made to Pearl, copied to Mr Zrary of the MNR. He objected:

> "Kindly it's not correct way to ask security id, any new persons or Co. they must goes through MNR rout , if not we can't accept any one at the site , this instructions of MNR , if any body doesn't like this instructions , he can goes directly to the minister to change it."

54. The Pearl representative said that the correct procedure would in future be followed. Mr Zrary followed up with an explanation:

> "It is well known to all that the contracts for the sale and purchase of products is among the parties, the ministry and the buyer so that we should see only the role of Dana Gas on the site, processing and as instructed by the ministry, and this talk that took place between me and my bosses today morning."

55. On 15 March 2011 Mr Watts sent the MNR an invoice with a covering letter:[30]

> "As you are aware, the marketing and lifting of LPG has been a matter of much discussion during the last two months, including by correspondence: notably, our letters of 19th January and 9th February 2011.
>
> The prevailing lifting instructions provided by MNR confirm that KRG has elected that we not market and sell the LPGs and instead sell the LPGs to the KRG. Clearly, the KRG has such a right under the Authorisation Contract and, upon such election, the LPGs are purchased at the international FOB Med market price as stipulated in the 6th bullet of Annexure 2 of the Authorisation Contract.[31]
>
> Accordingly, pursuant to Annexure 2 of the Authorisation Contract, we hereby enclose invoices for a total amount of US$4,384,765.99 consisting of:
>
> i). the sum of US$ 696,475.34, which represents the lifting by KRG of 786.96 tonnes of LPG during January '11 and purchasing the product at the average price for that month of US$ 885.02 per tonne; and
>
> ii). the sum of US$ 3,688,290.65 which represents the lifting by KRG of 4,114.1 tonnes of LPG during February 2011 and purchasing the

---

[29] C-157 Sic.
[30] C-151
[31] "KRG may elect that Pearl not market and sell the LPG's and instead sell its LPG's to the KRG at the international FOB Med market price and shall pay for such sales within 30 days from the month ends as quoted by Platts Oilgram Report or similar journals."

product at the average price for that month of US$ 896.50 per tonne."

56. On the following day, this invoice was rejected by Dr Hawrami:[32]

"THIS INVOICE IS REJECTED. YOU HAVE BEEN BURNING THE LPG DUE TO THE LACK OF MARKET, AND IF YOU CAN GET SUCH A HIGH VALUE FOR IT PLEASE GO AND FIND A BUYER FOR IT. PLEASE DO NOT SEND ANY INVOICES TO THE KRG."

57. It appears, however, that the MNR went on selling LPG from Khor Mor.  For example, in October 2011 the MNR issued a Ministerial Order:[33]

"As per the order of the minister of Energy Sale Committee who gathered in the ministry with the intention of selling LPG from Kormor (sic) LPG Plant we have decided:

1. To sell 600MT LPG per day from Kormor LPG plant for a period of 3 months as per the price formula shown below:

**(84% FOB LPG AB Marketscan - Minus $315/Ton)**

a) 400 tons of LPG per day will be directly sold to Kormor Company at the price of ($315/MT) three hundred and fifteen dollars per ton for a period of 3 months as per the above formula.

b) 200 tons of LPG per day will be directly sold to Ascent Company at the price of ($315/MT) three hundred and fifteen dollars per ton for a period of 3 months as per the above formula

2. The companies are required to lift the daily quantities of LPG allocated to them.

3. The companies are required to sign the contract and begin lifting on the date which they are instructed by the ministry."

58. The order was copied to Pearl "for necessary action".

B          The Evidence at the April 2015 Hearing

59. Pearl invited the Tribunal to infer from this documentary record that the MNR had bought the condensate from Pearl pursuant to its obligation under BP [7] and then sold it on, either through the agency of Pearl or, as in the case of Powertrans,

---

[32] C-152
[33] C-158

directly.  Likewise, it had bought the LPG, either by exercising its right to do so under BP [6] or because it was obliged to do so under BP [7].

60. In its evidence at the hearing, the KRG made a sustained attack upon these submissions.  Mr Bilind Abdulrahman, chairman of Pewand, said in a witness statement that as far as he was concerned, his contract in 2008 to transport condensate was made with Pearl and not with the MNR.  He had failed to sign a draft contract sent to him because it contained the phrase "for and on behalf of the Ministry of Natural Resources."[34]  Asked in cross-examination in that case he had signed a letter of intent which said that he was being awarded the contract "for and on behalf of the MNR", he said that his English was not good.[35]  He also said that he had in April 2011 to January 2012 bought condensates directly from Pearl[36] but an examination of the documents showed that the sales had been pursuant to Ministerial Orders.[37]

61. Mr Hawre Riwandizi, who had been Marketing Executive and then Marketing Director for Pearl between 2007 and 2013, gave evidence for the KRG.  He said that the contract with ESS was in reality with Pearl and not the MNR:

"106.     To preserve the position that we were unable to export, Crescent management in Sharjah instructed us to create a record that the whole transaction with ESS was "for and on behalf of" the MNR.. This was a phrase that Mr. Watts wanted us always to include in our letters and emails. This was part of Mr. Watts' strategy of, to use his words, "putting the monkey on the KRG's back," and obtaining from the KRG much higher prices for condensates than the actual export market was offering.

107.     The contract was entered into directly between Pearl and Crescent, on the one hand, and ESS, on the other. I drafted the contract in conjunction with the legal team in Sharjah. The legal team in Sharjah added the language stating that the contract was "for and on behalf of" the MNR. The MNR was not party to this contract and, as far as I am aware, did not review the contract before it was signed or approve this language."

62. Even the auctions followed by Ministerial Orders were in Mr Riwandizi's opinion sales by Pearl:

"125  Pearl and Crescent would take care of all the contractual arrangements and logistics after a bid was awarded. We knew what the quantities were, and we had Standard Operating Procedures for working with the company which had won the bid. We handled

---

[34] 1 Abdulrahman, paragraph 10.
[35] Transcript Day 3, pp. 227-229.
[36] 1 Abdulrahman, paragraph 20.
[37] Transcript Day 3, pp 233-235.

matters such as registering drivers and trucks, and coordinating with buyers on a process and workflow for lifting of the condensates, and so on."

63. In cross-examination, Mr Riwandizi had a little difficulty with some of the documents. Asked about his e-mail to Mr Watts reporting a conversation with Mr Serwan of the MNR in which he had said "Mr Serwan stated that his excellency the minister, having reviewed the comparative analyses…had instructed awarding the condensate sale contract to Energy Supply Services", he said that was the corporate culture at Pearl. One said that kind of thing.[38]  The ministerial instruction to award the contract to ESS[39] was, he said, understood by him to an "endorsement or approval" of a contract between Pearl and ESS.[40]

64. Although the KRG called evidence from Mr Riwandizi and his former colleague Mr Zaydoon Abdulazeez (who had left in 2009 and had nothing relevant to say) it did not call any of its own employees who had been involved in the condensate or LPG sales. There was no evidence from Mr Serwan Aziz or Mr Tahir or Mr Zrary.  The Minister, Dr Hawrami, had an altogether different explanation. He said that the MNR had indeed taken and sold the condensates and LPG, but it had done so at the request of Pearl, which could not find anyone to sell them to. Rather than allow them to go to waste or cause a stoppage in gas production, the MNR had stepped into the breach and arranged for them to be lifted and sold. As it was rendering a service rather than making a purchase, it had no obligation to pay for them. It did however from time to time make some cash advances to Pearl in the expectation that Pearl would invest the money in enlarging its facilities at Khor Mor to produce more gas. In 2004, when Pearl showed no sign of making additional investment in the plant, the cash advances were stopped.

65. Pearl's witnesses were cross-examined at some length on the question of whether Pearl or the KRG had made the sales.  It was put to Mr Jafar that in 2008 Pearl had rejected bids for condensates from domestic purchasers on the grounds that, as it was unable to export, it would do better by claiming international prices from the KRG.  Furthermore, he was "very keen to make sure that the right paper trail was put in place to maintain the position that [he] had decided upon." Mr Jafar frankly accepted both of these accusations.  His contractual right was that if Pearl was unable to export, the KRG would pay international prices.  There was no reason why he should accept less from an internal buyer. And he was indeed anxious that Pearl employees should not do anything which might be considered a waiver of its contractual right under BP [7] to require the KRG to buy and pay for the condensate and LPG.[41]  He denied that he was, as counsel put to him, "pretending" to contract

---

[38] Transcript Day 4, p. 41.
[39] See paragraph 43 above.
[40] Transcript Day 4, p. 43.
[41] Transcript Day 2, pp. 237-238.

on behalf of the KRG.[42]  He was making Pearl's position clear and the KRG was
accepting it.

66. The same point was put to Mr Watts, who said:[43]

"Why would I want to waive the rights of protection that is (sic) in
the HoA[? W]hen I can't export, I can't get it to the international
markets so I clearly write to the MNR telling them about this, saying
please give us advice. That advice eventually came on 20
September."[44]

C         A Question of Procedure

67. The KRG submits that the Tribunal cannot now decide the question of whether the
KRG bought condensate and LPG on the terms of BP [7] (or, in the case of LPG,
BP [6]).  It was not a question to be decided at the April 2015 hearing and the KRG
would be entitled to adduce further evidence and make submissions.  For example,
the KRG says in its Response to Pearl's present application that the question of
whether it or Pearl sold condensates to ESS remains open:

"19.       Thus, for example, there is evidence on the record that
Pearl directly sold condensates to Energy Supply Services ("ESS")
from 2010 to 2011. Pearl directly entered into the condensate sales
contract with ESS – a contract to which the KRG was not party.

20.       Although Pearl asserts that the transactions with ESS were
on the KRG's behalf, the documentary and witness evidence on the
record demonstrate that Pearl prepared the tender, selected ESS as the
buyer, and entered into the contract with ESS on its own behalf. (If
the Tribunal were not satisfied with that evidence for present
purposes, it need not be driven simply to assume that Pearl's case is
proven. This is a single-day hearing, and there is ample scope for each
Claimant to come back and seek to prove its case in the future.)"

68.    The Tribunal does not accept the submission that it is not in a position to
decide whether the KRG bought condensate and LPG from Pearl.  Although it is
true that it was not in itself an issue selected for decision at the April 2015 hearing,
it was a fully examined sub-issue on the question of whether Pearl had been able to
export within the meaning of BP [7]. It was the KRG which alleged that Pearl's
ability to export was shown by the fact that it had actually done so, and thereby put

---

[42] Transcript Day 2, p. 244.
[43] Transcript Day 3, p.119.
[44] The reference is to a meeting with Dr Hawrami which Mr Watts says took place on 20 September 2008. (see 1
Watts paragraph 32).  There is no documentary record of what was said at the meeting.

in issue the nature of the dealings by which condensate and LPG from Khor Mor undoubtedly found their way over the Turkish and Iranian frontiers. As the above discussion of the documents and evidence shows, these questions were thoroughly investigated at the April 2015 hearing.

69. Although the KRG says that it should be entitled to lead evidence and make submissions on these points, it has given no indication of what evidence it has found since April which it can now adduce.

70. Section 1(b) of the Arbitration Act 1996 says that "the object of arbitration is to obtain the fair resolution of disputes by an impartial tribunal without unnecessary delay or expense" and section 33(b) imposes a duty upon arbitrators to "adopt procedures suitable to the circumstances of the particular case, avoiding unnecessary delay or expense, so as to provide a fair means for the resolution of the matters falling to be determined." There are similar provisions in Article 14 of the LCIA Arbitration Rules 1998.

71. The Tribunal considers that it would be failing in its duty if it did not decide the questions in issue on this application on the material available to it, on which the parties have had full opportunity to make all relevant submissions.

**D          Discussion**

72. The Tribunal is faced with entirely inconsistent evidence on behalf of the KRG. On the one hand, the evidence of the former Pearl employees, submitted on behalf of the KRG, is that Pearl itself sold the condensates and LPG. The contracts with Pewand, Kani and ESS were made by Pearl and the KRG had no part in them. The auctions of condensates and LPG were "facilitated" by the KRG but ended in contracts of sale by Pearl. This was the thrust of the cross-examination of Mr Jafar and Mr Watts. On the other hand, the evidence of the Minister himself, Dr Hawrami, is that from the very beginning all the sales were by the KRG. Soon after condensate production had commenced, Mr Watts came to him to say that Pearl no longer wished to market it:[45]

"[I]t seems that Pearl formed the view that its "least bad option" was to ask the KRG to take the condensates and for the KRG also to assume the associated costs and risks of selling the condensates. In doing so, the KRG would relieve Pearl of the obligation to transport, store or market the condensates (and incur the associated costs). Pearl would effectively have to do nothing (by way of marketing, transporting or otherwise), and incur no costs, and, if suitable arrangements could be reached with the KRG, some value would be realised for Pearl from the condensates. I

---

[45] 1 Hawrami paragraph 111.

was naturally disappointed with Pearl's lack of initiative, particularly given Mr Jafar's previous statements about a willingness to invest in the Kurdistan region, but reluctantly agreed that the KRG would step in to take and sell the condensates."

73. Dr Hawrami went on to say that although Pearl might have hoped that the KRG would have "passed on some of the proceeds", the latter had no obligation to do so. It did make occasional "cash advances" to Pearl but these were only by way of encouragement to Pearl to invest in larger-scale gas production.

74. We reject Dr Hawrami's evidence that Mr Watts asked the KRG to take Pearl's condensates (and afterwards its LPG) for nothing. There is no trace of such an arrangement in any document in the five and a half years between the date in 2008 when it is alleged to have happened and Dr Hawrami's witness statement in April 2014. It is inherently improbable, to say the least, and entirely inconsistent with the actual documentary record as to which Mr Jafar and Mr Watts were accused of being so meticulous.

75. We also reject the evidence of Mr Abdulrahman and Mr Riwandazi that the contracts with Pewand, Kani, ESS and the purchasers at auction were not made with the KRG. These were written contracts entered into pursuant to authority given on behalf of the KRG. There has been no plea that such authority was not properly given. None of the officials who took part in the negotiations on behalf of the KRG has been called to cast any doubt upon the validity of the transactions.

76. It follows, and we find, that until September 2014 sales of the Khor Mor condensate and LPG were consistently made by the KRG. How was it able to do so? There are three possibilities. The first is that Pearl gave it the products for nothing. That is Dr Hawrami's theory, which we have rejected. The second is that the KRG simply converted Pearl's products to its own use. No one has made such a submission. The third is that the KRG bought them from Pearl. As we have already held that BP [7] had been triggered and that the KRG was obliged to buy the products, the third is in our opinion the logical answer. We therefore find that until September 2014, the condensates and LPG uplifted from Khor Mor were sold and delivered by Pearl to the KRG.

VI          BREACH OF CONTRACT

77. Pearl submits that, on the facts of this case, it does not really matter whether the KRG bought the products or not. If it was a purchaser, it is liable for the price (calculated in accordance with BP [7], but Pearl would have to give credit for what it had actually been paid, either directly from the KRG or from the companies to

which the KRG sold on.  If the KRG did not purchase, it is liable for breach of the sale contracts created pursuant to BP [7].  The damages would be the price it should have paid, less whatever Pearl was reasonably able to obtain.  In this case, Pearl could not have done anything to obtain more than it did.  The whole process of disposal of the products was in the hands of the KRG.  Accordingly, the damages are the difference between the contract price and the sums Pearl has actually received, which is exactly the same as if the claim had been for goods sold and delivered.  Although the causes of action are different, the result in this case is the same.

78. The KRG raises two objections to this reasoning.  The first is that, to support a claim for damages for non-acceptance, Pearl must prove that it brought contracts of sale into being by exercising the "put option" in BP [7].  We do not think there is anything in this point.  Although BP [7] gave Pearl the right to require the KRG to buy, and could therefore be described as a put option, it did not prescribe any particular method for the exercise of that option.  There was no provision requiring a notice in writing or anything of that kind.  No doubt Pearl would not have been entitled to complain that the KRG was not lifting the condensate until it had made it aware that it was unable to export and that there was condensate to be lifted.  But Mr Watts made the matter perfectly clear in his letter of 14 September 2008.[46] Thereafter, Pearl gave the KRG notice of the condensate and afterwards LPG which was available to be lifted and nothing suggested that it had departed from the position that it was unable to export.

79. The second objection is that a claim in debt is different from a claim for damages.  The first is a claim for a liquidated amount, fixed by the agreement of the parties.  The second is claim for loss caused by the breach of contract.  The loss caused by non-acceptance might be quite different from the price payable on delivery.

80. In theory that is true, but the question is whether there is a difference on the facts of this case.  The KRG says that an assessment of damages would have to take into account the effect which payment would have had upon the state of accounts between the parties under the HoA.  Payment would have discharged Petroleum Costs but the delay in payment means that Pearl has had longer to earn its 18% IRR. It might ultimately be better off as a result of the breach.  Furthermore, after payment of its costs and remuneration, 90% of the revenues will accrue to the KRG. It is all very complicated.

81. The Tribunal does not accept this submission.  Pearl's claims are under a series of contracts of sale between itself and the KRG, created by BP [7].  It had title to the condensate and LPG and sues in its capacity as vendor exactly as it would have

---

[46] Paragraph 35 above.

sued any other purchaser who failed to accept and pay in accordance with the contract. The question of how it would have to account for the proceeds is for this purpose irrelevant. Once it has received the proceeds, they will be subject to the accounting procedure in the HoA but until then it does not affect Pearl's claim to be paid.

82. It therefore follows that Pearl is right in its submission that for present purposes it makes no difference whether the KRG purchased the condensate and LPG or not.

## VII     QUANTIFICATION

83. It follows from the reasoning of the Tribunal so far that Pearl is entitled to payment for (a) the condensate and LPG lifted by or on behalf of the KRG between 2008 and September 2014 at prices calculated in accordance with BP [7] less the sums actually received by way of payments by or on behalf of the KRG and (b) the sums which should have been paid by the KRG for condensates and LPG sold by Pearl to third parties since September 2004, less the sums actually received upon these sales. The question is whether the Tribunal has the material upon which these amounts can be calculated.

84. Pearl has submitted evidence of:

(a)       the amounts of condensate and LPG lifted at Khor Mor from the commencement of gas production until 30 June 2015.  This is based upon weighbridge certificates signed by representatives of Pearl, the transport company and (after 2010) the MNR.

(b)       the prices payable for each consignment calculated in accordance with the ruling (d) in the Tribunal's Partial Final Awards;

(c)       The amounts received from the KRG and third party purchasers.

85. These figures have been audited by Ernst & Young, who examined all the underlying documents and certified that there were no material discrepancies.  In addition, on 6 August 2015 Pearl served an expert report of Mr Richard Boulton, in which he explained the significance of the audit performed by Ernst & Young and carried out a similar audit on a sample of the documentation in which he likewise found no material discrepancies. The net amount shown to be owing to Pearl is US$1,963,370,320.

86. The KRG has not served any evidence in answer to the material provided by Pearl and Mr Boulton. In its Response to the Claimant's application, it said:

"In support of their payment request, Pearl have submitted another report from Mr. Richard Boulton, who merely purports to "confirm" the arithmetic in certain of Pearl' calculations.   Mr. Boulton has no knowledge of the underlying facts. He engages in a simple mathematical exercise whereby he examines the invoices submitted by Pearl, adds them up and reconciles them to the amounts listed on the Statement of Liquid Petroleum Quantities sold, Revenue earned and Receipts of Pearl Petroleum Company Limited for the period from 4 April 2007 (inception) to 30 June 2015 ("June 2015 Statement"),  a report prepared by the management of Pearl and audited by its auditors, Ernst & Young (E&Y).15 This mathematical exercise establishes nothing in terms of Pearl' entitlement to payment.

The limitations in the scope of the Boulton report are expressly stated in the report itself. For example:

a. Mr. Boulton has not verified the quantities of condensates and LPGs reported on the invoices,  nor has he examined the basis on which these quantities were delivered: for example, he has not examined if they were delivered pursuant to a direct sale between Pearl and third parties, or if they were delivered pursuant to a valid exercise of the put option.

b. Mr. Boulton has not verified the amounts received by Pearl against a full set of bank statements (merely a subset of bank statements selected for his review by Pearl).  Thus, Mr. Boulton's calculations as to the amounts received by Pearl (and thus the amounts claimed to be outstanding from the KRG) are based only on a concededly selective and incomplete review of the underlying documentation.

c. Mr. Boulton has not verified the accuracy of the quantities reported on the invoices and the amounts received. Instead, Mr. Boulton has essentially relied on the work of Ernst & Young, who also may not have verified the invoiced amounts or the amounts received. Again, Mr. Boulton does not even claim to have reviewed the relevant underlying documentation.

This limited arithmetical reconciliation of Pearl's invoices is no substitute for proof of the elements of the claims and does not discharge Pearl's burden of proof that they are entitled to payment of the invoiced amounts."

87. It is not clear whether the KRG is saying that it would have been sufficient for Pearl to have produced to the Tribunal the underlying documents (we were told that

there were 13,944 weighbridge certificates) or whether they should have called the evidence of the personnel who loaded each consignment. In either case, we consider that this would be an absurd application of the hearsay rule. In the absence of anything to show the contrary, we consider that the Tribunal is entitled to accept the audited accounts as correct.

88. At the hearing, Mr Boulton was cross-examined. He was asked whether the monthly invoices had been calculated on the basis of a straight or weighted average of daily prices for that month. At first he said a straight average, but then corrected himself when it was pointed out that his report said that the price was calculated by reference to a weighted average.[47] This was in accordance with the terms of the HoA.[48] The other point put to him was whether the weighbridge certificates could be relied upon. An e-mail was produced recording an incident in which the weighbridge was found to have had an episode of not functioning properly. Mr Boulton said that if the parties concerned had signed the certificate, he (and Ernst & Young) could only assume that they were satisfied that it recorded the correct weight.

89. In our opinion, there is no evidence to cast doubt upon the figures as audited by Ernst & Young.

90. As recounted above, the Tribunal asked Pearl's counsel whether it could be given a breakdown of the shortfall of US$1,981,951,322 (to 30 June 2015) between the claim in debt on sales to the KRG and the claim in damages for consignments not taken up by the KRG and sold to third parties. The figures provided by Ernst & Young and sent to the Tribunal with Pearl's solicitors letter of 11 October 2015 was US$1,762,505,521 for sales to the KRG and US$219,445,801 as damages for non-acceptance of goods sold to third parties.

91. In the correspondence to which the Tribunal has referred, the KRG said that it was unable to comment on this breakdown without being given the documents underlying the Ernst & Young audit. The Tribunal does not accept this submission. The Ernst & Young audit results, as verified and explained by Mr Boulton, were part of the material relied upon by Pearl at the 21 September 2015 hearing. The KRG submitted no evidence to cast doubt upon the audit but contented itself with arguing that it was insufficient to discharge Pearl's burden of proof. The Tribunal has rejected that submission. In asking for comment upon the breakdown figures, the Tribunal was not inviting a re-examination of the audit. The breakdown was no more than an arithmetical calculation from figures already in the audit report. In the circumstances the Tribunal sees no reason not to accept them, particularly since, as the Tribunal has already held, the breakdown does not affect the amount for which the KRG is liable.[49]

---

[7] Paragraph 3.6.7
[8] C-1 (HoA) Appendix 6A para 5.3.2
[9] See paragraph 82 above.

## VIII        SET-OFF

92. The KRG has raised substantial claims for damages against Pearl. It alleges that, in breach of the HoA, the LPG plant was delivered late and that it was inadequately designed. In consequence, the plant did not produce adequate supplies of gas, condensate and LPG. The KRG's expert witnesses estimate the loss it has suffered at over $3 billion.

93. The KRG says that it is entitled to plead these claims by way of equitable set-off against Pearl's claims for payment. Pearl's position was originally that there was no set-off because there was no counterclaim which was sufficiently credible to be taken into account[50] and that the nature of the cross-claims was such that they could not give rise to an equitable set-off [51]. In answer to the cross-claims set out in detail by the KRG[52], the Claimants stated:[53] "The Tribunal will understand that in due course the Claimants will naturally take issue with all of the KRG's false contentions and the supporting reports in detail, but for the moment there is no point in entering into any such debate." In their written submissions on this application the Claimants said:[54] "... While the Claimants accept that the matters there raised, albeit artificial, cannot be resolved in the day now set aside, the Claimants strongly dispute them and deny they have any basis." The Tribunal will therefore proceed on the basis that the KRG has an arguable case on its cross-claims.

94. Pearl submits that set-off is excluded by paragraph 1.8.3 of Annex 6A to the HoA:

> "1.8.3. The **CONTRACTOR** shall have the right to be paid, receive, keep, transfer and use Abroad, without any restrictions or right of set off, all compensation and Remuneration Fee as set out in Paragraph 4."

95. We do not think that this has any application to this case. Pearl's claim is not to its compensation or remuneration fee. It claims in the character of a vendor for the price of goods or damages for non-acceptance.

96. We therefore consider the position at common law. There is no dispute as to the principles upon which a cross-claim may be relied upon as a defence. A recent statement is by Rix LJ in *Geldof Metaalconstructie NV v. Simon Carves Ltd*[55]

---

[50] Submission, August 6, 2015, paragraphs 24 and 52.
[51] *Ibid*, paragraphs 24 and 56-66.
[52] Response, September 4, 2015, paragraphs 37-106.
[53] Reply, September 11 2015, paragraph 53.
[54] September 16, 2015, paragraph 62.
[55] [2010] 4 All ER 847 at paragraph 43; RLM-19.

where, after examining a number of cases on the subject, he adopted a modified version of the formulation of Lord Denning in *The Nanfri*[56]:

> "[the] cross-claims…[must be] so closely connected with [the plaintiff's] demands that it would be manifestly unjust to allow him to enforce payment without taking into account the cross-claim".

97.  The requirement of close connection, which Rix LJ described as a formal requirement, is in our opinion satisfied.  The cross-claims do not arise out of the same contract. They arise out of the HoA, while Pearl's claims arise out of a series of contracts for the sale of goods. But the sale contracts were created by a provision of the HoA (BP [7]) and there is therefore a connection.

98. The more important question is what Rix LJ called the substantive requirement, that it should be "manifestly unjust" to allow Pearl to enforce payment before consideration of the cross-claims. We do not think it would. Pearl has invested substantial sums in developing and then operating Khor Mor in return for, among other things, obtaining title to the condensate and LPG and being able to sell it. These sales were to produce the cash flow which would service and repay the investment and afterwards yield remuneration. The parties contemplated, as their primary objective, export sales in the open market:[57]

> "KRG shall: (i) allow Pearl to market and lift and export all condensates from the Khor Mar HoA Area, free from all taxes, imposts, and the like; (ii) allow Pearl to market and lift and export all of the production of LPG's from the Khor Mar HoA Area; and (iii) allow Pearl to account for and retain the proceeds of sales of such LPG, condensates."

99. The HoA gave Pearl title to the condensates and LPGs and the right to sell them on the export market and receive the proceeds, subject to a later accounting. If this had taken place, there would have been no question of its being deprived of the proceeds by a cross-claim. BP [7] was a back-up to the right to sell, intended to deal with a situation in which there was no access to the export market. We do not think that Pearl should be in a worse position because the buyer has been the KRG.

100.    In our opinion, it would not be manifestly unjust for Pearl to continue to enjoy the cash flow from the sale of its condensates and LPGs while the resolution of the KRG's counterclaims takes place. This conclusion is not weakened by the fact that Pearl's claim includes a very substantial sum of arrears. We do not think that the KRG requires to retain this money by way of security for its cross-claims because, as Pearl points out in its submissions, it is the beneficiary of exclusive rights at

---

[56] *Federal Commerce & Navigation Co Ltd v. Molena Alpha Inc* [1978] 2 QB 927 at pp. 974-975.
[57] BP [2]

Khor Mor and Chemchemal which the KRG's counsel described as "worth billions".[58]

## IX        DISCRETION

101.      The KRG submits that even if we find that its cross-claims do not as a matter of law give rise to a defence by way equitable set-off, we should as a matter of discretion defer making or suspend the operation of any monetary award until the cross-claims have been decided.  We have been referred to authorities on the exercise of such discretion in the English courts exercising their jurisdiction to grant summary judgment.

102.      This, however, is not a case of summary judgment.  As counsel for the KRG reminded us, there is no provision for summary judgment in the Arbitration Act 1996, the LCIA Arbitration Rules or the HoA. We are exercising our jurisdiction under section 47 of the Arbitration Act 1996:[59]

> "(1)       Unless otherwise agreed by the parties, the tribunal may make more than one award at different times on different aspects of the matters to be determined.
>
> (2)       The tribunal may, in particular, make an award relating—
>
> (a)       to an issue affecting the whole claim, or
>
> (b)       to a part only of the claims or cross-claims submitted to it for decision.
>
> (3)       If the tribunal does so, it shall specify in its award the issue, or the claim or part of a claim, which is the subject matter of the award."

103.      We are making an award confined to Pearl's claim for the condensates and LPG which the KRG bought or was obliged to buy because we think that for the purpose of the Tribunal reaching a final conclusion in these claims, all the relevant issues have been fully investigated and the parties have had a full opportunity to tender evidence and make submissions.

104.      Assuming however in the KRG's favour that we have such a discretion, we would not exercise it, for the reasons which we have given for our conclusion that it would not be unjust to allow Pearl to enforce payment before determining its cross-claims.

## X        DISPOSITION

105.      We, Leonard, Lord Hoffmann, Lawrence, Lord Collins of Mapesbury and John Beechey,  having read and heard the evidence and the parties' written and oral

---

Transcript 20 April 2015, p. 135.
See also Article 27 of the LCIA Arbitration Rules 1998.

submissions made to us, and having carefully considered the same and for the reasons stated above, make our Third Part Final Award as follows:

a. We order that the KRG pay to Pearl within 28 days the sum of US $1,981,951,322 in respect of Pearl's claims under contracts for the sale of condensates and LPG made pursuant to BP [7] of the HoA until 30 June 2015, being USD$1,762,505,521 in respect of sales and deliveries to the KRG and US$219,445,801 in respect of sales to third parties.

b. We reserve to ourselves the determination of all other issues and claims in the reference, including the costs relating to this Award.

Place of arbitration:  London

27  November 2015

Signed:

Lord Hoffmann

Lord Collins of Mapesbury

Mr John Beechey