# Exhibit F

# CHEESWRIGHTS
### NOTARIES PUBLIC

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY that the photographic copies hereunto annexed are true copies of the original document and of my original notarial certificate attached thereto, I having carefully collated and compared the said copies with the said originals and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this sixteenth day of March in the year two thousand and sixteen.




International
Union
of Notaries


SCRIVENER
NOTARIES

Bankside House 107 Leadenhall Street London EC3A 4AF
Tel 020 7623 9477 Fax 020 7623 5428
E-mail notary@cheeswrights.co.uk
DX 627 / London City EC3   www.cheeswrights.co.uk

## APOSTILLE
(Convention de La Haye du 5 octobre 1961)

**1. Country:**
Pays/Pais

United Kingdom of Great Britain and Northern Ireland

**This public document**
Le présent acte public / El presente documento público

**2. Has been signed by**
a été signé par
ha sido firmado por

Edward Gardiner

**3. Acting in the capacity of**
agissant en qualité de
quien actúa en calidad de

Notary Public

**4. Bears the seal/stamp of**
est revêtu du sceau / timbre de
y está revestido del sello / timbre de

The Said Notary Public

**Certified**
Attesté / Certificado

**5. at** á / en    London       **6. the** le / el día    17 March 2016

**7. by** par / por    Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs

**8. Number** sous no / bajo el número    K908009

**9. Seal / stamp:**
Sceau / timbre:
Sello / timbre:



**10. Signature:**
Signature:
Firma:

P. Forbes

This Apostille is not to be used in the UK and only confirms the authenticity of the signature, seal or stamp on the attached UK public document. It does not confirm the authenticity of the underlying document. Apostilles attached to documents that have been photocopied and certified in the UK confirm the signature of the UK public official who conducted the certification only. It does not authenticate either the signature on the original document or the contents of the original document in any way.

If this document is to be used in a country which is not party to the Hague Convention of 5th October 1961, it should be presented to the consular section of the mission representing that country.

**To verify this apostille go to www.verifyapostille.service.gov.uk**

# CHEESWRIGHTS
## NOTARIES PUBLIC

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EDWARD GARDINER** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY the genuineness of the signature subscribed to the certificate appearing on the copy document hereunto annexed, such signature being in the own, true and proper handwriting of **SARAH JOANNA LANCASTER**, registrar of **THE LONDON COURT OF INTERNATIONAL ARBITRATION**, a United Kingdom company duly organised and existing, registered with the Registrar of Companies for England and Wales under number 2047647, who, acting in such capacity, is a proper and competent officer to issue such certificate.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this sixteenth day of March in the year two thousand and sixteen.



 

International Union of Notaries

SCRIVENER

Regulated by the Faculty Office of the Archbishop of Canterbury
Bankside House  107 Leadenhall Street  London EC3A 4AF
Tel 020 7623 9477 · Fax 020 7623 5428
Email notary@cheeswrights.co.uk
DX 627 / London City EC3  www.cheeswrights.co.uk

LONDON COURT OF INTERNATIONAL ARBITRATION
CASE NO. 132527

In the arbitration proceeding between

(1) PEARL PETROLEUM COMPANY LIMITED
(2) DANA GAS PJSC
(3) CRESCENT PETROLEUM COMPANY INTERNATIONAL LIMITED

Claimants

and

THE KURDISTAN REGIONAL GOVERNMENT OF IRAQ

Respondent

# PARTIAL FINAL AWARD

*Members of the Tribunal*
Rt. Hon. Lord Hoffmann
(Presiding Arbitrator)
Rt. Hon. Lord Collins of Mapesbury
Mr John Beechey

*Date of Award: 30th June 2015*

LONDON COURT OF INTERNATIONAL ARBITRATION
Certified true copy of original

LCIA Registrar
SARAH LANCASTER
Date 11 MARCH 2016

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I | List of Abbreviations | 3 |
| II | The Parties and their Lawyers | 4 |
| III | The Arbitration Agreement | 6 |
| IV | Summary of the Disputes | 7 |
| V | The Tribunal | 8 |
| VI | Procedural History | 9 |
| VII | The Heads of Agreement | 13 |
| VIII | Factual Background | 32 |
| IX | The Issues | 43 |
| | (a)   The Exclusive Right | 43 |
| | (b)   Title to Petroleum | 48 |
| | (c)   Inability to Export | 49 |
| | (d)   FOB Med Price | 57 |
| | (e)   Right to an Account | 61 |
| | (f)   Free Gas | 63 |
| | (g)   Time for Completion | 64 |
| | (h)   Time for First Gas | 66 |
| | (i)   Readiness to Receive Gas | 66 |
| | (j)   Novation and Assignment | 66 |
| | (k)   Breach and loss from novation etc | 68 |
| | (l)   Confidentiality | 68 |
| | (m) Accountability | 69 |
| X | Disposition | 69 |

# I   LIST OF ABBREVIATIONS

| | |
|---|---|
| BP | Bullet point[1] |
| Claimants | Pearl Dana and Crescent |
| Crescent | Crescent Petroleum Company International Limited |
| Dana | Dana Gas PJSC |
| FGI | Federal Government of Iraq |
| HoA | Heads of Agreement |
| IDRC | International Disputes Resolution Centre, 70 Fleet Street, London EC4Y 1 EU. |
| IOC | International oil company |
| ITP | Iraq-Turkey Pipeline |
| KR | Kurdistan Region of Iraq |
| KRG | Kurdistan Regional Government |
| LPG | Liquid Petroleum Gas |
| MOL | MOL Group, a Hungarian oil and gas company |
| MOO | Ministry of Oil of the FGI |
| OMV | OMV Aktiengesellschaft, an Austrian oil and gas company |
| Pearl | Pearl Petroleum Company Limited |
| SOMO | The Iraq State Oil Marketing Organisation |

---

[1] Annexure 2 to the HoA consists of 33 unnumbered bullet points. For convenience we have numbered them consecutively in square brackets.

## II   THE PARTIES AND THEIR LAWYERS

1.      The First Claimant is Pearl Petroleum Company Limited ("Pearl") a company incorporated in the British Virgin Islands with the following contact details:

Pearl Petroleum Company Limited
P.O. Box 5766
Sharjah, United Arab Emirates
Attention: The Company Secretariat
Email: mail@pearlpetroleum.com

2.      The Second Claimant is Dana Gas PJSC ("Dana") is a company incorporated in Sharjah, United Arab Emirates, with the following contact details:

Dana Gas PJSC
P.O. Box 2011
Sharjah, United Arab Emirates
Attention: Dr Mohamed Nour El Din El Tahir, General Counsel
Email: meltahir@danagas.com

3.      The Third Claimant is Crescent Petroleum Company International Limited ("Crescent") is a company incorporated in Sharjah, United Arab Emirates, with the following contact details:

P.O. Box 222
Sharjah, United Arab Emirates
Attention: Mr Drazen Petkovich, Legal Director
Email: dpetkovich@crescent.ae

4.      In this Award, "the Claimants" means Pearl, Dana and Crescent.

5.      The Claimants were represented in the arbitration by Freshfields Bruckhaus Deringer LLP, Three Crowns LLP and Mr Gordon Pollock QC, with the following contact details:

Freshfields Bruckhaus Deringer LLP
65 Fleet Street
London EC4Y 1HS, UK
Tel: +44 20 7936 4000
Ms Natalie Sheehan
E-mail: natalie.sheehan@freshfields.com
Mr Reza Mohtashami
Mr Sami Tannous
Ms Antonia Birt

Freshfields Bruckhaus Deringer LLP
Al Fattan Currency House, Tower 2, Level 20
DIFC
P.O. Box 506569
Dubai, United Arab Emirates
Tel: +971 4 5099 100
Email: reza.mohtashami@freshfields.com

sami.tannous@freshfields.com
antonia.birt@freshfields.com

Three Crowns LLP
New Fetter Place
8-10 New Fetter Lane
London EC4A 1AZ
Mr Constantine Partasides QC
E-mail: constantine.partasides@threecrownsllp.com

Gordon Pollock QC
Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG
Tel: 44 (0) 20 7813 8000
E-mail: clerksroom@essexcourt.com

6.      The Respondent is the Kurdistan Regional Government of Iraq ("the KRG")
with the following contact details:

The Kurdistan Regional Government of Iraq
Attn: H.E. Dr Ashti Hawrami
Minister of Natural Resources
Council of Ministers
Erbil, Kurdistan Region, Iraq

Email: ashti.hawrami@krg.org
mnr@krgoil.com

7.      The KRG was represented in this arbitration by Wilmer Cutler Pickering Hale
and Dorr LLP and Mr Graham Dunning QC with the following contract details:

Mr Gary Born
Mr Duncan Speller
Wilmer Cutler Pickering Hale and Dorr LLP
49 Park Lane
London W1K 1PS
United Kingdom
Tel: +44 20 7872 1084
Email: gary.born@wilmerhale.com
duncan.speller@wilmerhale.com

Graham Dunning QC
Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG
Tel: 44 (0) 20 7813 8000
E-mail: clerksroom@essexcourt.com

## III    THE ARBITRATION AGREEMENT

8.    This dispute arises out of Heads of Agreement ("the HoA") made on 4 April 2007 between the KRG and Dana.  Article 16 provided:

> 16.  For the purpose of this Article, "Dispute" shall mean any dispute, controversy or claim (of any and every kind or type, whether based on contract, tort, statute, regulation or otherwise) arising out of, relating to, or connected with these HoA, the Service Agreement or the RRC's and the operations carried out under them, including without limitation any dispute as the construction, existence, validity, interpretation, enforceability, breach or termination of these HoA, which arises between the Parties (or between any one or more entities constituting Dana and the KRG).
>
> A Party who desires to submit a Dispute for resolution shall commence the dispute resolution process by providing the other parties to the Dispute written notice of the Dispute ("Notice of Dispute"). The Notice of Dispute shall identify the parties to the Dispute, shall contain a brief statement of the nature of the Dispute and the relief requested and shall request negotiations among Senior Representatives.
>
> If the Dispute cannot be resolved by negotiation within sixty (60) days after the date of the receipt by each party to the Dispute of the Notice of Dispute any party to the Dispute may seek settlement of the dispute by mediation in accordance with the London Court of International Arbitration (LCIA) Mediation Procedure, which Procedure shall be deemed to be incorporated by reference into this Article, and the parties to such Dispute shall submit to such mediation procedure:
>
> (a) If the Dispute is not settled by mediation within sixty (60) days of the appointment of the mediator, or such further period as the parties to the Dispute may otherwise agree in writing, any party to the Dispute may refer the Dispute to, and seek final resolution by arbitration under the LCIA Rules, which Rules shall be deemed to be incorporated by reference into this Article.
>
> (b) Any arbitration shall be conducted by three (3) arbitrators.
>
> (c) The KRG and Dana shall each nominate one (1) arbitrator.
>
> (d) In any event, the two arbitrators so nominated shall, in good faith, use all reasonable endeavours to agree on the nomination of the third arbitrator, who will chair the arbitral Tribunal. In case of failure to appoint an arbitrator or to agree on the appointment of

the third arbitrator, Rules of the LCIA shall apply.

(e) Arbitration shall take place in London, England. The language to be used in any prior negotiation, mediation and in the arbitration shall be English. During the arbitration procedure and until the arbitral decision, neither entity shall act in a manner that may affect the rights of the other Party under these HoA/Service Agreement. The arbitral award may include an award of specific performance and may be enforced by any court of competent jurisdiction, including the Kurdistan Region. Any award shall be expressed in US Dollars.

(f) The Parties agree that the arbitral award shall be final and not subject to any appeal.

## IV   SUMMARY OF THE DISPUTES

9.      The HoA set out the terms upon which Dana agreed to provide services[2] in the Khor Mor and Chemchemal areas of the Kurdistan Region ("the KR"), where gas had previously been found. In summary, they required Dana to provide at Khor Mor a high pressure separator and LPG plant to enable suitable gas to be supplied to electricity power stations under construction at Erbil and Bazian and to construct a pipeline to carry the gas to the power stations and, at Chemchemal, to undertake exploration and appraisal work at an estimated cost of US $44 million. Dana was required to provide gas from Khor Mor free of charge but there is a dispute over whether the obligation was limited to a specific quantity.

10.     In return for providing the services, Dana was entitled inter alia to own, market and export condensate and LPGs recovered from the gas stream and such excess gas as it was not obliged to supply to the power stations. The proceeds were to be applied in recovering its expenses and remuneration. Dana was in the first instance responsible for sales but Annexure 2, BP [7] provided that if it was "unable to export and market" the LPGs and condensates by any act or omission of government and/or for political reasons beyond its control, the KRG would purchase the products "at international FOB Med market prices…"

11.     The HoA contemplated the negotiation of a more detailed Service Agreement (clause 4) and, "when permitted under law", two separate "Risk-Reward Contracts" for petroleum from Khor Mor and appraisal and development in Chemchemal respectively.  It provided, however, that until these further agreements had been negotiated, the HoA should continue to apply: clause 8. Its terms included clause 9, by which the KRG granted to Dana "the exclusive right during the term of [the] HoA… to develop and produce Petroleum" at Khor Mor and Chemchemal. The Claimants say this clause prevents the KRG from granting to anyone else the right to develop and produce Petroleum at Khor Mor and Chemchemal.  The KRG says that the Claimant's interest in Khor Mor is limited to the recovery of its expenses and

---

[2] Specified in Annexures 3 and 5 to the HoA.

remuneration and that it has no interest in Chemchemal.

12.      Annexure 2 provided that there was to be no assignment by either Party without the approval of the other but that "Assignment by Dana to an Affiliated or Associated Company is permitted without prior approval of the KRG". On 17 October 2007 Dana, with the approval of the KRG, assigned a 50% interest in the HoA to Crescent.

13.      On 5 February 2009, Dana and Crescent executed a document assigning their rights and liabilities under the HoA to their wholly owned subsidiary Pearl. They subsequently sold minority interests in Pearl to MOL and OMV, two European oil and gas exploration companies. There is a dispute about the effect, if any, of the assignment to Pearl. The Claimants say that it novated the HoA as between the KRG and Pearl or alternatively that it assigned to Pearl the benefit of the HoA. The KRG says that it was ineffective as either a novation or an assignment and that it was a breach of the terms of the HoA for which the Claimants are liable in damages or by way of an account for the proceeds of the sale of shares in Pearl.

14.      Since the gas from Khor Mor came on stream in October 2008 the Claimants have disposed of substantial quantities of condensates and LPGs but there is a dispute about the terms upon which they have done so. The Claimants say that they have been "unable to export and market" the products within the meaning of the HoA and that the KRG was accordingly obliged to buy them and did so at the prices provided in the HoA. The KRG says that at no time have the Claimants been unable to market and export the products and that it has never purchased them upon the terms provided in the HoA. It says that the Claimants either sold the products to third parties or delivered them to the KRG upon terms, which left it to the discretion of the KRG whether to pay them anything in return. The Claimants assert a claim for goods sold and delivered to the KRG upon the terms of the HoA while the KRG denies having purchased the products and alleges that sums it paid to the Claimants were discretionary and repayable cash advances.

15.      As against the Claimants' claims of a declaration of their exclusive rights in Khor Mor and Chemchemal and for payment of the price of condensates and LPG, the KRG brings counterclaims for damages for breaches of the HoA, principally for delay in the provision of the specified facilities, a declaration as to the inefficacy of the assignment to Pearl and an account of profits made by the negotiation and sale of minority interests in Pearl, including what is alleged to have been the wrongful disclosure of confidential information to the prospective purchasers.


V      THE TRIBUNAL

16.      On 27 January 2014 the LCIA Court of Arbitration, pursuant to Rules 5.4 and 5.5 of the LCIA Rules, appointed Mr John Beechey,  Lord Lawrence Collins of Mapesbury and Lord Leonard Hoffmann to be the Tribunal in this arbitration, with Lord Hoffmann presiding.  Their contact details are as follows:

Mr John Beechey
ICC International Court of Arbitration

33-43 avenue du President Wilson,
75116 Paris, France
Tel: +33.1.49.53.28.21
E-mail: john.beechey@iccwbo.org

The Rt Hon Lord Collins of Mapesbury
Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG
United Kingdom
Tel.: +44 (0)20 7147 7233
E-mail: lcollins@essexcourt.net

The Rt Hon Lord Hoffmann
Brick Court Chambers
7-8 Essex Street
London WC2R 3LD
Tel.: +44 (0) 20 7379 3550
E-mail: leonard.hoffmann@brickcourt.co.uk

## VI   PROCEDURAL HISTORY

17.    The arbitration was commenced by a Request for Arbitration delivered by the Claimants on 21 October 2013 in accordance with Article 1 of the LCIA Rules.  The Claimants nominated Mr John Beechey as arbitrator.

18.    On 20 November 2013 the KRG delivered its Response and Counterclaim pursuant to Article 2 of the LCIA Rules and nominated the Lord Collins of Mapesbury as arbitrator.

19.    Mr Beechey and Lord Collins nominated Lord Hoffmann as Presiding Arbitrator and on 27 January 2014 the Tribunal was constituted as stated in paragraph 16 above.

20.    On 30 January 2014 the Claimants served on the Tribunal and the KRG a Procedural Submission in which they asked for a procedural hearing at which the Tribunal should give directions for a hearing, either to determine certain preliminary issues or for an application for interim measures pursuant to section 39 of the Arbitration Act 1996 and Article 25 of the LCIA Rules.

21.    After reading further correspondence between the parties, in which the KRG challenged the jurisdiction of the Tribunal and indicated that it wished to make an application for security for costs, the Tribunal held a Case Management Conference at the IDRC on 3 March 2014, where the Claimants were represented by Mr Gordon Pollock QC and the Respondents by Mr Gary Born and Mr Duncan Speller of Wilmer Cutler Pickering Hale and Dorr LLP.

22.    On 4 March 2014 the Tribunal issued Procedural Order No 1, in which it declined to order the hearing of preliminary issues but ordered that the Claimants'

application for interim measures and the KRG's jurisdictional challenge and application for security for costs should be heard on 6 May 2014 and gave directions for the service of evidence.

23.     On 21 March 2014 the Claimants served (1) their Request for Interim Measures and supporting evidence (the second witness statement of Dr Patrick Allman-Ward and the first witness statement of Dr Hamid Jafar) and (2) their Submissions on Jurisdiction.

24.     On 18 April 2014 the KRG served (1) its Response to the Request for Interim Measures and supporting evidence (the first witness statement of Dr Ashti Hawrami dated 18 April 2014, the witness statement of Duncan Speller dated 18 April 2014 and the expert reports of Charles McPherson and Nicholas Good dated 17 April 2014) and (2) its Response to the Claimants' submissions on Jurisdiction and (3) an application for security for costs.

25.     On 25 April 2014 the Claimants served Replies on Interim Measures and Jurisdiction and responded to the application for security for costs. They also served the first witness statement of Mohammed Eid Makkawi, the second witness statement of Dr Hamid Jafar and the third witness statement of Dr Patrick Allman-Ward.

26.     On 5 May 2014 the KRG served a second witness statement of Dr Ashti Hawrami, a second expert report of Nicholas Good and an expert report of Serena Moe.

27.     On 6 May 2014 the Tribunal held a hearing at the Chartered Institute of Arbitrators, 12 Bloomsbury Square, London WC1A 2LP.  The Claimants were represented by Mr Gordon Pollock QC and Mr Constantine Partasides QC and the KRG was represented by Mr Gary Born and Mr Duncan Speller.  Submissions were made on (1) the challenge to jurisdiction (2) the application for interim measures and (3) the application for security for costs.

28.     On 10 July 2014 the Tribunal issued a Ruling on Jurisdiction, Interim Measures and Security for Costs. It dismissed the challenge to its jurisdiction, ordered the KRG, by way of interim measures, to pay the Claimants, as from the date of the Claimants' application for interim measures (21 March 2014), 70% of the international FOB Med prices of liquid petroleum products lifted by them or for their account, and dismissed the application for security for costs. The Tribunal gave the KRG leave to apply to discharge the order for interim measures if it was at any time able to procure the necessary permits and consents for the Claimants to export and market the products themselves.

29.     On 23 July 2014, the KRG not having complied with the order for interim measures, the Claimants applied for a peremptory order in accordance with section 41(5) of the Arbitration Act 1996.

30.     On 28 July 2014 the KRG served a response to the application for a peremptory order and an application to discharge the order for interim measures, on the ground for which leave had been given and also on other grounds.  It served in support the third witness statement of Dr Ashti Hawrami dated 27 July 2014.

31.     After a telephone conference on 28 July 2014 the Tribunal directed that the application to discharge and the application for a peremptory order should be heard at a hearing to be held on 4 September 2014. On 1 August 2014 the Claimants served a Statement of Case.

32.     On 18 August 2014 the Claimants served a Reply to the Response to their application for a peremptory order and a Response to the application to discharge.

33.     On 1 September 2014 the KRG served a Reply to the Claimants' Response to the application for discharge, supported by a fourth witness statement by Dr Ashti Hawrami, an expert report by Robert Snell and a second expert report by Serena Moe.

34.     On 4 September 2014 the Tribunal held an oral hearing of both applications at the IDRC.  The parties made submissions orally and in writing.

35.     On 17 October 2014 the Tribunal issued "Rulings On Applications To Discharge Provisional Measures, Peremptory Order To Enforce Them And Timetable". It dismissed the application to discharge, made a peremptory order (without prejudice to its interim order of 10 July 2014) that the KRG should within 30 days pay to the Claimants US$100 million and fixed 20 April 2015 as the commencement date for the hearing of the arbitration.

36.     On 6 November 2014 the Claimants notified the Tribunal that the parties had reached substantial agreement on a procedural timetable with a view to a hearing commencing on 20 April 2015 but that they were unable to agree on whether the proceedings should be bifurcated to exclude quantification of damages and certain other issues from that hearing.

37.     On 12 November 2014 the KRG replied to the Claimants' letter of 6 November 2014 and said that while it was unable to accept the list of issues, which the Claimants proposed should be excluded from the 20 April 2015 hearing, it was willing to discuss the question of bifurcation at a Case Management Conference.

38.     On 31 December 2014 the Tribunal informed the parties that it proposed to convene a Case Management Conference to consider outstanding procedural matters and in particular to settle the issues which would be determined at the hearing commencing on 20 April 2015 and which would be left for later determination.

39.     On 12 January 2015 the Tribunal (Lord Hoffmann and Mr Beechey present in person, Lord Collins of Mapesbury participating by video link) held a Case Management Conference at the IDRC at which the Claimants were represented by Mr Gordon Pollock QC and the KRG by Mr Duncan Speller, at which submissions were made as to the issues to be determined at the hearing commencing on 20 April 2015.

40.     On 14 January 2015 the Claimants served a list of proposed issues for determination at the hearing commencing 20 April 2015 and a Request for Further and Better Particulars of the Counterclaim.

41.     On 21 January 2015 the KRG served its list of proposed issues for

determination at the hearing commencing 20 April 2015.

42.     On 10 February 2015 the Tribunal issued a list of the issues, which it ordered to be determined at the hearing commencing 20 April 2015, giving the parties leave to apply to vary the order.

43.     On 12 February 2015 the KRG applied to vary the list of issues.  The Claimants sent their comments on 13 February 2015 and on 17 February 2015 the Tribunal issued a final Amended Procedural Order on Preliminary Issues. The final list of issues ordered to be determined is attached as Appendix A to this Award.

44.     On 16 February 2015 the parties exchanged requests for the production of documents.  On 20 February 2015 and 19 February 2015 respectively the Claimants and the KRG served objections to production of some of the requested documents and on 23 February 2015 the Claimants and the KRG each served replies to the objections.  On 27 February 2015 the Tribunal issued a Procedural Order on the Document Requests.

45.     On 5 March 2015 the KRG applied to the Tribunal to vary its ruling on one of the document requests.  By a Procedural Order dated 9 April 2015 the Tribunal refused the application.

46.     On 19 April 2015 the Tribunal gave leave for five witnesses who had not been issued with visas to travel to London to give their evidence by video link from Erbil.

47.     A hearing of the issues set out in Appendix A took place at the IDRC on 20 to 24 April 2015 inclusive.  The Claimants were represented by Mr Gordon Pollock QC, Mr Constantine Partasides QC of Three Crowns LLP and Freshfields Bruckhaus Deringer LLP.  The KRG was represented by Mr Graham Dunning QC and Mr Gary Born, Mr Duncan Speller, Miss Rachael Kent of Wilmer Cutler Pickering Hale & Dorr LLP.  Both sides made written and oral opening submissions.

48.     For the Claimants, the following witnesses of fact made written witness statements and were cross-examined: Mr Hamid Jafar, Mr Thomas Watts and Mr Mohammed Makkawi.

49.     For the KRG, the following witnesses of fact made written witness statements and were cross-examined: Mr Azad Mustafa Hussain, Mr Bilind Abdul Rahman, Mr Sirwan Aziz, Mr Ziadoon Abdulazeez, Mr Hawre Riwandizi, Mr Hadi Nezir, Dr Ashti Hawrami and Mr Ahmed Ismail.  The following witnesses of fact submitted witness statements but were not cross-examined:  Mr Ahmed Mufti, Mr Sardeez Hawrami and Mr Saad Sadollah.

50.     For the Claimants, the following experts submitted reports and were cross-examined:  Dr Pedro Van Meurs, Mr Chris Moyes, Dr Abbas Kadhim and Mr Aykut Bakirci.  In addition, the following submitted reports but were not cross-examined: Mr Richard Boulton and Mr William B. Hoffman.

51.     For the KRG, the following experts submitted reports and were cross-examined:  Mr Ümit Hergüner, Mr Robert Snell and Mr Peter Lumley.  In addition,

the following submitted expert reports but were not cross-examined: Dr Mark Cronshaw and Mr Douglas N Jacobson.

52.    On Friday 24 April 2015 the Tribunal declared the oral hearing closed.

53.    On 22 May 2015 the parties submitted closing post-hearing submissions in writing.

## VII       THE HEADS OF AGREEMENT

54.    The following are the provisions of the HoA, which the Tribunal considers relevant:

### HEADS OF AGREEMENT
### ("HoA")

THESE HEADS OF AGREEMENT are made on the 4th day of April 2007 ("the Effective Date")

Between

THE KURDISTAN REGIONAL GOVERNMENT OF IRAQ ("KRG")…

and

DANA GAS PJSC…

The KRG and Dana are collectively referred to as (the "Parties").

WHEREAS

A     The KRG has entered into a Strategic Alliance Protocol ("SAP") dated 4th April 2007 with Dana and Crescent Petroleum Company International Limited ("Crescent") (Dana and Crescent are collectively herein referred to as the "Companies") whereby the Companies will carry out optimization of the development and utilization of natural gas resources in the Kurdistan Region of Iraq.

B     The KRG wishes to appoint Dana to carry out certain works in the field of Khor Mor situated some 45 Km from Kirkuk and in the field of Chemchemal situated some 50 Km from Sulaimaniyah in the Kurdistan Region of Iraq. The work is urgently required to fulfill energy requirements in the Kurdistan Region of Iraq and in particular to provide urgent gas supplies for

use at the power stations under construction at Erbil and Bazian, and thereby help to relieve the electrical power shortage affecting all the people of Iraq.

C    The KRG has endorsed a federal draft Oil and Gas Law for Iraq that requires petroleum contracts issued by federal and regional entities, including by the KRG, to meet agreed commercial criteria, in addition to other relevant provisions pursuant to the KRG and the Constitution of Iraq.

D    The KRG has endorsed the principles of a draft Revenue Sharing Law for Iraq that provides for all petroleum revenues, however derived, to be shared and distributed throughout Iraq in proportion to the whole of the population of Iraq.

E    Dana, being a natural gas resource company does not normally enter into service-type agreements, but being suitably qualified and desirous of developing a strategic partnership with the KRG for development of gas resources, is willing to co-operate with the KRG by entering into these HoA. The KRG recognizes that work and services performed in the context of the perceived current legal and political circumstances in Iraq may render engagement of subcontractors for the performance of the Services problematic and which may add elements of additional expense and difficulty, to the performance of the Services. The KRG accordingly undertakes to assist and accommodate Dana so far as possible, in so far as the terms and provisions of these HoA are concerned, in order to manage and ameliorate such risk.

F    The KRG, desirous of rapid and optimal economic development of the petroleum gas resources of the Kurdistan Region of Iraq, gas-related industries, and job creation for the benefit of the people of Iraq and the Kurdistan Region of Iraq, has declared its intention to associate and contract with Dana Gas to take the lead in the development of the gas resources of the Kurdistan Region of Iraq, both for domestic gas utilization as a priority, as well as for export.

G    These HoA set out the terms by which the Parties agree to perform certain services (the "Services") in respect of the Khor Mor and Chemchemal areas as further described below ("the HoA Areas") and simultaneously to negotiate terms of a Service Agreement (as legally permitted, the respective successor two risk-reward contracts envisaged herein in respect of the HoA Areas) for: (a) the initial Development and Production of Petroleum within the Khor Mor HoA Area, and transportation of gas, by pipeline from the Khor Mor HoA Area to the power stations at Erbil and Bazian; (b) appraise the additional deep oil reserves potential of the Khor Mor HoA Area; and (c) appraise the reserves and the development potential of the Chemchemal HOA Area, prior to full-scale development in accordance with good petroleum industry practice.

NOW IT IS AGREED as follows:

1.  Dana together with the KRG have identified the Khor Mor HoA Area as delineated in Annexure 1 ("Khor Mor HoA Area") in relation to which Dana has agreed to commence the initial Work Program and related activities for the Khor Mor Gas Utilization Plan as set out in Annexure 3  ("Khor Mor Gas Utilization Plan").

2.  Dana together with the KRG have identified the Chemchemal HoA Area within the Kurdistan Region of Iraq as delineated in Annexure 4 ("Chemchemal HoA Area") in relation to which Dana has agreed to commence the initial appraisal program and related activities as set out in Annexure 5 ("Chemchemal Appraisal Program & Subsequent Development Program").

3.  Dana has an LPG plant under construction which is scheduled for completion in July 2007 (ex works US) and is willing to divert said LPG plant (which is destined for another project) for use in the Khor Mor Gas Utilisation Plan

4.  The Parties wish to enter into a detailed Service Agreement with a view to producing gas as soon as reasonably possible pursuant to the Khor Mor Gas Utilization Plan (it being understood that production is urgently required on a fast track basis to supply power stations currently under construction in Erbil and Bazian, and to perform the Chemchemal Appraisal Program & Subsequent Development Program in accordance with the timetable forming part of the Chemchemal Appraisal Program & Subsequent Development Program set out in Annexure 5. The KRG shall facilitate the co-ordination of Dana directly with the relevant governmental authorities and the power station owners/contractors to ensure seamless management and interface of the power stations with the Khor Mor Gas Utilization Plan.

5.  The Service Agreement shall incorporate the Commercial Terms set out in Annexure 2 ("Commercial Terms") as well as applicable terms of these HoA. At any future date and as and when permitted by law, Dana in consultation with the KRG may, as circumstances permit pursuant to the provisions stipulated herein as and when permitted under law, whether before or after execution of the Service Agreement, in preference to continuing with the Service Agreement elect to substitute the arrangements as agreed herein, into the terms of two separate Risk-Reward Contracts ("the RRC's"): one in respect of Petroleum from the Khor Mor HoA Area, and the other in respect of Appraisal and Development within the Chemchemal HoA Area. In such event the terms of the said RRCs shall, in respect of the Khor Mor RRC, be along the lines of the model Production Sharing Contract the KRG may adopt in the future (albeit suitably adjusted to take account of the higher risks prevailing at the date hereof) and in respect of the Chemchemal RRC be based on the draft document

attached in Annexure 7 ("Chemchemal Draft RRC") and otherwise as consistent with the model Production Sharing Contract KRG may generally adopt in the future. In any event and irrespective of the grant of any such contract, the Parties shall honour the terms of these HoA and any subsequent Service Agreement until such time as Dana has performed its obligations, and has been paid in full for the Services in accordance with the terms of these HoA.

6.     Dana shall use its best efforts to utilize commercially and technically competent local companies for the construction work related to services under this HOA to be approved by KRG.

7.     Until such time as the Parties have executed the Service Agreement and/or (as applicable) the RRC's, Dana shall implement the initial Work Programs of the Khor Mor Gas Utilization Plan and the Chemchemal Appraisal Program & Subsequent Development Program set out in Annexures 3 and 5, respectively to be subsequently followed by full development program on both HOA Areas as reasonably agreed by the Parties. These documents will be updated and revised from time to time by agreement between the Parties as new information is obtained by the Parties, and such revisions shall be incorporated into the respective documents to be annexed to the Service Agreement or the RRC's as applicable.

8.     Until such time as the Service Agreement (and/or the RRC's as applicable) has been signed, the Parties agree that, in respect of the HoA Areas, the Commercial Terms shall apply to the Services to be performed pursuant to these HoA.

9.     The KRG hereby grants Dana the exclusive right during the term of these HoA and that of the Service Agreement (and/or the RRC's as applicable) to develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area.

9. *[bis]*     The Parties undertake to keep all data and information relating to these HoA ("Confidential Information") confidential during the entire term of these HoA and for a period of five years thereafter. The Parties further undertake each to the other not to divulge or disclose such data or information to third parties without the specific written consent of the other Party, such consent not to be unreasonably withheld or delayed. The foregoing confidentiality obligation shall not apply to information or data in the public domain, or which is known to the Receiving Party at the date of disclosure; nor shall it apply with regard to any public announcements or press releases required to be made under any applicable law, rules or regulations, by a Government agency having jurisdiction over Dana; or by a court order; or pursuant to the regulations of a recognised stock exchange on

which the shares of Dana or its Affiliate are listed.

Notwithstanding the foregoing a Party may disclose Confidential Information to:

...

(e)  bona fide prospective assignees of a participating interest under these HoA;

For these purposes "**Affiliate**" means any company or legal entity which (i) controls a Party, or (ii) is controlled by a Party, or (iii) is controlled by a company or legal entity which controls a Party. "Control" means the right to exercise, either directly or indirectly, more than fifty percent (50%) of the voting rights in such company or legal entity; "**Associated Company**" means a company with which Dana has a cooperation or similar agreement.

10.   The KRG hereby warrants to Dana that all necessary KRG, other Governmental and regulatory approvals required for the implementation of these HoA and the Service Agreement shall be obtained when and if required.

...

12.   The Parties intend that these HoA shall continue to govern the relationship between the Parties until execution of the Service Agreement, and/or the RRC's (as applicable). In the event the Service Agreement or the RRC's is/are not executed before 30th June 2007, Dana may at its discretion suspend the Services under these HoA until such time as the Service Agreement or RRC has been executed in respect of the HoA Areas. Under such circumstances, the KRG shall reimburse Dana for all Expenses (comprising direct and indirect costs, including any costs for canceling/suspending various suppliers' and subcontractors' agreements) within 3 months of the date of such suspension.

13.   The Parties shall make their best efforts to negotiate the terms of the Service Agreement and/or the RRC's consistent with the terms of these HoA as soon as possible. Until and unless such Service Agreement and/or the RRC's is/are agreed and entered into by the Parties, the terms of these HoA shall continue to be legally binding upon the Parties.

14.   The KRG and Dana undertake to sign such documents as may reasonably be required to put into full force and effect the intention and provisions of these HoA.

15.   The HoA/Service Agreement/ RRC's (as applicable),

including any Dispute arising in relation thereto, shall be governed by English Law (except any rule of English Law which would refer the matter to another jurisdiction), together with any relevant rules, customs and practices of international law, as well as by principles and practice generally accepted in the international petroleum industry.

16.   [Dispute resolution and arbitration clause: see paragraph 8 above].

17   The KRG hereby undertakes to Dana that it will, pursuant to the provisions of the Federal Oil and Gas Law of Iraq when adopted, and as and when permitted by said Law, enter into appropriate arrangements for the joint administration between the KRG and the Central Government of Iraq of these HoA and any subsequent Service Agreement and/or RRC and undertakes to ensure that these HoA and any subsequent Service Agreement and/or RRC are adopted by any incoming governmental authority on substantially the same terms. The KRG shall hold Dana harmless from the result of any material change suffered by Dana as a result of KRG failure or inability to honour this obligation.

18   …

19 …

20   …

21 The KRG will make its best efforts to ensure that these HoA and any subsequent Service Agreement/RRCs are adopted by any authority on substantially the same terms. The KRG shall hold Dana harmless from the result of any material change to these HOA arising from such Referendum.

22   …

[Signatures]

### Annexure 2

### Key Commercial Terms of the Service Agreement

• [1] The KRG shall pay Dana in United States Dollars for the Services on the basis set out in the Accounting Procedure and in these HoA or in the Service Agreement (as applicable);

• [2] The KRG shall provide a guarantee in a form acceptable to Dana for its payment obligations for the Services. KRG shall: (i) allow Dana to market and lift and export all condensates from the

Khor Mor HoA Area, free from all taxes, imposts, and the like; (ii) allow Dana to market and lift and export all of the production of LPG's from the Khor Mor HoA Area; and (iii) allow Dana to account for and retain the proceeds of sales of such LPG, condensates ; referred to as "Revenues" to firstly, pay for the Expenses, Operating Costs and Remuneration Fee (defined below) and secondly for the electricity tariff to be paid to the Independent Power Producer (IPP) at the agreed electricity tariff between the KRG and the IPP.

• [3] Dana shall be entitled to take title and market any " Excess Gas" on an optimized arms-length commercial basis, with first priority being given to local industries, and then (if available in sufficient quantities) for export." Excess Gas" shall mean any gas in excess of the specisfication [sic] gas required to be supplied by Dana to the IPP, on behalf of the KRG, free of charge. Any revenue from such sale of Excess Gas , after reimbursing Dana pursuant to its entitlements under the HOA and/or Service Agreement (as applicable), shall be for the account of KRG.

• [4] The KRG shall procure that all Gas produced from the Khor Mar HoA Area (excluding Gas required for Petroleum Operations) is processed by the Plant to be built by Dana as part of the Services. The title to the petroleum liquid products shall pass to Dana at the point of processing.

• [5] Dana undertakes that it shall make reasonable efforts to obtain the best arms-length price reasonably possible for the LPG's and Condensates and Excess Gas in accordance with generally accepted petroleum industry practices but taking into account the location and availability of infrastructure.

• [6] KRG may elect that Dana not market and sell the LPG's and instead sell its LPG's to the KRG at the international FOB Med market price and shall pay for such sales within 30 days from the month ends as quoted by Platts Oilgram Report or similar journals.

• [7] In the event Dana is unable to export and market the LPG's, Condensates by any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control Dana then the KRG shall purchase and lift (or arrange for the lifting by the domestic companies/users) and pay for the liquid petroleum products at international FOB Med market prices as quoted by Platts Oilgram Report or similar journals within 30 days from the month ends.

• [8] In the event Dana is unable to market locally or export Excess Gas by any act or omission of government (including foreign neighbouring governments) and/or for political reasons

beyond the control Dana then the KRG shall: (a) allow any Excess Gas to be re-injected into the field (by adding suitable compression); and (b) permit any Excess Gas to be flared on a short-term temporary basis.

• [9] Khor Mor Services shall include all operations conducted by Dana during the construction phase of the Khor Mor project, in accordance with the Khor Mor Gas Utilization Plan. Such construction phase to end when Services are complete as per the Khor Mor Gas Utilization Plan and gas production commenced ("First Gas").

• [10] "Expenses" means all expenditure incurred by Dana pursuant to these HoA including those related to the Chemchemal Appraisal Program & Subsequent Development Program and the Khor Mor Gas Utilization Plan and all Services and work performed during the construction phase, including financing costs and any other expenditures (such as head office overhead, costs of security, costs or the equivalent fair market costs of insurance against terrorism and sabotage and other such risks) as determined in accordance with the Accounting Procedure. For the avoidance of doubt, Expenses include: (a) all Services and work performed during the construction phase related to the Chemchemal Appraisal Program and the Khor Mor Gas Utilization Plan; and (b) all Services and work performed relating to production and operation of the Khor Mor field prior to First Gas.

• [11] ...

• [12] ...

• [13] In addition to reimbursement of the Expenses and Operating Costs, Dana shall be entitled to a remuneration fee that provides Dana with an IRR of (18%) ("Remuneration Fee") on funds incurred for the Expenses, Operating Costs as per the Accounting Procedure. The Remuneration Fee, however, in no event shall be less than ten percent (10%) of the Aggregate Revenues throughout the duration of the Service Agreement.

• [14] Dana shall perform services as per the Khor Mor Gas Utilization Plan through the construction phase and thereafter during production/operating activities until Dana has recovered its Expenses and Remuneration Fee in respect of the Services.

• [15] Expenses and Operating Costs in respect of Operating Activities incurred by Dana and Remuneration Fee shall be recovered from the Revenues derived from the sales of condensates or LPG's extracted from Natural Gas from the Khor Mor HOA Area, commencing on the date of First Gas, as per the Accounting Procedure

• [16] ...

• [17] …

• [18] Dana to carry out its activities in compliance with Iraqi laws and laws of the Kurdistan Region of Iraq;

• [19] The KRG shall secure all necessary governmental approvals, licenses and permits for project implementation, including from the Iraqi central government. In addition, the KRG shall secure all necessary export and import permits and licenses for Dana's use, including from neighbouring countries, if required, on a government-to-government basis.

• [20] …

• [21] …

• [22] …

• [23] The KRG waives on its own behalf and that of the KRG any claim to immunity for itself and assets;

• [24] …

• [25] …

• [26] …

• [27]      Either Party may terminate the HoA on the grounds of a breach by notice in writing to the other Party provided a 60 day rectification period has first been given;

• [28] …

• [29] No assignment by either Party without approval of the other, such approval not to be unreasonably withheld or delayed. Assignment by Dana to an Affiliated or Associated Company is permitted without prior approval of the KRG.

• [30]   …

• [31] …

• [32]…

• [33]

Annexure 3

## The Khor Mor Gas Utilization Plan

### 1. Introduction

The Khor Mor field is a large anticline situated along the Kirkuk structure to the South East, some 45 kms from Kirkuk town. The structure is approximately 35 kms long by 4 kms wide rather smaller than Chemchemal, but having some 30% more reserves and clearly more prolific.

Khor Mor field was discovered in 1929, and two appraisal wells were drilled in 1954, and 1980. It was one of the five fields that were earmarked by the Iraqi KRG in the mid-nineties of the last century as a source of gas for export to Turkey. The plan called for the development of the field in two stages: An initial stage of 50 MMscf/d, and a final stage of 200 MMscf/d. The gas was to be partly processed on site and transported as a single phase fluid (or, alternatively, as a two-phase fluid) to a new processing plant to be built in Beiji.

Khor Mor has been partly developed and put on early production. Five development wells were drilled during the period July 1989 to August 1990, and the field was connected to Jambur degassing station for gas processing, so as to partially substitute for the production of Dome gas from Jambur field. An international tender was issued by SCOP in 2005 for further development of this Field, but no information is available on the outcome.

### 2. Wells

Discovery well KM-1, which was drilled in 1929, proved the existence of hydrocarbons in the Jeribe Tertiary reservoir. The first appraisal well KM-2 which was drilled in 1953 down to Jaddala formation, flowed sweet gas and condensates to surface from the Jeribe reservoir. The field however was not properly appraised until 1980, when well KM-3 was drilled down to the Kometan formation (Upper Cretaceous). The well produced sweet gas from Euphrares, Askend, and Ibrahim (Tertiary reservoirs), and sour gas from the Kometan. The five development wells drilled in 1989-1990 were completed in the Tertiary reservoirs, and flowed gas at rates of 23 MMscf/d to 61 MMscf/d ...

Based on the above tests, wells KM 4- KM 8 appear capable of initially delivering the required 200 MMscf/day: 100 MMscf/dy to each power station. However, detailed test data are not available and

22

therefore the sustainability of these rates cannot be confirmed. It is therefore proposed that the plans include at least two additional wells to improve well distribution and create a more balanced and sustainable off take from the reservoir.

### 3- Gas Reserves

...

### 4- Reservoir Pressure

...

### 5- Surface Facilities

#### a- Overview

It is not known what existing facilities are already installed at Khor Mor and this will need to be ascertained before the design of the facilities can be finalized. Nevertheless, it is intended that the existing wellheads on the flanks will be connected to a central manifold by means of infield surface flow lines. High pressure gas separation facilities will be installed at the collection point to condition the Gas (both water and hydrocarbon dewpoint) so that the Gas is suitable for transporting by pipeline and for use in the power stations. The Gas will be dehydrated by the use of molecular sieve facilities to lower the water content so that no free water can form in the chilling section of the LPG plant. The Gas will be further processed in a packaged LPG plant which will not only achieve a low hydrocarbon dewpoint (to meet the Gas specification requirements of the turbine manufacturer at the power stations), but also maximise the production of high value liquid products (LPG's and condensate).

A 150 MMscfd liquids recovery expander plant (after appropriate modifications) that is currently being built by a US manufacturer has recently become available and will be ready for shipment from the US in July 2007. The plant includes: inlet separation/filtration, mol sieve dehydration, licensed SCORE liquids recovery plant, depropaniser, debutanizer, product pumps, hot oil system, flare system, fuel gas system, instrument air system, drains system, chemical storage and 9500 HP of residue gas compression. This plant will require some modifications (larger depropaniser and debutanizer columns) to handle the higher liquid loads but such columns can be constructed readily at the US suppliers newly opened facilities in the UAE. Consequently, the LPG plant could be installed and ready for operation by the end of 2007. Any increase in gas processing capacity beyond the 150 MMscfd shall be provided by the installation of additional gas processing facilities, as mutually agreed by KRG and Dana. The condensate outlet from the high pressure separator together with the condensate from the LPG plant will be stabilised by means of a low pressure separator and a

23

degassing tank and stored in a suitably sized tank. The condensate will be either: (a) trucked or piped to existing facilities at Kirkuk (or elsewhere if feasible), for commingling and export sales utilizing the existing export pipelines; or (b) processed by means of a small topping plant (availability of second-hand plants are being investigated) for converting to finished products that can be sold into the domestic market. The LPG's will be stored in pressurized spheres and transferred either by truck to existing LPG bottling plants or to new LPG bottling plants that are likely to be established adjacent to the LPG plant by the existing domestic marketing companies.

### b· Pipelines

The Gas from Khor Mor is destined for use in the power stations at Erbil and Bazian. It is proposed to route the pipeline from Khor Mor to Chemchemal so that Gas from the Chemchemal field can be subsequently combined with the Khor Mor Gas. The distances to Erbil and Bazian have been estimated to be 145 Kms and 65 Kms, respectively. A preliminary pipeline route has been selected, however, such a route can only be confirmed once surveys have been carried out.

Preliminary hydraulic calculations... provide[s] the following results:

• a 20" inch diameter pipeline is required to deliver the 200 MMscf/day of gas to Chemchemal, some 50 Kms North of Khor Mor,

• a 12" inch diameter pipeline is required to deliver 100 MMscf/day of gas to Bazian power station, some 15 kms from Chemchemal and

• a 20" inch diameter pipelines is required to deliver the 100 MMscf/day of gas to Erbil power station, some 95 kms from Chemchemal.

It is suggested that slightly larger pipelines are installed, together with thicker wall thickness to provide for future expansion capacity. The nominal increase in costs for the larger and thicker wall pipes provides considerable growth potential to supply the expanding needs of Erbil, Sulaimaniyah and other neighbouring cities, villages, and industrial localities. However, such decisions require input from KRG and so the selection of the pipe size will be taken with the approval of the KRG during the initial engineering stages.

### 6· Timing

The timetable for such a project is typically 18 to 20 months; the key long lead item is the LPG plant. However, because the LPG plant is available from the US in July 2007 the timetable may be reduced to circa 9 months, depending upon the deliveries obtained for pipe materials, which has now become a critical path activity for the Project. However, further definition of deliveries for both the pipe materials and the larger columns are required from the suppliers before a detailed project schedule can be prepared to confirm that such timings are achievable. Nevertheless the timings given below are based upon the above assumptions and are given in months after unconditional award of the HoA.

| | |
|---|---|
| Month 0 | Place order for available LPG plant outlined above and source shortest deliveries for pipe and valves. |
| Month 1 | Perform process and engineering related studies to design new columns and surface facilities equipment and select pipe size. Carry out preliminary survey to ascertain pipe quantum. |
| Month 2 | Place orders for materials for pipelines, separators, columns, storage tanks, valves and long lead facilities. Perform detailed route survey. |
| Month 3 | Finalise detailed engineering and place remaining equipment and bulk orders. |
| Month 4-5 | Invite tenders for pipeline construction and award construction contract. Ship LPG plant from US to nearest port in Turkey. |
| Month 5-6 | Prepare and level site and transport LPG plant to site by road from Turkey port. |
| Month 6-7 | Deliver pipes, manifold, separator, columns, and valves to site and install LPG plant and related surface facilities. |
| Month 7-9 | Install export pipeline, separation, and condensate storage tanks. |
| Month 9-10 | Test and pre-commission LPG plant and deliver gas to power stations. |

The activities required to achieve the above timings are shown in the attached schedule.

7. Costs

The following preliminary (very rough) cost estimates have been prepared…

## Annexure 5

## Chemchemal Appraisal Program & Subsequent Development Program

### 1. Introduction

Chemchemal gas field is a large elongated anticline situated in the folded Zagros foreland basin, some 50-100 kms South East of Erbil city, and some 50 kms to the East and North East of Kirkuk…

The available data related to the Chemchemal field is very limited. Indeed, even though two wells have been drilled on the structure, the field has not been properly appraised and tested, and very little petrophysical data is available; neither the wireline logs, nor cores have been found. Clearly, further data is required to assist in the understanding of the geological and reservoir features of the Chemchemal field.

…

### 4. Work Program

The Work Program involves:

(i) appointing risk advisors to establish proper security arrangements and attain 'manageable risk' status at the worksite;

(ii) acquiring 400kms of 2D seismic data;

(iii) drilling out the cement plug in the existing Chemchemal well 2, running wire-line logs and, if feasible, retesting the horizons; and

(iv) drilling two appraisal wells to 3,000 metres and testing the horizons.

### 5. Costs

The capital expenditure for the Appraisal Program is estimated as follows:

…

Total       US $44.4 [million]

## 6. Timing

The estimated schedule for the Appraisal Program is around 12 months as shown on the attached schedule. The actual dates depend upon the date of execution of the HOA and the prevailing conditions at that time, particularly with respect to seismic and drilling contractors. Subsequent to appraisal program and pursuant to the results thereof, Dana shall propose a development program for full field development.

ANNEXURE 6A[3]

ACCOUNTING PROCEDURE

## PARAGRAPH 1 -GENERAL PROVISIONS

### 1.1 Purpose

This detailed Accounting Procedure forms an integral part of the HOA. The purpose of this detailed Accounting Procedure is to describe certain provisions as provided herein, including setting out the detailed nature of Petroleum Costs, and to clarify and prescribe the intended mechanism for the recovery of said costs, the payment of the Remuneration Fee to the CONTRACTOR, and the manner in which the CONTRACTOR's Accounts shall be prepared, submitted and approved. The provisions of this document shall therefore, with regard to the HOA, be comprehensive for the recovery of the Petroleum Costs and the Remuneration Fee and other related matters.

### 1.2 Definitions

Capitalised terms and expressions are defined below and elsewhere in this Annexure:

...

**Aggregate Revenues** means the aggregated amount of monthly revenues in Dollars earned by the **CONTRACTOR** from the sales of all Petroleum, and any tariffs paid by third parties in connection with the use of the Facilities.

**Arm's-Length Sales** means sales of Petroleum in freely convertible currencies between sellers and buyers having no direct or indirect relationship or common interest whatsoever with each other that could reasonably influence such sales price. Such Arm's-Length Sales shall exclude:

---

[3] Annexure 6A was incorporated into the HoA on 25 January 2008: see Exhibit C-7.

a)  sales between or among the **CONTRACTOR** and its Affiliates;

b)  sales involving the KRG;

c)  sales involving exchanges and any transactions not relating to normal commercial practices.

**CONTRACTOR** shall mean Dana and its rightful and lawful assignees.

...

**Facilities** shall mean the plant, pipelines, and all other equipment and facilities installed by **CONTRACTOR** in respect of the Services performed, pursuant to the HOA.

**Further Services Plan** means an approved plan or plans other than the Initial Services Plan in respect of Services in the HOA Areas.

**Initial Services Plan** means the scope of the Services set out in Annexure 3 and Annexure 5 as updated and including appraisal, drilling, well rehabilitation, Operation Activities and the purchase and installation of two LPG trains and other processing facilities, and for the construction of the pipeline for the transportation of processed gas including to the IPP electrical power stations at Erbil and Bazian.

**Operating Activities** means the activities commencing at First Gas in respect of the servicing, maintenance and operation of the Facilities, including production, processing, transportation, storage and handling facilities.

**Operating Costs** means all costs incurred by the **CONTRACTOR** in respect of Operating Activities.

**Petroleum** means all naturally occurring hydrocarbons which (as applied in this HOA) includes any condensates, LPGs and natural gas and any products derived therefrom.

**Petroleum Costs** means all Expenses and Operating Costs incurred by the **CONTRACTOR** in connection with the Services.

**Remuneration Fee** is defined in Paragraph 4.2.

**Services Plan** shall mean either the Initial Services Plan or any Further Services Plan.

### 1.3 Accounting Records and Reports

...

1.3.2 The **CONTRACTOR** shall maintain appropriate accounting records to segregate, properly record and account for the Petroleum Costs incurred and Aggregate Revenues (as hereafter defined) earned by the **CONTRACTOR** from the HOA Areas.

1.3.3. The **CONTRACTOR** shall provide to the **KRG** appropriate periodic reports on the Accounts to enable the recovery of Petroleum Costs and the Remuneration Fee by the **CONTRACTOR** and for the repayment of the balance amount of Aggregate Revenues remaining in any month after the recovery of Petroleum Costs and the Remuneration Fee to the KRG in accordance with the provisions of Paragraph 4. The requisite reports are set out in Paragraphs 6, 7, 8, 9 and 10 of this Accounting Procedure. Each of the reports and statements submitted by the **CONTRACTOR** shall be considered true and correct if not contested by the **KRG**. The **KRG** may, however, contest and raise an exception thereto within the timeframe and under the process set out in Paragraph 1.5 of this Accounting Procedure.

...

### 1.5 Audit and Inspection Rights of the KRG

The **KRG** shall have the right: (a) to audit the Accounts with respect to each Calendar Year within a period of two (2) Calendar Years following the end of such Calendar Year ("**Audit Period**"); and (b) to retain an auditor of international standing familiar with international petroleum industry accounting practice to undertake or assist the **KRG** to undertake the said audit.

1.5.2   For purposes of auditing, the **KRG**, acting reasonably and in accordance with prudent international petroleum industry practice, may examine and verify, at reasonable times upon reasonable prior written notice to the **CONTRACTOR**, all charges and credits relating to the Services, such as books of account, accounting entries, material records and inventories, vouchers, payrolls, invoices and any other documents, correspondence and records including electronic records reasonably considered necessary by the **KRG** to audit and verify the charges and credits, values and treatments.

## PARAGRAPH 2 -WORK PROGRAM AND BUDGET

### Approval of Work Program and Budget

2.1.   Within ninety (90) days following the submission of any Further Services Plan to the **KRG**, the **CONTRACTOR** shall prepare and submit to the **KRG** a proposed work program (together with a budget) in respect of work anticipated to be performed in respect of such Further Services Plan. Thereafter, the **CONTRACTOR** shall no later than 1 October in each calendar year after First Gas, submit to the **KRG** an annual work program (together with a budget) in respect of work anticipated to be performed pursuant to such Further Services Plan in the coming calendar year. In order to enable the **KRG** to forecast expenditures, any work program shall include details of the following (for the avoidance of doubt, "including" and similar words when used herein does not imply any limitations):

(a) works to be carried out;

(b) material and equipment to be acquired by main categories;

(c) type of services to be provided, distinguishing between third parties and Affiliated Companies; and any budget shall include the categories of general and administrative expenditure.

No further approval of the **KRG** is required in respect of the Initial Services Plan which the **CONTRACTOR** has already initiated with the approval of the KRG, and in relation to which the **CONTRACTOR** is currently performing Services. For the avoidance of doubt, the costs incurred or to be incurred by the **CONTRACTOR** pursuant to the Initial Services Plan shall be considered Petroleum Costs and shall be recovered by the **CONTRACTOR** in accordance with the terms of this Accounting Procedure.

2.2.   Any modification to a proposed work program and budget shall be discussed by the Parties who shall meet to discuss such proposed modifications within forty five (45) days from its receipt. In the event that no mutually agreed changes are made to such proposed modifications by the Parties within 30 days of the said meeting, then the proposal made by the **CONTRACTOR** shall be deemed adopted.

. . .

2.5   In accordance with the HOA, the Services to be performed by the **CONTRACTOR** in the HOA Areas shall include:

(i)   all seismic and drilling activities including: (a) geological, geophysical, aerial and any other surveys and interpretation of data relating thereto; (b) drilling of shot holes, core holes, strati graphic tests holes etc; (c) the drilling of wells; (d) the production testing and the purchase or acquisition of supplies, materials and equipment therefor.

(ii) The implementation of plans and all development operations devised and performed pursuant to the HOA with a view to developing all Petroleum and reservoirs, including: drilling of wells; primary and subsequent recovery projects and pressure maintenance; survey, engineering, building and erecting or laying of production plants and facilities (including: separators, compressors, generators, pumps and tankage, gathering lines, pipelines and all facilities required to be installed for production, pressure maintenance, and treatment, storage and transportation of Petroleum); obtaining of such materials, equipment, machinery, items and supplies as may be required or expedient for the foregoing activities; and all auxiliary operations, including operations conducted pursuant to approved Petroleum development programmes or production plans and activities required or expedient for the production and sale of Petroleum.

(iii) all maintenance activities and other operations directly or indirectly related or connected with the above operations (including pipeline maintenance and health, safety and environmental operations and activities) and other activities authorised or contemplated by, or performed by the **CONTRACTOR**.

(iv) any services in respect of petroleum operations for the processing, production and sale of Petroleum from the start of commercial production, including extraction, injection, stimulation, pumping, treatment, storage, engineering, operating, servicing, repairing, and maintaining any wells, plants, equipment, pipelines, terminals and any other installations and facilities, and any related operations and auxiliary operations, and storage and transportation of Petroleum to the relevant delivery point.

...

## PARAGRAPH 3 - RECOVERABLE COSTS OF THE CONTRACTOR

### 3.1 Costs

All Petroleum Costs incurred by CONTRACTOR in connection herewith shall be recoverable. Such costs shall include:

...

### 3.1.18. *Petroleum Marketing Costs*

All costs and expenses incurred by the **CONTRACTOR** in respect of the marketing and lifting of Petroleum and related products carried out under the HOA

## PARAGRAPH 4- RECOVERY OF PETROLEUM COSTS AND REMUNERATION TO CONTRACTOR

All Petroleum Costs incurred by the **CONTRACTOR**, together

with the Remuneration Fee, shall be recovered from the
Aggregate Revenues as compensation for the performance of the
Services pursuant to the following terms:

4.1. All Petroleum Costs incurred shall be recovered on a monthly
basis from the Aggregate Revenues earned by the
**CONTRACTOR**. Any Petroleum Costs not recovered at the end
of each Month shall be carried forward to the succeeding Month,
until such time as the Petroleum Costs are fully recovered.

4.2. In addition to the reimbursement of Petroleum Costs, the
**CONTRACTOR** shall be entitled to earn a Remuneration Fee
which shall be an amount sufficient to provide the
**CONTRACTOR** with an Internal Rate of Return of 18% on the
Petroleum Costs incurred (herein, "IRR"). In no event, however,
shall the Remuneration Fee be less than ten percent (10%) of the
Aggregate Revenues earned during the term of the HOA, which
shall not be less than 25 years in accordance with the provisions
of the HOA. The remuneration of the **CONTRACTOR**
determined as stipulated in this Paragraph shall be defined
as the **Remuneration Fee**. The procedure for the calculation of
the **Remuneration Fee** is set out in Paragraph 4.4.

4.3. The Aggregate Revenues received by the **CONTRACTOR**
in each Month shall be applied as follows:

a) First, to the recovery of the **Remuneration Fee** due to the
**CONTRACTOR**, as provided for under the provisions of
Paragraph 4.2, and computed in accordance with the procedure set
out in Paragraph 4.4.

b) Secondly, to the recovery of Petroleum Costs incurred by the
**CONTRACTOR**.

The balance amount of Aggregate Revenues remaining in any
Month after the recovery of Petroleum Costs and the
Remuneration Fee, shall be payable by the **CONTRACTOR** to
the **KRG**.

...

## VIII   FACTUAL BACKGROUND

*(a)    General comments*

55.    Most of the issues set out in the Appendix turn upon the construction of the
HoA.  Nevertheless, some raise questions of fact.  And the factual background known
to the parties against which they entered into the HoA is also of course highly relevant
to its construction.  It is therefore necessary for the Tribunal to make some findings of
fact. In some cases these will be relevant only to a specific issue and we shall consider

the facts when dealing with that issue. On the other hand, some matters, such as the background to the HoA, are more generally relevant and we shall deal with them here.

56.     On some important points the Tribunal was faced with conflicts between the oral evidence of witnesses. We do not think that any witness gave evidence, which he knew to be untrue, but we are concerned with events, which in some cases took place over eight years ago and memories may be unreliable. In addition, it is a well-known phenomenon that when a dispute arises some time after the event, the mind tends to construct a narrative to fit the position one has afterwards adopted. Because of these weaknesses of recollection, courts and tribunals have consistently taken the view that the best materials for making findings of fact are the contemporary documents and the inherent commercial probabilities of the case.

57.     Because the Tribunal attaches weight to contemporary documents, it is bound to observe that in the case of a number of meetings and conversations at which high-level representatives of the KRG were present, no minute or file-note appears to have been taken or at any rate produced. In the experience of the members of the Tribunal, this is unusual for a government department. The Tribunal does not propose to speculate on the reasons for the absence of such memoranda or to draw an inference, but it does mean that in some cases the documentary record of the meeting or conversation is available from one side only.

58.     This is the point at which to mention two other matters from which the Tribunal does not propose to draw any inferences. The first is that on 11 November 2014 Mr Mohammad Makkawi, the Projects Director employed by Crescent to manage the Khor Mor facility, travelled from his office in Sharjah to Erbil to attend a meeting with Dr Hawrami at the latter's invitation. On Sunday 13 November, when returning in a car to the airport on the main highway, he was held up by two men with guns who demanded his laptop computer and mobile telephone. No other items were stolen. The laptop and telephone have not been returned to him and documents stored in the laptop have been produced by the KRG as evidence in the arbitration.

59.     The Claimants notified the Tribunal and Wilmer Cutler Pickering Hale and Dorr LLP of this incident in a letter of 28 November 2014. Mr Makkawi described it in his witness statement of 20 March 2015. Dr Hawrami made a witness statement on 3 April 2015 but made no reference to the event. On 13 March 2015 Wilmer Cutler Pickering Hale and Dorr LLP wrote to the Claimants:

> "We have been informed that the KRG is carrying out a criminal investigation of Dana and its employees involving matters of national security. We understand that the KRG has obtained documents within the Kurdistan Region that are related to the Claimants' operations in the Kurdistan Region, pursuant to this investigation and in the exercise of the Kurdistan Region's security and police powers.
>
> The KRG has provided us with documents in its possession related to the Claimants' operations in the Kurdistan Region, and confirmed that these documents were acquired lawfully within the Kurdistan Region. We have put in place a third party screening

> procedure to ensure we do not receive legally privileged
> documents or information.  We are not in possession of Mr
> Makkawi's laptop."

60.     The Tribunal has not been made aware of any proceedings in which
documents from Mr Makkawi's laptop have been used other than in this
arbitration.

61.     The second incident occurred on the first day of the hearing.
Counsel for the Claimants informed the Tribunal next day that -

> "armed officers of the Kurdistan police descended upon the
> branch offices of Crescent and Dana, brandishing arrest warrants
> that they would not hand copies of, and seeking the branch
> managers of both Crescent and Dana, who were not present, so
> they asked for their home addresses, and instructed them that if
> they were not found before today that they should turn themselves
> in to 'Dr Asti's police station'."

62.     In addition, the Tribunal was told that the police visited the local
lawyer for Crescent and Dana and told him that he was no longer to act for
them.

63.     The Tribunal requested an explanation from counsel for the KRG
but, apart from a denial that Dr Ashti had a police station, no further
information was forthcoming before the end of the hearing.

64.     The Tribunal mentions these matters because the Claimants
understandably feel strongly about them, but they do not provide a basis for
the Tribunal to draw any inferences relevant to the outcome of this
arbitration.

*(b)     Background to the HoA*

(i)     <u>The LPG Plant</u>

65.     The principal negotiators of the HoA were, on the KRG side, Dr
Ashti Hawrami and, on the Dana and Crescent side, Mr Hamid Jafar.  Dr
Ashti Hawrami has a technical engineering background and has occupied
senior positions in companies engaged in the upstream petroleum industry
in Scotland and other places. In April 2006 he became Minister of Natural
Resources in the regional government of Kurdistan.  Mr Jafar has also had
many years' experience in the petroleum industry, starting at the age of 23
as general manager of the Buttes Gas concession in Sharjah.  He acquired a
100% interest in Crescent in 1985 and founded Dana, a publicly listed
company, in 2005.

66.     The two men give rather different accounts of how they came to

enter into the HoA.   Dr Hawrami says:[4]

24.        Shortly after my arrival in Erbil in 2006 and into 2007, I agreed to meet a number of times with Mr Hamid Jafar, who presented himself as the chief executive officer and a major shareholder of Dana, a publicly listed natural gas company based in the United Arab Emirates ("UAE"). Mr Jafar said that, as a "friend" of the Kurdistan Region, he wanted to provide input on the discussions between the FGI and the KRG on a federal oil and gas law. He also said that he believed his company would likely not be able to secure any oil and gas rights elsewhere in Iraq (outside of Kurdistan), and that he was looking for investment opportunities in Kurdistan for Dana.

26.        At one meeting, in late 2006 or early 2007, Mr Jafar and I specifically discussed the two power stations scheduled for completion in 2008 and the KRG's urgent need for natural gas to supply to them. Mr Jafar told me that he was aware of the timescale for the two power projects and the urgent need for gas, and said that Dana coincidentally had a liquefied petroleum gas plant (which he called an LPG plant to emphasise that it was able to produce both LPG and condensates, and which therefore was more sophisticated than a unit that was not able to produce such products from the Wet Gas stream) that was being built in Houston, Texas for delivery to Dana's operations in Egypt.

27.        Mr Jafar told me that the LPG plant that Dana had procured could process sufficient quantities of gas to satisfy the immediate and likely short-term requirements of the planned Erbil and Bazian power stations (which he understood would exceed 200 MMscf/day). He also told me that the LPG plant in Houston could be easily and quickly modified to increase the plant's rated capacity to match the increasing future requirements of the two power stations or other requirements of the KRG.

28.        Most critically, Mr Jafar repeatedly and specifically told me and my colleagues in the KRG government that Dana's LPG plant would be ready by the time the Erbil and Bazian power stations came on-stream in 2008. He said that the LPG plant was essentially complete and ready for shipment, and that it could be diverted to the Kurdistan Region and installed, commissioned, and made fully operational to process Wet Gas from Khor Mor within ten months of reaching an agreement with the KRG. According to Mr Jafar, this ten month time frame included the time necessary to install the LPG plant and build the required pipelines."

67.    The impression given by Dr Hawrami's evidence is that Mr Jafar made an

---

[4] First Witness Statement 18 April 2014.

unsolicited approach with a view to making an investment in Kurdistan, heard about the need for a gas supply to the power stations and offered to provide the necessary upstream facility, offering as an inducement a promise that he would provide a LPG plant which would be commissioned and ready when the power stations came on stream in 2008.

68.     The contemporary documents tell a somewhat different story.  The first encounter between the two men is recorded in an e-mail from Mr Jafar to Dr Hawrami on 10 August 2006 with the subject-heading "Pleasure Meeting You" and beginning "It was a real pleasure for me to renew our acquaintance of old."[5]  Mr Jafar said in evidence that they had met once before, when Dr Hawrami was working in London. The e-mail records a discussion about the future of Iraqi petroleum policy. Dr Hawrami was about to publish a draft hydrocarbon law for the Kurdistan Region and Mr Jafar offered to review it and make comments. There clearly had also been some discussion of possible investment by Crescent and Dana:

> "Separately, on the commercial front for opportunities in Iraqi
> Kurdistan, we (both Crescent and Dana Gas) will be delighted to
> work with the KRG and invest seriously in exploration and
> production opportunities in Iraqi Kurdistan. I simply await your
> suggestion as to when would be a convenient time to visit Arbil.
> In the meantime I will prepare some ground work technically and
> assess potential partner synergy.  As an Iraqi-owned company
> with an established operating history, Crescent Petroleum has
> been approached by several international companies wishing to
> partner us for work in Iraq, including the Kurdistan region."

69.     The last sentence suggests that (whether it was the case or not) Mr Jafar probably did not say that he was unlikely to secure any oil and gas rights outside Kurdistan. Dr Hawrami replied next day:[6]

> "It was a pleasure seeing you. I was glad to find our ideas for the
> utilization of the Iraq natural resources to be very similar.  Hope
> to see you before I go back and I look forward to seeing you in
> the near future at Erbil as well."

70.     Dr Hawrami sent Mr Jafar the draft Kurdistan hydrocarbon law, which he studied while on holiday in Scotland and returned with lengthy comments. Dr Hawrami described it as an "excellent critique".[7]  It appears from the last words of the passage quoted above that he had invited Mr Jafar to come to Erbil.  This took some time to come to fruition: on 3 October 2006 Mr Jafar said that the earliest date for a visit would be 11 October 2006 and Dr Hawrami wrote back "please plan to be here on the 10th".  Mr Jafar organized a team from Crescent and Dana for the visit ("Let's plan on an impressive delegation"[8]) and asked one of them to –

> "finish his research to designate 2 of the most highly prospective

---

[5] Exhibit C-269
[6] Exhibit C-270
[7] Exhibit C-271
[8] Exhibit C-272

exploration areas for us to apply for: one for oil (Crescent) and one for gas (Dana Gas). Also, if available, ditto re undeveloped fields, or current fields that require further development."

71.     The visit took place on 10 and 11 October 2006, after which Mr Jafar and Mr Hawrami wrote each other (by e-mail) effusive thank-you letters[9] and Dr Hawrami sent some information on Khor Mor (under the name Anfal) and Chemchemal.  Over the following week-end, Mr Jafar asked his team to find out such information as they could about the two fields ("let me know if Khormor is currently, or has ever been, producing…"[10]). These inquiries were clearly with a view to possibly putting in a bid for exploration or development in these fields.

72.     Attention seems to have been at first focused on Chemchemal.  By 17 October Dana Gas and Crescent Petroleum had prepared an internal draft of a "Chemchemal Appraisal Programme and Preliminary Development Plan for the Kurdistan Regional Government", which was revised over the following month.[11]  It laid out a programme in a form familiar in the industry:  initial appraisal programme leading to a Declaration of Commerciality, then initial development and further appraisal work and finally the full development of the Field.  It envisaged a Production Sharing Contract with the KRG.

73.     On 22 November 2006 technicians from Dana visited Erbil to see such information as was available about the Chemchemal field. There was not very much. In the previous year a company called Woodside Energy Ltd had been commissioned by the Federal Iraqi Ministry of Oil to make some inquiries but reported that there was a "high degree of uncertainty due to lack of data."[12]

74.     Dana was continuing its research into the possibilities of appraisal and development at Chemchemal when, on Saturday 28 January 2007, Mr Jafar met the Prime Minister of the KRG, Mr Nechirvan Barzani and Dr Hawrami at a function to celebrate the opening of the offices of a Norwegian energy company in Dubai. There is a record of the meeting in an e-mail sent later the same day to Crescent's Project Manager:[13]

> "[T]he KRG delegation was in fact headed by Nechervan Barazani, the KRG PM. He and Dr Ashti told me that they would like us (I would prefer Dana Gas) to urgently undertake the development of Khormor on a service contract basis (probably because it already has facilities?) as they need the gas urgently and without further delay, and as the MOO was "not doing anything". Dr Ashti said that that wouldn't affect our bid for Chemchemal, etc. We didn't discuss details, nor the complex implications/ramifications of taking over Khormor operations from the MOO, nor the fact that it lies in the "disputed territory". Both "hot potato" issues imagine! I will meet Dr Asti tomorrow

---

[9] Exhibit C-111
[10] Exhibit C-273
[11] Exhibit R-209
[12] Exhibit C-274
[13] Exhibit C-112

(Sun).

> In the meantime, MMM/GH pls give me your opinion as to the technical feasibility/timetable of producing gas from Khormor, with the (limited) info that we have to hand. Feel free to consult with ARA and SR on the phone. I have not copied them on this email in view of the obvious sensitivity."

75.　What this e-mail in our opinion demonstrates is that (i) the approach came from the KRG (perhaps on the spur of the moment, at a party) and not from Mr Jafar and (ii) the latter's interest but also his concern with the political sensitivity of the project – it being a project which was originally to have been undertaken by the FGI and the field lying within "disputed territory".

76.　The following evening the scene moved to Sharjah, where Mr Jafar entertained Mr Barzani, Dr Hawrami, Sarbaz Hawrami, (Director of the Prime Minister's Office) and Falah Mustafa (the KRG's Head of Foreign Relations) to dinner at his home.  This time the Tribunal has no contemporary note of the discussion, but one would expect the proposal to have been discussed in more detail. Mr Jafar says that Mr Barzani took the lead and explained that in 2005 the FGI had undertaken to the KRG that MOO would develop Khor Mor to supply gas for electrical power generation. On the strength of that undertaking, the KRG had contracted with Mass Jordan (afterwards renamed Mass Global) for the construction of two independently owned power stations ("IPPs"), one at Erbil and one at Bazian, and to provide it with enough fuel to generate 500 MW of electricity per day. The IPPs were supposed to be ready to receive gas and generate electricity at the end of 2007.

77.　Mr Jafar's evidence is that Mr Barzani said the MOO had not kept its promise. No development had taken place at Khor Mor.  It was politically imperative to be able to provide electricity for the people of the KRG.  Unless gas could be urgently obtained, enormous sums of money – US 1.5 billion a year was mentioned - would have to be spent running the IPPs on imported diesel. Dr Hawrami said that each IPP would have four gas turbines, each generating 125 MW of electricity and needing an average of 25 MMscf/d of gas.  That amounted to an estimated requirement of 200 MMscf/d, which Dr Hawrami thought the Khor Mor field was capable of producing.

78.　Mr Sarbaz Hawrami, the Prime Minister's Chief of Staff, did not make a note of the conversation but says in his witness statement made eight years later that the discussion was "at a high level" and that no mention was made of how much gas the power stations would require or how much it would cost to run them on diesel. Neither he nor Mr Hawrami were cross-examined on this point and the Prime Minister and Mr Falah Mustafa neither made a note nor gave evidence but we think it improbable that the KRG representatives, who now say they made it clear that any delay in delivery of gas would have huge cost consequences, did not mention any figures or that Mr Jafar did not ask how much gas the Khor Mor field was expected to produce. Be that as it may, what Mr Sarbaz Hawrami does not say is that there was any discussion of an LPG plant.  That may be contrasted with Dr Ashti Hawrami's evidence which we have quoted in paragraph 66 above.

79.     Dana reacted quickly. Mr Thomas Watts, the Project Director for Dana and Crescent, drafted a plan for the development of the Khor Moor gas field, which Mr Jafar forwarded to Dr Hawrami on 14 February 2007.[14] It proposed the construction of –

> "high pressure gas separation facilities…at the collection point to condition the gas (both water and hydrocarbon dewpoint) so that the gas is suitable for transporting by pipeline and for use in the power station."

80.     Mr Watts's plan also gave an "indicative fast track timetable", which indicated that dry gas could be exported within 20 months.

81.     The plan also contained an observation about the character of the agreement into which the parties were proposing to enter:

> "It is assumed that the KRG award the surface facilities and pipeline installation on a simple cost plus transparent service contract basis. Alternatively, the costs can be recovered from the liquid and gas sales, but some form of PSA and off-take agreements will be required for such an arrangement."

82.     For the moment, it seems to the Tribunal that the significance of this document is that it was drafted some two weeks after the initial discussion about the Khor Mor project and must have been intended to reflect what the KRG was asking Dana to do. But there is no mention of an LPG plant.

83.     Dana had previously ordered an LPG plant from Hanover, a company in Houston, Texas for the purposes of a project in Egypt. On 6 March 2007 Hanover wrote to Mr Watts saying that owing to a cancellation, a plant which was due to be delivered to an American client around July 2007 was now available.[15] Mr Watts decided that Dana's Egyptian project would not be ready by July and that the LPG plant could be offered to the KRG instead. On 12 March 2007 Mr Watts and others met Dr Hawrami and his legal adviser, Mr Jonathan Morrow. Mr Watts says that he informed Dr Hawrami about the availability of an LPG plant and proposed that it be included in the Khor Mor plan. Dr Hawrami agreed.

84.     Dr Hawrami, on the other hand, has a different account of how the LPG plant came to be included. As seen above, his evidence was that he had been promised swift delivery of an LPG plant at the very beginning of the negotiations; indeed, it was that promise that Mr Jafar held out as an inducement to get the contract for Khor Mor. But that must be mistaken, because there was no mention of an LPG plant until it surfaced after the offer from Hanover on 6 March 2007. He also has to explain why Mr Watts's 14 February 2007 version of the Plan for Khor Mor makes no mention of an LPG plant. In cross-examination, Dr Hawrami said that this was Dana's proposal and that he rejected it:[16]

---

[14] Exhibit C-113
[15] Exhibit C-275
[16] Transcript Day 4, p. 99.

"A. I was not satisfied with it. That's what I was trying to say. You said you were satisfied with it. I was not satisfied with this report. Because there it talks about no specific LPG plant. It talks about some taking the gas completely and burning it as it is, putting it into pipeline, taking it -- not any separating of liquids. That proposition was never entertained at all."

85.     Dr Hawrami must have been mistaken about there being "no separation of liquids". The high pressure gas separation facility was to have separated the bulk of the condensate, as subsequently happened during the four years between the time when the gas came on stream in October 2008 and the time when the LPG was available in 2012.[17] In any case, the Tribunal finds this explanation improbable. By the time Mr Watts came to the meeting on 12 March 2007, Dr Hawrami had had the first draft of the Plan for Khor Mor in his possession for nearly a month. There is no trace in the documents of any rejection or complaint about the absence of an LPG plant. Once again, there is no file note of the discussion on 12 March 2015 (though one might have expected the KRG's American lawyer, Mr Jonathan Morrow, to have taken one) and it would be a coincidence if Dr Hawrami had declared his rejection of the plan because of the absence of an LPG plant at the very moment when Mr Watts was fortuitously in a position to provide one.

86.     The Tribunal has gone into this matter in some detail because it illustrates the fallibility of memory. In summary, we find that contrary to Dr Hawrami's present recollection, the ability of Dana to provide an LPG plant in short order played little or no part in the background against which the HoA was negotiated. The important factor was the urgency with which the KRG required gas to be delivered to the IPPs. The LPG plant was a last minute addition to the Khor Mor plan.

(ii)     Political Risks

87.     The political climate for oil and gas in Iraq in early 2007 was undoubtedly an important element in the background to the HoA. The Iraqi Constitution contained provisions dealing with oil and gas,[18] which had been intensely negotiated between representatives of the Kurdish Alliance and the Shia Alliance in August 2005. The legal advisers to the US Embassy in Baghdad at the time, who were closely involved in observing the negotiations, say that the language of these clauses was "ambiguous by design".[19] No doubt each side in the negotiation, as is commonly the case, hoped that any subsequent disputes over what the words meant could be resolved by agreement or, if that did not happen, that a court would accept its own interpretation.[20] The Constitution came into force in May 2006 but, over the following months, no

---

[17] Dr Hawrami may have been confusing Mr Watts's draft Plan with a proposal from Mass Global, the company building the IPPs. It had offered to build the Khor Mor facility and pipeline as well, but the proposal was to burn all the condensate as part of the gas stream until an LPG plant commissioned from an Italian company had been built: see Mr Jafar's e-mail to Mr Ahmed Ismail of 2 April 2007 (Exhibit C-279). Dr Hawrami said in cross-examination "I think they were both talking about the same thing early on.": Transcript Day 4, p.99.

[18] Articles 110, 111 and 112.

[19] AS Deeks & MD Burton *Iraq's Constitution: A Drafting History* (2007) 40 Cornell International Law Journal 40 at p. 68. This article is discussed in the opinion of Professor James Crawford, Exhibit C-8.

[20] Article 93 Fourth of the Constitution gives the Federal Supreme Court jurisdiction over such a dispute.

progress was made in agreeing a Federal oil and gas law. Early in 2007, the Energy Committee of the federal Council of Ministers proposed a draft Oil and Gas Law, which, Professor Crawford says, sought to "maximize federal control over oil and gas activities."[21] This was unacceptable to the KRG, which had already drafted the regional oil and gas law on which Mr Jafar had sent comments to Dr Hawrami. In the autumn of 2006, the latter was visiting Baghdad ("the hot spot"[22]) to try to reach an agreement. These negotiations were continuing into 2007 when the HoA was negotiated.

88.    The perceptions at the time are captured in a note made by Mr Nicholas Hills of the dinner conversation with Dr Hawrami and Mr Jonathan Morrow, the KRG's American legal adviser, on 6 March 2007:[23]

> "[T]here is indeed no definitive text of the draft federal petroleum law "agreed" as between the KRG and the federal authorities. The draft law itself has been agreed (apparently fully) in principle but the language is not finalised. Ashti agrees with me that the uncertainty as to the text is unhelpful. The KRG has given the federal authorities two months to agree the whole package (fiscal annexes, revenue sharing law, model forms of contract, new INOC charter, etc.). It is essential to the KRG that the whole package is agreed. The KRG Petroleum Law will be "in harmony" with but not necessarily absolute conformity with the agreed principles for the federal legislation. I did not detect unqualified optimism that the draft package will get enacted by the federal Council of Representatives (parliament) in this period.
>
> I raised the concern some IOCs had that commencing discussions with the KRG could compromise relations with the federal Government and vice versa. Ashti's response was that, as far as the KRG was concerned, this would no longer be an impediment but that he would expect IOCs to conduct discussions in Erbil. Now that the principles of the federal law have been "agreed" he did not see why this should be a problem in Baghdad – but obviously that had to be for the judgment of the IOC.
>
> Much of the evening was spent in a very interesting discussion as to the exact status of the Federal Region of Kurdistan in the international community and as to the consequences and as to exactly where a secure and integrally sound Kurdistan Region would stand in legal, contractual, constitutional and public international terms if (as may well happen) the rest of Iraq was to disintegrate as a political entity or to emerge with an undemocratic regime which defied or tore up the Constitution and/or resiled on its obligations to the Kurdistan Region. I believe that it is probably unwise to view the Federal Region of Kurdistan as being analogous to any subcomponent of any other

---

[21] Exhibit C-8 at p. 9.
[22] Exhibit C-111
[23] Exhibit C-276

State. The Federal Region of Kurdistan is an individual creature and the current Republic of Iraq Constitution is a voluntary union. My previous paragraph does beg questions as to an investor's risk if the KRG perforce chooses to "go it alone" without a federal law. Ashti believes that the KRG will be demonstrated to have been entirely reasonable in its efforts to subscribe to a federal regime and hopes and expects that IOCs will buy into the KRG's autonomous right to proceed on that basis. However, securing the moral high ground may not in itself provide an internationally recognisable legal foundation for doing so. Essentially I sense that there will always be a legal lacuna and this becomes an issue of political risk."

89.    There were two areas of uncertainty.  First, the FGI maintained that it had a constitutional right to all Iraqi oil and gas in the ground and that the KRG had no right to enter into production sharing agreements or the like, granting rights to the development of oil and gas fields.  Secondly, and independently, it claimed that under both the constitution and pre-existing but unrepealed legislation,[24] MOO and its marketing arm SOMO, had the sole right to export petroleum products, including oil, condensates and LPGs, from Iraq.  The latter monopoly was reinforced by the fact that in practice SOMO controlled the pipelines, which constitute the principal means of export from Iraq. These are the Iraq-Turkey Pipeline ("ITP") and the pipeline to Basrah in the south.  Kurdistan shares frontiers with Turkey and Iran, which the FGI cannot physically control. So, subject to the consent of the receiving country, there was always the possibility of sending petroleum products by truck and tanker over the border.  But the FGI regarded such exports as illegal by Iraqi law. Its most potent weapon was to blacklist IOCs, which engaged in what it termed smuggling of Iraqi oil. This of course had no effect upon truckers who operated entirely within Kurdistan, but the FGI also pursued purchasers of Kurdistan petroleum products in other jurisdictions.

90.    At the time when the HoA was concluded, there was a distinct possibility of a compromise agreement between the FGI and the KRG, which would enable the KRG to enter into production sharing agreements with IOCs and authorize exports. Agreement in principle had been reached in February but the details had still to be negotiated. Further progress was made in June when a draft Federal Revenue Sharing Law was agreed. In July, however, the skies clouded over when the FGI tabled two annexes on the allocation of exploration and producing blocks, which were unacceptable to the KRG.  In August 2007 the KRG enacted its own Kurdistan Regional Oil and Gas Law and negotiations broke down.

---

[24]  Laws No 101 of 1976 and 272 of 1987: see Exhibit C-97.

## IX   THE ISSUES

(a) *"Whether the Claimants have the exclusive right to develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area or one of them, and if so, for what period".*

*(1)   The positions of the parties*

91.   The Claimants' position can be shortly stated.[25]   Clause 9 of the HoA says:

> "The KRG hereby grants Dana the exclusive right during the term of these HoA and that of the Service Agreement (and/or the RRC's as applicable) to develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area."

92.   Annexure 2 provided that –

> "The term of these HOA or any successor agreement(s) thereto shall be for a duration to be agreed by the Parties but in any event shall not be less than the maximum duration of gas supply to any IPP or the duration of RRCs normally applicable to this type of agreement, whichever is greater."

93.   The Claimants say that the duration of RRCs normally applicable to this type of agreement would be at least 25 years and that this is confirmed by paragraph 4.2 of Annexure 6A, which says that the term of the HoA "shall not be less than 25 years in accordance with the provisions of the HOA." Therefore, the Claimants have the exclusive right to develop and produce Petroleum at Khor Mor and Chemchemal for at least 25 years.

94.   The KRG, in its Response, said that the exclusivity conferred by clause 9 must be "interpreted and limited by reference to the Initial Work Programme that was the subject of the HoA, and Dana's own commitments and duties in relation to the HoA." Such a broad right (a) would prevent the KRG from developing its own resources for 25 years, (b) would be incommensurate with the consideration which Dana was providing, (c) would restrict the KRG's rights even though the parties had not entered to any Risk-Reward Contracts or agreed upon the performance of any Services beyond the initial Work Programme and (d) would have been ultra vires the legal and constitutional capacity of the KRG. When the HoA was concluded, there was no agreement between the FGI and Regional Governments on how petroleum resources would be managed. The question of the "disputed territories" was also unresolved.

95.   The KRG summarised its position in its Statement of Defence, saying that the Claimants' construction of clause 9 -

---

[25]   Request for Arbitration, paragraphs 43-45.

> "seeks to convert the HoA from a limited risk services agreement
> to a concession agreement, with broad rights to exploit oil and gas
> in both Khor Mor and Chemchemal. This would fundamentally
> change the scope of Dana's rights and would strip the KRG of its
> sovereignty over the oil and gas reserves in Khor Mor and
> Chemchemal in a way that is fundamentally inconsistent with the
> parties' agreement under the HoA."

96.    Instead, the KRG says that clause 9 –

> "protects Dana by granting Dana the exclusive rights to perform
> those specifically-defined Services. This protection was important
> because Dana's only means of recovering its invested Petroleum
> Costs and Remuneration Fee was through the sale of condensates,
> LPGs, and Excess Gas produced at Khor Mor. Dana thus wanted
> to ensure that it was the only company authorized to produce and
> sell those products for the term of the HoA."

97.    The understandings in the petroleum industry of what could be expected to be
found in various types of agreement ("services contract", "production sharing
agreement", "risk-reward contract", "concession agreement") was the subject of
expert evidence from Dr Charles McPherson, who provided two reports on behalf of
the KRG. He was not cross-examined, but the Claimants submitted a report from Dr
van Meurs, who, like Dr McPherson, has had many years of experience in the
industry.

98.    The KRG, in its closing submissions, said that we should not make any
findings or grant a declaration on the basis of the expert evidence. The evidence of Dr
van Meurs was provided late and the KRG did not have an adequate opportunity to
reply to it.

99.    We do not however propose to make any findings as to the practices in the
petroleum industry. Dr McPherson was not cross-examined and we would not reject
his evidence on such matters when he had not been given an opportunity to explain
himself. But we are concerned with the construction of this particular contract and we
did not detect any differences between him and Dr Meurs as to the industry
background against which it had to be interpreted or any technical terms which it
contained. So far as they expressed opinions about how the particular terms of the
HoA should be interpreted, we regard them as no different from the submissions of
counsel.

100.    Dr McPherson said that the "defining characteristics of service contracts are
limited scope and duration, limited contractor exposure to risk, and fixed or pre-
determined compensation". One species of service contract is a "risk service
contract", where the contractor "bears the financial risk associated with performing
the services" and in exchange may be "reimbursed for its costs and earn a fixed pre-
determined percentage return". On the other hand, the distinguishing feature of
production sharing and concession agreements is "the contractor's full exposure to
both financial and technical risks and…the long term nature of the arrangement".

101.   The HoA, said Dr McPherson, would be understood in the industry as a "risk service contract" because Dana bore the financial risk "subject to re-imbursement of costs and a pre-determined remuneration fee" and because the HoA was "limited in scope and duration". Another indicator of the "limited and transitional nature" of the HoA was its brevity.  It appeared to envisage that the parties might negotiate further agreements but these were not guaranteed.  In a second report, Dr McPherson drew attention to various matters which one would expect to be covered in a long term production sharing agreement but in the HoA were dealt with sketchily or not at all.

102.   On the other hand, the Claimants (and Dr Van Meurs) submitted that it was not helpful to try to assign the HoA to a category of contracts .  It had elements of what Dr McPherson said were to be found in a production sharing contract, a concession contract and a risk service contract. The Contractor was not rewarded only with payment of his costs and a proportionate remuneration.  He was entitled to 10% of production revenues for the whole duration of the contract. Furthermore, he took title to the condensates, LPGs and Excess Gas in kind, subject to accounting to the KRG (after recovery of costs and percentage remuneration) for its 90% share.  These features were more characteristic of a production sharing contract.

103.   The Claimants also disagreed with Dr McPherson's observation that the HoA was "limited in scope and duration".  It was expressed to continue for at least 25 years, which is by any standards a long-term contract, characteristic of production sharing or concession agreements. Nor did the HoA exposed Dana to "minimal risk".  The KRG did not agreed to pay Dana anything.  The sole source for recovery of its costs and remuneration was to be its sales of Petroleum from the gas fields, about which little was then known.  Additional risk arose from the political situation in Iraq at the time.  None of these risks could be described as 'minimal'.

104.   Mr Dunning, in his submissions, emphasised that the HoA was a contract for services.  It specified the services Dana was to provide in annexures 3 and 5. Beyond those services, there was nothing more than an unenforceable agreement to agree. So the exclusivity in clause 9 should be read to mean the exclusive right to provide the contractually agreed services and to be paid for them according to the terms of the HoA, but nothing more.[26]

## (2)   Opinion of the Tribunal

105.   We note that the construction of the HoA is to be governed not only by English law but also by "any relevant rules, customs and practices of international law, as well as by principles and practice generally accepted in the international petroleum industry."  Reference to the latter body of principles and practice is important in the case of a relatively brief document like the HoA, which, as Dr McPherson comments, leaves out a number of matters, which are spelled out in other contracts.  In this case, it may be that gaps can be filled from generally acceptable principles and practice.

---

[26] Transcript Day 1, p. 125-8.

106.     We do not however accept that a contract can properly be given a label such as "Risk Service Contract" and then construed to mean whatever one would commonly expect a contract so described to contain.  We think that it is necessary to read the actual contract. If one does so, it becomes clear that categorisation is unhelpful. It is true that the HoA contains several references to it being a "Service Contract", but there was evidence that this description was adopted because it was a term acceptable to Baghdad as describing the contract, which could properly be entered into by the KRG, whereas "Production Sharing Agreement" was not.  Recital E was clearly an attempt to persuade Baghdad that Dana was not a production sharing wolf in the sheep's clothing of a service provider.[27]

107.     We agree that a contract expressed to continue for at least 25 years cannot be described as being "limited in scope and duration".  Likewise, we agree that it cannot be said to have involved minimal risk. The HoA in several places acknowledged that extent of the risk. To take only one example, clause 5 said that if "when permitted by law" Risk-Reward Contracts were to be substituted for the HoA, they should be "along the lines of the model Production Sharing Contract the KRG may adopt in the future (albeit suitably adjusted to take account of the higher risks prevailing at the date hereof.)"

108.     The difficulty for the KRG is that clause 9 is as clear and explicit as anyone could wish.  It grants Dana the exclusive right, during the term of the HoA, to "develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area." Mr Dunning was unable to construct a narrower meaning which could be reconciled with the language and made rational sense.  He said that the exclusivity was impliedly restricted to an exclusive right to perform those services, which had been agreed. But that made no sense in relation to Chemchemal, where the only services agreed were exploration and appraisal, estimated to take about a year. Nothing was agreed about any development at all.  What was to be the exclusivity in respect of those services for the next 24 years?

109.     To meet this point, Mr Dunning was obliged to say that clause 9 was an umbrella which also conferred exclusivity upon whatever services or developments might be agreed in the future.  It gave an exclusive right to anything as to which the parties might agree that Dana was to have an exclusive right.  However, quite apart from the redundancy of such a provision (the parties were perfectly capable of agreeing which rights were to be exclusive when the time came) clause 9 is very specific.  It does not confer a right to perform services or recover costs and remuneration.  It gives the exclusive right "to develop and produce Petroleum" within two designated fields.

110.     Mr Dunning's strongest point was that any future work at Khor Mor or Chemchemal beyond the plans specified in Schedules 3 and 5 and amplified in Annexe 6A would require the agreement of both parties. Clause 7 provides:

>     "Until such time as the parties shall have executed the Service
>     Agreement and/or (as applicable) the RRC's, Dana shall implement the

---

[27] The attempt at disguise was a failure: see Dr Jafar's evidence of the reaction of the Federal Oil Minister in Transcript Day 2, pp. 153-155.

initial Work Programs of the Khor Mor Gas Utilisation Plan and the Chemchemal Appraisal Program & Subsequent Development Program set out in Annexures 3 and 5, respectively *to be subsequently followed by full development program on both HoA areas as reasonably agreed between the parties.*" [Emphasis supplied]

111.   Mr Pollock said that paragraph 4.2 of Annexure 6A entitled the Claimants to undertake further development work at Khor Mor and Chemchemal without the consent of the KRG. That paragraph provides that a "modification to a proposed work plan and budget" shall be discussed between the parties but, if there is no agreement, the proposal of the contractor shall be deemed to be adopted. But that paragraph deals with a work plan for the implementation of a Services Plan, not with the adoption of a new Services Plan. Annexure 6A distinguishes between an "Initial Services Plan" (being the plans in Annexures 3 and 5 as updated) and a "Further Services Plan" meaning "an approved plan or plans other than the Initial Services Plan." For work being done under the Initial Services Plan, no further approval was required. But a Further Services Plan first had to be approved and then required also the approval of an initial and annual work programme for its execution. It is only the modification of this latter programme to which clause 4.2 refers.

112.   Mr Pollock also relied upon the wide definition of Services in paragraph 4.5, which includes "the implementation of plans and all development operations devised and performed pursuant to the HOA with a view to developing all Petroleum and reservoirs". But Annexure 6A deals with accounting procedures and the definition in paragraph 4.5 tells you what things done pursuant to a Services Plan will count as Services for the purposes of obtaining repayment of costs and remuneration. It does not dispense with the need for a Services Plan.

113.   Mr Dunning said that because any further development on the two sites would require further consent which the parties could not be compelled to give, the effect of giving the words of clause 9 their conventional meaning would be to sterilise the two fields for upwards of 25 years. This was a hopelessly uncommercial outcome, which the parties could not be supposed to have intended.

114.   We do not accept this submission because the language of clause 9 is too clear to admit of any of the narrower meanings for which Mr Dunning contends. In addition, although we do not need to decide the point, we think that there may be two reasons why the ordinary meaning does not necessarily produce an uncommercial result.

115.   The first is that clause 7 provides that the Services in Annexures 3 and 5 should be followed by 'full development program on both HOA Areas as *reasonably* be agreed by the parties." The word "reasonably", together with the requirement that the HoA be governed by "principles and practice generally acceptable in the international petroleum industry" suggest that this was not an "agreement to agree" at large, but that it created an obligation to enter into an agreement in accordance with objective criteria which could, in the event of dispute, be determined by arbitration.

116.   Secondly, even if the first reason is wrong, there seems to us nothing commercially absurd in Dana having stipulated for exclusivity to give it a bargaining

position in any further negotiations. Without such exclusivity it could simply have been turned out of Chemchemal (as in fact happened) and denied the opportunity for any further development of Khor Mor. On the other hand, it would not be commercially sensible for it to use its exclusivity in a self-defeating refusal to undertake any development, even if this was permissible under the general law. One could expect the parties to arrive at a compromise by which the fields could be developed to the advantage of both.

117.    The KRG submitted that as a matter of discretion we should not make a declaration on this point without a fuller investigation of petroleum industry practice. However, we consider that the KRG has put before the Tribunal, in the evidence of Dr McPherson, a full account of such practices and we have accepted it. But our conclusion is that it does not support the construction of this particular contract for which he and the KRG contends.

118.    Our answer to issue (a) is therefore, yes, both of them, and for the term of the HoA, being not less than 25 years.

(b) *"Whether the Claimants have title to all or any of the petroleum liquid products processed by the Plant built by the Claimants as part of the Services."*

*(1)    The positions of the parties*

119.    The Claimants rely upon BP [4] of Annexure 2: "the title to the petroleum liquid products shall pass to Dana at the point of processing". That, they say, is clear enough and it is reinforced by the provisions which allow Dana to "market lift and export" the liquids and retain the proceeds,[28] subject to the accounting mechanism in Annexure 6A which makes it accountable for the proceeds to the KRG after deducting Remuneration Fee and Cost Recovery.[29]

120.    The KRG originally argued that acquisition of title was conditional upon compliance with Dana's obligation to market and export the liquids, which it said it had failed to do. But this argument faced the difficulty that title passed "at the point of processing", before any possible marketing or exporting, and it was not mentioned at the hearing. Instead, the KRG accepted that the legal title passed to Dana but claimed that the KRG retained or acquired an "equitable interest" under a *Quistclose* trust.[30] In its closing submissions, however, the KRG submitted that the question of whether it had a proprietary interest in the liquids or their proceeds did not at present arise and that the Tribunal should make no declaration as to title.

*(2)    Opinion of the Tribunal*

121.    As the KRG accepts, title to the liquids passed to Dana at the point of

---

[28] Annexure 2, BP [2].
[29] Annexure 6A, paragraph 4.3
[30] *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] AC 567.

processing. The HoA clearly did not envisage that the KRG would have any interest in the liquids after they had been processed. Dana was to be able to transfer a clean title to a purchaser, whatever a purchaser may have known about the HoA or the state of accounts between Dana and the KRG. On this point we think it is necessary to make a declaration to put the matter beyond doubt, although we accept that it is unnecessary to decide whether the KRG has a proprietary interest in the proceeds of sale.

122.   The Tribunal's answer to issue (b) is therefore yes.

(c) *"Whether, and if so for what period or periods, the Claimants were "unable to export and market the LPFs Condensates by any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control [of] Dana" within the meaning of [BP 7 of Annexure 2]"*

(1)   *Analysis of the question*

123.   It appears to the Tribunal that most of the dispute on this issue was about the construction of the relevant provision in the HoA, that is to say, about what counted as an inability of "export and market" by "any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control [of] Dana". This question in turn divides up into two sub-questions: what counts as an export, and what counts as the act or omission of government or political reasons? We shall first consider these questions of interpretation and then examine the relevant facts.

(2)   *Positions of the parties on construction*

(i)   Exports

124.   The Claimants say that an export is a transaction where the point of sale is outside the territory of Iraq. The KRG says that is ridiculous because the classic export contract is f.o.b. from a port within the territory of the exporting country. It submits that a contract for the sale of goods that are intended to be carried to another country, whether on behalf of seller or buyer, is an export contract, irrespective of the point of sale.

(ii)   Act of Government or Political Reasons

125.   The Claimants say that the legal and political background to the HoA, which the Tribunal has discussed above, as well as indications in the HoA itself, show that Dana would be "unable to export" if this would be contrary to the view of the FGI as to the legality of such exports. The KRG says that Dana was able to export if it was in practice able to have its petroleum liquids carried over the frontier in trucks or a pipeline, irrespective of any possible reprisals from the FGI.

(3)     *Opinion of the Tribunal on construction*

(i)     Exports

126.    We agree with the KRG that a contract for sale f.o.b. Basrah is an export contract, notwithstanding that the point of sale is within an Iraqi port. On the other hand, we do not think that a sale for delivery to an Iraqi company within Iraq becomes an export sale because the seller knows that the purchaser intends, at his own risk, to carry the goods over the frontier. The best indicators of what the parties meant by an export are, first, the provision that if Dana is unable to export, the KRG should be obliged to purchase at "international FOB Med market prices" and, secondly, the background known to both parties as to what the FGI meant by exports. In our opinion, in this context, an export means an agreement that provides for the products to be sent out of Iraq and realises an international price. Dana is unable to export if it is unable to enter into an agreement, which so provides. It does not matter where the risk or property passes, so long as Dana is able to contract to send the products out of the country. Only by such a contract, which enabled the buyer freely to dispose of the goods to any destination out of Iraq, would Dana have been able to achieve "international FOB Med market prices".

(ii)    Act of Government or Political Reasons

127.    At the time when the parties entered into the HoA, the KRG was negotiating the terms of an oil and gas law with the FGI and it was hopeful that they might reach a compromise by which the latter recognised the FRG's right to enter into production sharing agreements with IOCs who would be free to export petroleum products. But the HoA acknowledged that this might not happen.

128.    Dr Hawrami said in evidence:[31]

> Mr Jafar clearly understood the risks inherent in his proposal, including the absence of an established regulatory regime and the risks of marketing condensate (and LPG) production from the Kurdistan Region. In particular, Mr Jafar understood that, in 2006, there was no oil and gas law in either the Kurdistan Region or Iraq generally. Mr Jafar also said that he understood that by entering into contracts or operations in territories where there were jurisdictional disputes, Dana ran the risk of having difficulties with the Iraqi federal government. He also made clear that he understood the difficulties and risks of marketing condensates and LPGs from Khor Mor, including the fact that any exports of petroleum to Turkey had historically only taken place through the Iraqi State Oil Marketing Organization (SOMO), and that would likely remain the case for future exports of petroleum, including condensates.

129.    That is right. The fact that these risks were very much in the minds of the parties is supported by the terms of the HoA itself. Recitals C and D state the position which had been reached in negotiations between the KRG and the FGI. In clause 5, the substitution of "risk-reward contracts" is to take place "at any future date and as

---

[31] 1 Hawrami, paragraph 33.

and when permitted by law" – a phrase which is repeated in the next line. By clause 10 the KRG warranted that "all necessary KRG, other Governmental and regulatory approvals" required to implement the HoA would be obtained. Clause 16 looked forward to the adoption of the Federal Oil and Gas Law of Iraq, when the KRG promised "as and when permitted by the said Law", to make arrangements for the joint administration of the HoA or any subsequent RRCs by the FGI and the KRG. BP [18] of Annexure 2 provided that Dana was to "carry out its activities in compliance with Iraqi laws [i.e. Federal laws] and laws of the Kurdistan Region of Iraq" and (in BP [19]) that the KRG "shall secure all necessary governmental approvals, licenses and permits for project implementation, including from the Iraqi central government."

130.    In our opinion the main purpose of BP [7] of Annexure 2 was to shift to the KRG the risk that Dana might not to be able to obtain international prices for export sales of its condensates and LPGs, because the FGI prohibited such exports and was willing to take action to enforce the prohibition. The clause goes wider than that – it includes the actions of other governments and political reasons generally – but that it our opinion was its chief object. It follows that in our opinion Dana was not expected to defy the FGI by finding such export routes as it could not in practice police. If the FGI regarded such exports as unlawful and was willing to back that view with action, then Dana was unable to export within the meaning of BP [7].

131.    Mr Dunning referred us to passages on *force majeure* provisions in Chitty on *Contracts*[32] which say that a party is not "unable" to do something unless he is physically or legally prevented from doing it. But this was not a general *force majeure* clause; it was tailored to specific circumstances contemplated by the parties and must be construed according to what appears to have been its purpose. As for legal impossibility, there is, as mentioned earlier, a dispute over the effect of the provisions of the Constitution distributing competence in oil and gas matters between the FGI and the regions. The precise legal position is uncertain, although we understand that the Iraqi Supreme Court has been asked to pronounce upon the matter. But we do not think that BP [7] contemplated that the parties would wait upon a decision of the Supreme Court as to which view was legally correct. It says nothing about whether exports by Dana would be unlawful. It refers to "act or omission of government" and "political reasons" which make it unable to export.

(4)    *Positions of the parties on the facts*

132.    The Claimants say they have been unable to export because at all times since they started producing gas, condensates and LPGs, the FGI has taken the view that SOMO has the sole right to export these products from Iraq and that exports by others involve smuggling state property out of the country. It has supported this policy by blacklisting companies involved in such activities and taking legal proceedings in other jurisdictions to claim title to petroleum products exported from Kurdistan. In addition, it says that Turkish law has made it impossible to export through Turkey and that US sanctions have made it perilous to do so through Iran.

133.    The KRG says that the Claimants have not only been at all times able to export through Turkey and Iran, but they have actually done so. To some extent this

---

[32] For example, paragraph 14-144.

position is based upon a view about what counts as an export, which is different from that of the Tribunal. For example, ability to sell to an Iraqi trucking company, which exports the products through Iran, is treated by the KRG as ability to export. Dr Hawrami said in evidence:[33]

> "There are numerous such trading companies in Kurdistan (including Qaiwan, Pewand, Iraq Oil, Sermian, Saman, Legacy, Asent and Mellet (among many others), which are willing and able to buy the condensates (and LPGs) and assume the cost and risk of exporting the products."

In our opinion, that is not what the HoA means. A sale to a Kurdistan company subject to deductions from the price for the cost of transport (which under the HoA would have been chargeable as a Petroleum Cost) and further deductions for the risk of adverse FGI action, is not calculated to realize anything like an international price. However, we shall examine what the factual position was.

*(5)    Findings of the Tribunal on the facts*

134.    As we have noted earlier, negotiations between the FGI and the KRG over oil and gas legislation stalled in August 2007. In December 2007, the Federal Minister of Oil wrote to Crescent, declaring "the annulment of all the contracts that have recently been signed by the [KRG] without authorisation and approval of the Government of Iraq".[34] Crescent was black listed and the MOU between Crescent and the FGI, signed before Crescent's participation in the HoA, was suspended.

135.    Thereafter, negotiations resumed from time to time. In November 2008 the Prime Minister of Kurdistan Mr Barzani and the Federal Oil Minister Mr al-Shahristani met to discuss the joining of two Kurdistan oilfields to the ITP. However, they said at a press conference afterwards, "further talks would be needed before national export licences would be assigned to the fields."[35] During the period between 2009 and 2014 there were from time to time agreements between them by which the KRG sent petroleum through the ITP and received payment from the FGI. But this means of export was not open to anyone except the KRG. During the period from January 2011 to April 2012 petroleum products from the KRG were exported by SOMO, which received the revenue, out of which the FGI made payments (referred to as "*silfa* payments") to the KRG. The KRG distributed part of this money among the oil and gas companies, which had provided the exported products, including the Claimants. But the arrangement broke down and no further agreement was reached.

136.    In 2011 Turkey, which had previously prohibited the transit of Kurdish petroleum through its territory, gave the government power to grant licences for this purpose to Turkish companies. Such a licence was granted to Powertrans Petrol ve Enerji Tic. A.S. ("Powertrans"), a company, which was thought to have good political connections. In October 2012 the KRG began exporting petroleum through Powertrans. This again provoked threats and protests from the FGI.[36] In January 2014 the KRG opened a spur pipeline, which crossed into Turkey from its own

---

[33] 2 Hawrami paragraph 17.
[34] Exhibit C-85
[35] Exhibit C-212.
[36] Exhibit C-239

territory and then connected with the ITP. It began sending oil through the ITP for export at Ceyhan. As a result, the FGI commenced arbitration proceedings against the Turkish government and the ITP operating company for breach of the agreement under which the pipeline had been built.[37]

137.    In his first witness statement, Dr Hawrami said:

> "118.  During this period from 2009-2011, Dana was never prohibited from selling or shipping condensate, either domestically or abroad, by the KRG or any other government. Dana was at all times free to market the condensate, subject to the terms of the HoA, and did not contend otherwise."

138.    Whether Dana contended otherwise is not a matter which arises at this stage of the arbitration, but the Claimants did not accept that they had been able to export and Dr Hawrami was asked to enlarge upon how they could have done so.  In his second witness statement he said that Dana could have exported through SOMO to Turkey or from ports in southern Iraq. They could send the petroleum by truck through Iran or sell it to Kurdish trading companies.

139.    Taking up the suggestion that they could export through SOMO, the Claimants wrote a *faux naif* letter to SOMO, offering to sell it condensates and LPGs.  As expected, they received an unequivocal reply:

> **Sub: Legal warning**
>
> With respect to your letter dated 6th July. 2014.  We formally notify you of the following:
>
> 1. Neither the Ministry of Oil nor SOMO recognizes any petroleum contracts granted by the provincial government of Kurdistan.
>
> 2. As widely known the policy of the Iraq Government and the Ministry of Oil has always been that export of all Iraqi petroleum is within the exclusive mandate of the Ministry of Oil through its marketing body SOMO as per the applicable law of Iraq which has continued since the Iraqi Constitution of 2005. Any attempts to export Iraqi petroleum except by SOMO are therefore illegal and void.
>
> 3. The contents of your letter is rejected and we hereby instruct you to cease and desist from all illegal activities in connection with attempts to export Iraqi petroleum and to immediately stop collusion with the provincial government of Kurdistan in this respect.
>
> 4. The Ministry of Oil has already commenced legal actions against the provincial government of Kurdistan in respect its

---

[37] Exhibit C-169

illegal activities as well as the seizure of assets in international courts. We are committed to prosecuting all violators involved in the smuggling of Iraq petroleum including transporters, shippers, intermediaries and buyers that assist the provincial government of Kurdistan, who are all at risk for substantial legal claims.

140.    It seems to us that the explanation for Dr Hawrami's evidence that Dana could export through SOMO is in a footnote to his second witness statement, where he says:

When I say "through SOMO", I mean a procedure where SOMO takes, ships, and sells petroleum, and the contractor and the Kurdistan Region are paid through the federal budget process and the KRG's arrangements.[38]

141.    This is a description of the *"silfa"* arrangements.[39]  But in our opinion these were dealings between the KRG and FGI and did not constitute exports by Dana within the meaning of BP [7]. There were no contracts between Dana and international purchasers.

142.    As we consider that political and governmental action on the part of the FGI left Dana unable to export its products, we do not need to consider whether such action on the part of other governments would also have prevented it from getting them through Turkey or Iran.  There was however a good deal of evidence on these questions and so we shall say something about them.

Turkey

143.    Between 2006 and 2012 the Turkish government did not permit the transit from Kurdistan through Turkey of petroleum products (including condensates and LPGs) otherwise than through the ITP.[40]  There was no law, which made it illegal. The government simply did not allow it.

144.    In 2011 the Cabinet made a decree ("the Decree Law"), which declared in general terms the import or transshipment of condensates or LPGs into or through Turkey to be prohibited, but allowed the possibility of a licence being granted by the Ministry if it was "to the benefit of the country".  As mentioned above[41], such a licence has been granted to Powertrans and no one else.

145.    Mr Ümit Hergüner, who gave expert evidence on Turkish law for the KRG, said that Dana could have applied for a licence under the Decree Law.[42]  Applicants had to be Turkish companies, but there was no reason why Dana should not incorporate a Turkish subsidiary. No doubt as a matter of law this is true, but the grant of a licence under the Decree Law is a matter of political discretion and we think it highly improbable that such a licence would have been granted to a Dana subsidiary. Powertrans has a lucrative monopoly, which no other Turkish company has been able

---

[38] 2 Hawrami paragraph 12, footnote 2.
[39] See paragraph 135 above.
[40] Hergüner Report, paragraph 32;
[41] Paragraph 136.
[42] Hergüner Report paragraph 20.

to break into.

146. In the alternative, Mr Hergüner says that Dana could have contracted with Powertrans to carry its condensate and LPG through Turkey for export elsewhere. This is a matter which has some history. Powertrans started transporting condensate from Khor Mor in August 2012. The arrangements were made by the KRG, as part of a barter arrangement by which condensate was exchanged for diesel and kerosene.[43] Dana was obviously not a party to these arrangements and Dr Hawrami says that "the agreement contained no commitment that the proceeds of the condensate sales made through Powertrans would be passed through to Dana."[44] However, he says that there was no reason why Dana should not have entered into direct arrangements with Powertrans and exported its condensate through Turkey.

147.   On 8 November 2012 Mr Makkawi met Dr Hawrami in his office in Erbil. He made a file note of the meeting but Dr Hawrami does not appear to have done so. Mr Makkawi's note[45] recorded that he had -

> "said that the Operators are ready to take over the arrangements of exports and transfer of condensate through Turkey and selling it to the international markets. AH said that this is not possible for many reasons. AH mentioned that the whole process is done on verbal basis, and that there are no contracts between KRG and any Turkish party. It is as if the condensate is given free of charge….Also, AH added that the process is politically sensitive and can stop at very short notice."

148.   Dr Hawrami says that he never said that Dana should not deal directly with Powertrans and that Mr Makkawi's file note was "created for purposes other than proving a true and accurate record of the content of our meetings."[46]

149.   We note that Dr Hawrami's first two witness statements, dated 18 April 2014 and 5 May 2014 respectively, make various suggestions as to how Dana might have exported its condensate (e.g. through SOMO) but make no reference to the possibility of contracting with Powertrans. Only in his third statement of 27 July 2014, in support of an application to discharge the Tribunal's order on interim measures, does he say that Dana is (and always has been) free to do so. It seems to us improbable that if Dana had been free to export by this means and receive the money itself instead of having to pursue the KRG for payments, it would not have done so.

150.   After Dr Hawrami's statement that the Claimants were free to enter into contractual arrangements with Powertrans, Mr Makkawi wrote inviting them to do so.[47] Powertrans replied:[48]

> "Regrettably inform you that our permission given by the Turkish official authorities clearly do not cover any 3rd party transaction

---

[43] 1 Hawrami, paragraph 141.
[44] 1 Hawrami paragraph 139.
[45] Exhibit C-95
[46] But see Exhibit C-189
[47] Exhibit C-184
[48] Exhibit C-189

instead of MNR of KRG to export crude oil and condensate from Iraq."

151.    Dealings between Dana and Powertrans would require a new permission, supported by a "legal authorization document" from the KRG. Mr Makkawi asked Powertrans for a draft of an acceptable document but nothing seems to have come. On 15 February 2015 Mr Makkawi wrote to Dr Hawrami asking for his assistance.[49] If Powertrans was unable to obtain the necessary permission, would the KRG sell the condensate to Powertrans and direct that the proceeds be remitted to Dana? On 17 February 2015 Dana also wrote to Powertrans inviting a bid for its condensate.[50] Neither of these communications appears to have received a reply.

152.    The Tribunal finds on the balance of probabilities that, for governmental and political reasons, Dana was at no time able to sell its products to Powertrans or otherwise have its products exported through Turkey.

Iran

153.    The Claimants say that, in addition to the prohibition on oil exports by the FGI, they were in practice unable to export through Iran because of the threat of US sanctions. We had the benefit of expert evidence on US sanctions law by, on behalf of the Claimants, William B. Hoffman, who was Chief Counsel to the Office of Foreign Assets Control in Washington, which was responsible for legal interpretation and advice to the US Government on all issues of US economic sanctions, and, on behalf of the KRG, from Douglas N. Jacobson, a US lawyer with extensive experience of sanctions law.

154.    There was little difference between the experts about the terms of US law. The difference related to the extent to which the Claimants ran a risk of it being invoked against them. It is agreed that primary sanctions, which prohibit persons subject to US jurisdiction from doing various acts in relation to Iran (including transiting goods across its territory) do not apply to any of the Claimants because they are not subject to US jurisdiction. However, the US government has a wide discretion to apply various indirect "secondary sanctions," such as blocking US located assets or denying access to the dollar banking system to foreign persons who are considered to have acted in a way contrary to the policy of the sanctions. Mr Jacobson thinks that there is little risk of such sanctions being invoked and Mr Hoffman thinks the risk is one, which the Claimants were right to take seriously.

155.    Clearly a Kurdistan trucking company with no assets in the United States and no need for a dollar banking account will have no fear of US secondary sanctions. But the Claimants, as an international oil and gas company, are not in that position. Mr Hoffman also makes what seems to us to be the valid point that the US Government is likely to exercise its wide discretion under the secondary sanctions legislation in accordance with its general foreign policy in the Middle East. That includes support for the FGI and discouragement of oil exports without FGI consent. He referred to a briefing on 10 June 2014 at which the State Department spokesman said:[51]

---

[49] Exhibit C-383
[50] Exhibit C-384
[51] Exhibit WH-21.

"[O]ur position…has been clear and longstanding in that we don't support the export or sale of oil, absent the appropriate approval of the Federal Iraqi Government. And as you know, this exposes those who are undergoing this effort to potentially serious legal risk".

156.    Likewise, a former State Department official wrote in the *New York Times* in July 2014:

"U.S. policy has not changed… [It] remains: preserve the territorial integrity of Iraq, promote a political unity among the three major factions and oppose the K.R.G. flouting that unity by marketing its oil over Baghdad's objections."

157.    It is clearly difficult in the circumstances to separate potential enforcement of the FGI's policy in prohibiting exports from the US policy of reinforcing that policy by the use of secondary sanctions against exporters through Iran. But taken together they seem to us the risks of the very kind against which BP [7] was intended to protect Dana.

158.    The KRG also submits that the acts of the US Government do not fall with BP [7] because it was not a "neighbouring" government. However, firstly, the clause says that government "includes" neighbouring governments but is not confined to them; secondly, we think that US sanctions were "political" acts and thirdly we think that the position of the FRG was sufficient to make Dana unable to export within the meaning of BP [7].

159.    In summary, therefore, we find that the Claimants were at all material times unable to export their condensates and LPG within the meaning of BP [7].

160.    We note in conclusion that in addition to its claim that the KRG was obliged to buy its condensates and LPG, the Claimants also allege that the KRG actually bought them upon the terms of BP [7]. This latter claim is thus one for the price of goods sold and delivered rather than for damages for non-acceptance under a contract of sale created by BP [7]. Whether the alternative claim is valid is not one of the issues directed to be tried at this stage.

   (d) **"What was the meaning of "at international FOB Med market prices as quoted by Platts Oilgram Report" in [BP [7]]."**

Prices of Condensate

*(1)    Positions of the parties*

161.    There is no dispute that Platts Oilgram has never quoted FOB Med market prices for condensate. The Claimants say that the words must therefore mean a price determined by reference to the most suitable proxy or comparable among quoted FOB Med prices. They submit, with the support of their expert witness Mr Moyes, that the Kirkuk Crude is a suitable proxy for Khor Mor condensate. They rely on the fact that

a substantial quantity of Khor Mor condensate (27% of production) has in fact been sold as Kirkuk Crude and realized the FOB Med market price for Kirkuk Crude. It has been taken to the Jambur Terminal of the ITP and there blended with the crude flowing to Ceyhan, where the undifferentiated mixture is sold by volume as Kirkuk Crude.

162.    The KRG says that as Platts Oilgram has no quotation for condensate, the clause fails for uncertainty. There is no contract of sale but Dana is entitled to a quantum meruit for condensate delivered to the KRG.[52] Alternatively, it says that Kirkuk Crude is not a suitable proxy and that an adjusted naphtha price should be used instead. Its expert witness, Mr Robert Snell, says that condensate is not Kirkuk Crude and should not be priced as such.[53] "Condensate prices would vary based on location, quality, timing and other factors". He goes on to say that –

> "Determining an appropriate price involves an analysis of actual component yield, transportation costs, tariffs and other government rents, as well as refinery asset configurations and constraints associated with spot refinery economic optimization. Based on a combination of all these factors, condensate prices vary drastically from buyer to buyer and region to region."[54]

*(2)    Opinion of the Tribunal*

163.    We reject the submission that the clause is void for uncertainty. The parties, as persons experienced in the oil and gas industry, must have known perfectly well that there was no quotation for condensate. It was part of the background to the HoA. But they must have intended the clause to mean something and the function of the Tribunal is to declare what they would reasonably have been taken to mean. In our view, their meaning is clear enough.

164.    Mr Snell is of course quite right when he says that you cannot discuss the value of condensate at any given time and place without knowing all the facts, which go to determine that value. But the question is not whether the prices quoted by Platts for Kirkuk Crude accurately reflect the value of all kinds of condensate at all times, places and circumstances, but whether using them as a proxy would reflect the particular intention of the parties as expressed in BP [7].

165.    It appears that when the first condensate was lifted by direction of the KRG, Dana had some internal discussions about how it should be priced in accordance with BP [7]. Mr Zaydoon Abdulazeez, who was at that time Marketing Director for Dana and Crescent in Erbil, wrote a paper recommending that as the condensate consisted largely of naphtha, it should be priced by reference to naphtha FOB Med quotations as quoted by Platts. His superior Mr Watts at first accepted this recommendation, but subsequently, on the advice of Mr Neil Chandi in Sharjah, adopted Kirkuk Crude instead. Mr Abdulazeez says in evidence on behalf of the KRG that there was no logic in this choice and Mr Watts adopted it because there had been a fall in the price of naptha (these events occurred at the onset of the global financial crisis) and he

---

[52] Post-hearing submissions, paragraphs 101-102.
[53] 1 Snell paragraph 18.
[54] 1 Snell paragraph 21.

wanted to obtain a higher price. We are not however concerned with the motives for adopting Kirkuk Crude as the appropriate proxy. As a matter of construction of the HoA, it was either right or wrong.

166.    It is therefore necessary to ask what was the purpose of specifying a quoted international price in BP [7]. In general terms that is in our opinion clear. If Dana was unable to export, the KRG was to pay the price Dana would have obtained if it had been able to do so. Furthermore, that price is assumed to be capable of determination by reference to FOB Med prices quoted by Platts.

167.    One therefore has to ask: if all had been harmony between the FGI and the KRG and Dana had been free to export, how is it likely to have gone about doing so and what price would it have obtained? The evidence shows that the most likely method of export would have been to take the condensate to the Jambour Terminal, blend it with Kirkuk Crude and have it sold as Kirkuk Crude at Ceyhan. Mr Watts said that the Jambour field had for several decades produced condensate of similar quality to that from Khor Mor. It has generally been commingled with Kirkuk Crude and sold as Kirkuk Crude.[55] Mr Moyes points out that the capacity of the ITP is around 1.6 million barrels a day. Since 2001, the highest throughput has been 459,000 bpd in 2009. There is plenty of room in the ITP for Khor Mor condensate.[56] Furthermore, Mr Moyes said that the 15,000 bpd produced by Khor Mor, as part of the current 250,000 bpd throughput of the ITP, would have very little effect (less than 1.5° API) on the API gravity of the blend sold as Kirkuk Crude.[57] On this evidence, it appears to us that, if Dana had been free to export, selling the condensates as part of Kirkuk Crude would have been the obvious and most efficient way of doing so. It would not have been sold as naphtha.

168.    Accordingly the Tribunal thinks that at all material times with which it is concerned, the Platts FOB Med price for Kirkuk Crude was the correct proxy for exports of Khor Mor condensate. That situation need not continue indefinitely. This is a 25 year contract and there may be future developments which change the way in which Dana would export if it were free to do so and which make it appropriate to use a different proxy.

Prices of LPG

*(1) Positions of the parties*

169.    LPG consists of propane and butane, the latter having the higher molecular weight. Platts publish separate FOB West Med prices for propane and butane. They are expressed by reference to weight rather than volume. As butane is the denser constituent, 60% - 40% propane/butane by weight will be the equivalent of 70%-30% by volume. Those are the average proportions of Khor Mor LPG. The Claimants used these to calculate their prices by treating their LPG as made up of equal parts of propane and butane. Mr Watts explained:[58]

---

[55] 1 Watts footnote 77.
[56] 2 Moyes, paragraph 49.
[57] Mr Moyes was not challenged on these figures and Mr Snell did not disagree with them: *Transcript* Day 5, p. 93.
[58] 1 Watts 94.

"When we were preparing our first invoice for LPG in February 2011, we decided to use the average of the propane and butane prices, corresponding to a 50/50 LPG mixture. This method was adopted for the sake of simplicity because the propane - butane mixture of the LPG would vary from time to time, ranging from a 50/50 split when produced in Joule Thomson mode or increasing to a 60/40 propane/butane split when produced from the cryogenic trains of the LPG plant. Similarly, the prices of propane and butane, as quoted by Platts, vary, one exceeding the other at times and vice versa."

170.    Mr Moyes supported the adoption of this simplified method of calculation, He said that prices of propane and butane follow each other closely and he calculated that between January 2011 (when the Khor Mor plant started producing) and December 2014, the difference in value between a 60%-40% mixture and a 50%-50% mixture was 0.6%.

171.    The KRG says that, as in the case of condensate, BP [7] fails for uncertainty because there is no published price for LPGs as opposed to their constituent elements. Alternatively, the Claimants' Platts calculation is wrong because (i) LPG which is 70% propane and 30% butane (by volume) cannot be sold at the same price as if the constituents were equal[59] (ii) the sulphur content of the Khor Mor LPG is unacceptably high[60] and (iii) the FOB Med price excludes costs of transport, storage, loss in transit and discounts for poor quality.[61]

*(2)    Opinion of the Tribunal*

(i)    Proportions.

172.    We reject the submission that the price mechanism for LPGs is void for uncertainty for the same reason as we did in relation to condensate. There was no challenge to the evidence of Mr Moyes that the prices of propane and butane are, over a long run, so close to each other that the difference between pricing on a 50-50 basis and a 60-40 basis is 0.6%. We think that as Platts prices are by reference to weight, this is the right proportion to compare. But even a comparison with 70-30 produces a price difference of just over 1%. As an average, that seems to us within the margin of permissible error.

(ii)    Sulphur

173.    The ASTM International Standard for sulphur in LPG is 140 ppmw for propane/butane mixes.[62] The assay reports for Khor Mor in 2013 show that that the sulphur content was usually between 30 and 40 ppmw, sometimes higher but never more than 100.[63] The LPG therefore complied with international standards.

---

[59] 1 Snell paragraph 54.
[60] 1 Snell paragraphs 49-50.
[61] 1 Snell paragraphs 51-53.
[62] 1 Watts 81.
[63] 1 Watts 82.

174.    Mr Snell did not challenge the assay reports but said that some domestic markets had stricter requirements. In Turkey, for example, the limit was 50 ppmw. But the price payable under BP[7] is an international price by reference to Platts, which makes no distinction according to the domestic market in which the buyer intends to sell the product.  We therefore think that it is sufficient that the LPG was marketable according to international standards.

175.    In addition, we think it significant that we received no evidence that any Khor Mor LPG had been rejected on the ground of non-compliance with specification. The arguments addressed to us have been entirely theoretical.

(iii)    Transport costs etc

176.    Mr Snell's section on LPGs is headed "Khor Mor LPGs should not be priced at international prices."  Whether they should or not is a matter of the construction of BP [7] rather than for expert evidence. In our opinion, that provision clearly states that the KRG are to pay international prices by reference to those quoted in Platts. There is no provision for a net back or any form of deduction for transport and other incidental costs of selling.

177.    In summary, therefore, the Tribunal considers that a price based upon equal proportions of the Platts FOB West Med prices for propane and butane correctly reflects the intention of BP [7].

(e) **"If the KRG has or was obliged to purchase liquid petroleum products, whether the taking of an account to determine the Claimants' Petroleum Costs and Remuneration Fee is a condition precedent to the Claimants' right to payment of the price of liquid petroleum products which the KRG has purchased or been obliged to purchase."**

178.    This question is based upon two hypotheses: first, that the KRG has actually purchased products and, secondly, that it was obliged to do so.  The second hypothesis therefore assumes that the KRG did not actually purchase. The difference is material because in the first case, the claim is for goods sold and delivered.  In the second, it is for damages for non-acceptance under a contract of sale created by the "put" option in BP [7].  Whether the one or the other was the case is not a question to be decided at this stage of the arbitration.

(1)    Positions of the parties

179.    The Claimants say that they are entitled to receive the "Aggregate Revenues" from sales of Petroleum and Excess Gas.  In that respect, a sale to the KRG under BP [7] is a sale like any other. Under paragraph 4.3 of Annexure 6A they are then accountable on a monthly basis to the KRG for the balance of such revenues after recovery of the Petroleum Costs and the Remuneration Fee.  But that does not mean that the KRG can refuse to pay the price for petroleum which it has purchased until it has been satisfied that it would not be entitled to some payment under paragraph 4.3.

The Claimants can hardly be accountable if they have not received the money in the first place.

180.    The KRG submits that on the true construction of the HoA, it is a condition precedent to its liability to pay the price of any products that there has been a determination of the Petrol Costs and Remuneration Fee. Alternatively, it is entitled to an equitable set-off of the amount for which Dana is accountable against the price due for the products. It relies also upon its proprietary claim under a *Quistclose* trust as a ground for being able to set it off.

*(2)    Opinion of the Tribunal*

181.    This question raises a fairly short point of construction. Under the HoA, Dana becomes owner of the liquid petroleum products at the point of processing: BP [4] of Annexure 2. It can sell those products or, if unable to export, require the KRG to buy them: BP [5] and [7]. Annexure 6A deals with what it must do with the proceeds, defined as the "Aggregate Revenues". Paragraph 4 provides that all Petroleum Costs together with the Remuneration Fee shall be recovered from the Aggregate Revenues. Paragraph 4.3 provides that accounting is to be on a monthly basis, applying the Revenues first to recovery of the Remuneration Fee, then the Petroleum Costs. Whatever remains must be paid to the KRG.

182.    The method of accounting is specified in paragraph 1.3.3. Dana is required to provide the KRG with monthly statements containing information detailed in paragraphs 6-9 and an end-of-year statement in accordance with paragraph 10. Paragraph 1.3.3 provides that each of these statements shall be "considered true and correct" if not contested by the KRG. The procedure for contesting a statement is set out in paragraph 1.5. The KRG is entitled to request an audit of each calendar year within two years after its end. Within six months of the audit request, the KRG may make an audit exception: paragraph 1.5.5. There is then a procedure for agreeing corrections to the statements or, in the absence of agreement, referring the matter to an independent expert. The expert's opinion is not final and a party dissatisfied may refer the matter to arbitration.

183.    In our opinion it is quite impossible to construe these provisions as requiring the taking of an account, which is entirely at the option of the KRG, as a condition precedent to Dana being entitled to claim payment for condensates or LPGs sold to the KRG. The liability of the KRG as buyer to pay the price and its entitlement to an account under Annexure 6A have no connection with each other. That is enough to provide an answer to issue 5. Although the KRG raised the question of set-off, It proposed in closing submissions that we should not deal with it[64] and we shall not do so.

184.    The Tribunal's answer to issue (e) is therefore no.

---

[64] Closing submissions paragraph 123.

(f) "Whether the KRG was entitled to be supplied (at the IPPs or otherwise) free of charge with gas in excess of 200mm scf/day."

*(1)   Positions of the parties*

185.   The Claimants say that under BP [3] of Annexure 2, they are entitled to "take title and market" any "Excess Gas", which is defined to mean "any gas in excess of the specisfication [sic] gas required to be supplied by Dana to the IPP on behalf of the KRG, free of charge." How much gas was required to be supplied? The Claimants say this is to be found in the description of the Khor Mor wells in the "Khor Mor Gas Utilisation Plan" in Annex 3. It lists four development wells drilled in 1989, which are still producing and gives their production rates, which add up to 206.9 MMscf/day. The Appendix then says:

> "Based on the above tests, [the wells in production] appear
> capable of initially delivering the required 200 MMscf/day: 100
> MMscf to each power station. However, detailed test data are not
> available and therefore the sustainability of these rates cannot be
> confirmed. It is therefore proposed that the plans include at least
> two additional wells to improve well distribution and create a
> more balanced and sustainable offtake from the reservoir".

186.   The Claimants say that this description shows that the gas required to be supplied free was 200 MMscf/day. The rest, if any, would be "Excess Gas" which they could sell. The Claimants say that an open-ended obligation to allocate undefined amounts of gas to the IPPs would have been commercially unworkable, rendering the concept of "Excess Gas" meaningless. It would be impossible to enter into a long-term gas sales agreement if one could not know precisely how much gas the KRG might "require" in the future. 200MMscf/day is the only figure to be found in the contract itself: Annexure 3, section 2, page 15; and also section 1, page 14. The IPP requirements as understood in April 2007 were around 200MMscf/day. There is a clear rationale for the 200MMscf/day figure chosen by the parties and incorporated into the contract. It is common ground that the expectation at the time the Contract was signed was that the capacity of Erbil and Bazian would be 500MW each, comprising four 125MW turbo-generators. The 25MMscf/day consumption per turbine spread across four turbines at each of the Erbil and Bazian IPPs is consistent with the 200MMscf/day figure contained in the contract. The existence of 200MMscf/day limit is also consistent with international petroleum industry practice. Dr van Meurs explained that the free gas allocation in the Contract "has the character of a royalty". Such royalty of 200MMscf/day free gas for the life of the Contract is worth billions of Dollars to the KRG. There is therefore nothing commercially unusual or unfair about the free gas allocation agreement between the parties.

187.   The KRG, on the other hand, says that Dana's obligation was simply to send to the power stations at Erbil and Bazian whatever gas they required and could be produced by the "Services" specified in Annexure 3. The reference to 200 MMscf/day in Annexure 3 was intended as an indication of what the power stations would initially need but not as a limitation on the amount of gas, which Dana was obliged to supply. Dana is already fully remunerated for building the plant and its

operating costs, and gets at least an 18% IRR on those costs, or 10% of Aggregate Revenues, out of the condensates and LPGs. At the time when this was agreed the Claimants were aware that the power stations would require in excess of 200MM scf/day. The HoA provides, in Annexure 2, for Dana to recover its costs and earn its Remuneration Fee out of the sales of these condensates and LPGs. Those sales were expected to be so large that the sales of the condensates and LPGs would be such that there would be a large revenue stream for the KRG.

*(2)    Opinion of the Tribunal*

188.    The drafting of the HoA could have been clearer but we think that the KRG is right. Dana was to receive repayment of all its expenses in providing the services in Annexure 3 and a remuneration fee, but the KRG in return was entitled to the gas that Khor Mor produced. As we noted in connection with issue (a), the KRG accepts that it would not be entitled to demand that Dana make further investments at Khor Mor (or anywhere else) to enlarge its gas producing capacity. That would be a Further Services Plan requiring the consent of both parties. But the KRG is in our opinion entitled to whatever gas the Initial Services Plan can produce.

189.    The parties clearly considered what the position would be if the power stations were unable to use all the gas. They provided that in such a case, Dana should be able to sell the gas to third parties or, if unable to sell, to re-inject or flare it. But they do not appear to have contemplated the possibility of a sale to the KRG itself. There are no provisions for determining the price at which such sales would take place. On the contrary,A Dana's obligation was to market the gas on an "arms' length commercial basis" and Annexure 6A says the sales involving the KRG are not to be regarded as at arms' length.

190.    The reference to 200 MMscf/day must in our opinion be seen in its context, which was whether the existing wells of the Khor Mor field could produce enough gas to supply the power stations under construction. It was not a financial provision dealing with the question of whether the KRG should have to pay for gas in excess of that figure. The Tribunal's answer to issue (f) is therefore yes.

(g) **"Whether the HoA expressly provided a fixed timetable for providing the LPG plant and pipeline and, if so, what that timetable was."**

*(1)   Positions of the parties*

191.    The KRG says that the LPG plant and pipeline had to be installed and operational by the end of February 2008. It says that Dana committed to the timetable in Annexure 3. It submits that it is unusual for parties to include in the operative part of a formal agreement a clause which is not intended to have contractual effect of any kind. The Tribunal should start from the presumption that it was intended to have some effect on the parties' rights and obligations: *Dwr Cymru (Welsh Water) v Corus UK Limited* [2007] EWCA Civ 285, at [13]. The sensible construction is that the timetable was intended to be binding. It would be unusual to set out in a formal document a schedule for performance by one of the parties of an

absolutely critical part of the bargain, and to identify specific contingencies which might warrant an extension to that schedule, all of which was included for information only and had no effect on the parties' rights and obligations.

192.    The arguments of the KRG are based on (1) inferences from other provisions of the contract; and (2) surrounding circumstances and discussions. As regards other provisions of the contract, the KRG points in particular to these: (1) Recital G of the HoA; (2) Clause 1, which identifies Dana's obligation in relation to Khor Mor to: "… commence the initial Work Program and related activities for the Khor Mor Gas Utilization Plan as set out in Annexure 3 ('Khor Mor Gas Utilization Plan')"; (3) Clause 3, which provides that Dana has an LPG Plant at its disposal and the date for its completion (July 2007); (4) Clause 4: "The Parties wish to enter into a detailed Service Agreement with a view to producing gas as soon as reasonably possible pursuant to the Khor Mor Gas Utilization Plan (it being understood that production is urgently required on a fast track basis to supply power stations currently under construction in Erbil and Bazian …)"; (5) Annexure 3, which sets out (in Section 5) Dana's promises in relation to the LPG Plant and (in Section 6) a timetable for performance; (6) the existence of *force majeure* provisions for delay in clause 19, which would be unnecessary if the timetable was merely aspirational.

193.    The surrounding circumstances on which reliance is placed include: (1) Dana was aware at the time of the HoA that the KRG contracted with it because of its commitments that it had the LPG Plant immediately available and could provide it according to a time schedule that marked a significant improvement on the industry lead time; (2) the KRG proceeded with Dana, because time was of the essence and Mr Jafar had specifically committed that Dana would provide the LPG Plant and pipeline on an expedited basis; (3) Dana's press release on 15 April 2007 stated: "In addition, Dana Gas was appointed on a service contract basis to develop, process and transport natural gas from the Khor Mor Gas Field on a fast-track basis … in order to provide urgently-needed natural gas supplies to fuel domestic electrical power generation plants currently under construction near Erbil and Suleymania, by January 2008. For this purpose, Dana Gas will be diverting a state-of-the-art gas processing plant currently nearing completion which it had previously acquired for another project, in order to circumvent the typical 2-year lead time required for a new construction"; and (4) shortly after the conclusion of the HoA, the Claimants prepared and forwarded to the KRG a Project Execution Plan which stated that: (a) the "Project Objectives" were to include "provid[ing] urgently-needed natural gas supplies … by January 2008" (p 2); (b) the LPG Plant installation and tie-in to the existing facilities "will be completed by Dec 2007 and the Plant will be ready for testing and precommissioning by January 2008" (p 4); (c) the project would be progressed in accordance with the attached master schedule, which identified 6 February 2008 as the date of "Start-up (First Gas)" (p 2 of the schedule).

194.    The Claimants say that there was no fixed timetable. Annexure 3 contained a "best case" timetable, which was clearly not intended to be contractually binding. Recital E to the HoA acknowledged that Dana's performance was largely in the hands of such subcontractors as it could find to do the work in the then prevailing conditions in Kurdistan:

"The KRG recognizes that work and services performed in the context

of the perceived current legal and political circumstances in Iraq may render engagement of subcontractors for the performance of the Services problematic and which may add elements of additional expense and difficulty, to the performance of the Services."

*(2)       Opinion of the Tribunal*

195.    In our opinion one has only to read the HoA, and in particular the section on Timing in Annexure 3, to see that there is no contractual commitment to a fixed date for completion.  There were hopes and aspirations but no promises. Section 6 refers to a timetable which is "typically" 18 to 20 months, which "may" be reduced, depending upon" deliveries. It envisaged "further definition" of deliveries before a detailed project schedule could be prepared to "confirm that such timings are achievable". The timings were given based on those assumptions. No doubt there was an obligation to do the work within a reasonable time in all the circumstances, but that was all.

196.    The KRG's submissions make copious reference to surrounding circumstances, oral discussions and so forth.  Dana would have been aware that the gas was required as a matter of urgency.  The HoA said so.  But that is not sufficient to give rise to a contractual obligation to complete the work by a particular date.  For that purpose the contract must say so and this contract did not.

**(h) "What was the date by which the HoA required the Claimants to supply gas to the IP?"**

197.    It follows from our answer to the previous issue that there was no specific date by which the HoA required the Claimants to supply gas to the IP.

**(i) "When was the first IPP ready to receive a supply of gas?"**

198.    As there was no specific date by which the HoA required the Claimants to supply gas to the IP, it does not for present purposes matter when it was ready to receive it.

**(j) "Whether the benefit of the HoA was validly (i) novated or (ii) assigned to Pearl"**

*(1)     Analysis*

199.    On 17 October 2007 Dana assigned a 50% interest in the HoA to Crescent.  There is no dispute about the validity of this transaction. Pearl was a BVI company in which Crescent and Dana each held 50% of the issued share

capital.  By an Assignment Agreement dated 5 February 2009[65] Crescent and Dana transferred to Pearl their interest in the HoA and agreed to hold it as trustee for Pearl until it notified Crescent and Dana that it had been recognized by the KRG as owner of the entire legal and beneficial interest in the HoA.

200.  By letter dated the same date Crescent and Dana gave notice to the KRG (in the person of Dr Hawrami) that they had "assigned their benefits and obligations" under the HoA to Pearl.  They also undertook jointly and severally to guarantee the obligations of Pearl.  Dr Hawrami says that he did not consent to the assignment or novation and the Claimants say that he was not asked to consent.  The Claimants were giving notice of an assignment or novation made as of right.

201.  Whether they were entitled to do so depends upon the construction of BP [29] of Annexure 2:

> "No assignment by either Party without approval of the other, such approval not to be unreasonably withheld or delayed. Assignment by Dana to an Affiliated or Associated Company is permitted without prior approval of the KRG."

*(2)    Positions of the parties*

202.  The Claimants say that "assignment" in BP [29] includes a novation. Pearl was an "affiliated company" or an "associated company" and Dana and Pearl were therefore entitled to novate the agreement so that Pearl took over their rights and obligations.  The KRG says that assignment does not include a novation and that in any case Pearl was neither an affiliated nor an associated company.  The purported novation was wholly ineffective.

*(3)    Opinion of the Tribunal*

203.  In our opinion Pearl was an affiliated company of Dana and Crescent, who together jointly constituted the other "Party" to the HoA within the meaning of BP [29]. "Affiliated company" is defined in clause 9 *bis* of the HoA as a "company which is controlled by a Party" and Dana and Crescent jointly controlled Pearl.  Although the 9 *bis* deals with confidentiality and the definition is preceded by the words "for these purposes" it reflects the ordinary meaning of the word and it has not been suggested that it meant something different in BP [29].  Crescent and Dana were therefore entitled to assign to Pearl the benefit of the HoA.  We do not need to decide whether Pearl was also an "associated company".

204.  On the other hand, we do not think that Dana and Crescent were entitled unilaterally to novate the agreement by transferring their liabilities to any off-the-shelf affiliate.  That would be a very improbable construction. Indeed, the unlikelihood of that being the intention of the parties was recognized by Dana and Pearl in their letter notifying the KRG of the assignment, in which they voluntarily guaranteed Pearl's liabilities.  In our

---

[65] Exhibit C-38

opinion, "assignment" in BP [29] means an assignment and not a unilateral novation.

205.   The KRG submits that because the document could not novate the agreement, it was wholly ineffective.[66]  But we do not agree. The purported novation was not unlawful or a breach of contract.  As against the KRG, it simply had no legal effect.  There is therefore no reason why it should not have been an effective assignment. Although the provision that Pearl would take over the liabilities of Dana and Crescent did not affect the KRG, which was not a party to the assignment, there is no reason why it should not have been effective as between the parties. Pearl therefore became primary liable, as between itself and Crescent and Dana, for performing their obligations under the HoA.

   (k) **"If the answer to [issue (j)] (i) or (ii) is no, whether the purported novation or assignment was a breach of contract which caused loss to the KRG."**

206.   The answer to issue (j) (i) was no, but the purported novation can have caused no loss to the KRG.  It was simply ineffective and Dana and Crescent remained liable under the HoA.  In fact, by giving a guarantee in the notice of assignment, they remained liable anyway.

   (l) **"Whether the Claimants disclosed information which they were contractually obliged to keep confidential and, if so, whether the KRG suffer any loss thereby."**

*(1)   Positions of the parties*

207.   When Dana and Crescent sold shares in Pearl to MOL and OMV[67] they disclosed to each of them information concerning the HoA which was prima facie subject to the confidentiality obligation in clause 9 *bis* of the HoA. The KRG say this was a breach of the HoA for which Dana and Crescent are liable in damages or for an account of profits or a notional licence fee.  The Claimants say that they were entitled to make the disclosure under the exception for "bona fide prospective assignees of a participating interest under these HoA".  The KRG says that MOL and OMV were buying shares in Pearl and that this was not a "participating interest under these HoA".  Furthermore, since the purported novation had been invalid, they were not bona fide.

---

[66] Skeleton Argument, paragraph 167.
[67] See paragraph 12 above.

*(2)    Opinion of the Tribunal*

208.    The term "Participating Interest" is not defined and must be inferred from the context.  In our opinion it means an economic interest in the HoA, without regard to the niceties of the corporate structure by which it is created.  MOL and OMV were proposing each to acquire a 10% economic interest in the HoA and in our opinion that meant that they were participants.

209.    The KRG referred us to the judgment of Christopher Clarke LJ in *Excalibur Ventures LLC v. Texas Keystone Inc* [2013] EWHC 2767, in which he held that the term "participating interest" in the contract in that case did not include an "indirect interest".  But the context in that case was entirely different and we do not find it of any assistance.  It only demonstrates the importance of having regard to the context in which language is used.  Likewise, we gained no help from the conflicting expert evidence about what the term "participating interest" would be understood to mean in the industry.  It is not a term of art with a fixed meaning and the question is what it means in this agreement.

210.    The Claimants also contended that MOL and OMV were "associated companies" but in view of our decision on "participating interest" we do not need to decide whether or not they were.

### (m)    "Whether the Claimants are accountable to the KRG for all or part of the profits made on the sale of shares in Pearl to MOL and OMV."

211.    It follows from our answer to issue No 12 that the disclosure of information to MOL and OMV was not a breach of the HoA.  There could be no other basis for a claim to a share of the profits on the sale of the shares and the answer to issue (m) is therefore no.

## X    DISPOSITION

212.    We, Leonard, Lord Hoffmann, Lawrence, Lord Collins of Mapesbury and John Beechey, having read and heard the evidence and the parties written and oral submissions made to us, and having carefully considered the same and for the reasons stated above, make our Second Part Final Award as follows:

(1) We declare that upon the true construction of the HoA and in the events which have happened:

(a) the Claimant Pearl has the exclusive right to develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area until the expiry of the HoA.

(b) the Claimant Pearl acquires title to all or any of the petroleum liquid products which it processes by the Plant built as part of the Services;

(c) the Claimants have at all material times been unable to export and market the LPGs and Condensate by reason of acts of government and/or political

reasons beyond their control within the meaning of BP [7] of Annexure 2

(d) for the period until the date of this award. *"international FOB Med market prices as quoted by Platts Oilgram Report"* in the said BP [7] has meant (i) in respect of condensate, the prices quoted by Platts for Kirkuk Crude at Ceyhan and (ii) in respect of LPG, the Mediterranean prices quoted by Platts for butane and propane on the assumption that the LPG consists of equal quantities by weight of the two liquids;

(e) the taking of an account to determine the Claimants' Petroleum Costs and Remuneration Fee is not a condition precedent to the Claimants' right to payment of the price of liquid petroleum products which the KRG has purchased or been obliged to purchase;

(f) the KRG is entitled to be supplied free of charge at the IPPs at Erbil and Bazian with such gas as may be produced by the plant at Khor Mor constructed in accordance with the Initial Services Plan

(g) the HoA does not expressly provide a fixed timetable for providing the LPG plant and pipeline;

(h) the HoA was validly assigned by Dana and Crescent to Pearl by the assignment agreement of 5 February 2009 but the agreement was not novated and Dana and Crescent remain liable to the KRG to perform (whether by themselves or by Pearl) the obligations created by the HoL.

(i) the purported novation was ineffective but not a breach of contract and caused no loss to the KRG;

(j) the disclosure of information by Dana and Crescent to MOL and OMV was permitted by clause 9*bis* of the HoA on the ground that they were bona fide prospective assignees of a participating interest under the HoA and the disclosure was therefore not a breach of the HoA

2. We reserve to ourselves the determination of all further issues (including costs) arising in this arbitration.

Place of arbitration:   London

John Beechey

Lord Collins of Mapesbury

Lord Hoffmann

June 30, 2015

APPENDIX A

The issues to be determined shall be, upon the true construction of the HoA and in the events which have happened –

(a) Whether the Claimants have the exclusive right to develop and produce Petroleum within the Khor Mor HoA Area and the Chemchemal HoA Area or one of them, and if so, for what period.

(b) Whether the Claimants have title to all or any of the petroleum liquid products processed by the Plant built by the Claimants as part of the Services.

(c) Whether, and if so for what period or periods, the Claimants were "unable to export and market the LPFs Condensates by any act or omission of government (including foreign neighbouring governments) and/or for political reasons beyond the control [of] Dana" within the meaning of point 7 on page 10.

(d) What was the meaning of "at international FOB Med market prices as quoted by Platts Oilgram Report" in point 7 on pager 10?

(e) If the KRG has or was obliged to purchase liquid petroleum products, whether the taking of an account to determine the Claimants' Petroleum Costs and Remuneration Fee is a condition precedent to the Claimants' right to payment of the price of liquid petroleum products which the KRG has purchased or been obliged to purchase.

(f) Whether the KRG was entitled to be supplied (at the IPPs or otherwise) free of charge with gas in excess of 200mm scf/day.

(g) Whether the HoA expressly provided a fixed timetable for providing the LPG plant and pipeline and, if so, what that timetable was

(h) What was the date by which the HoA required the Claimants to supply gas to the IP?

(i) When was the first IPP ready to receive a supply of gas?

(j)     Whether the benefit of the HoA was validly (i) novated or (ii) assigned to Pearl

(k)     If the answer to question (j) )(i) or (ii) is no, whether the purported novation or assignment was a breach of contract which caused loss to the KRG.

(l)     Whether the Claimants disclosed information which they were contractually obliged to keep confidential and, if so, whether the KRG suffer any loss thereby.

(m)     Whether the Claimants are accountable to the KRG for all or part of the profits made on the sale of shares in Pearl to MOL and OMV.